UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK[1]

| | |
|---|---|
| SALIX CAPITAL US INC., | No. 13-cv-4018-NRB |
| Plaintiff, | **AMENDED COMPLAINT** |
| -against- | <u>**JURY TRIAL DEMANDED**</u> |
| BANC OF AMERICA SECURITIES LLC, BANK OF AMERICA CORPORATION, BANK OF AMERICA, N.A., BARCLAYS BANK PLC, BARCLAYS CAPITAL INC., CITIBANK N.A., CITIGROUP GLOBAL MARKETS INC., CITIGROUP GLOBAL MARKETS LTD., CITIGROUP INC., CREDIT SUISSE GROUP AG, CREDIT SUISSE INTERNATIONAL, CREDIT SUISSE SECURITIES (USA) LLC, DEUTSCHE BANK AG, DEUTSCHE BANK SECURITIES, INC., JPMORGAN CHASE & CO., JPMORGAN CHASE BANK, N.A., J.P. MORGAN SECURITIES LLC, f/k/a J.P. MORGAN SECURITIES INC., ROYAL BANK OF SCOTLAND PLC, and UBS AG, | |
| Defendants. | |

---

[1]  Plaintiff has captioned this Amended Complaint using a federal-court caption only because this action has been removed to the United States District Court for the Southern District of New York.  Plaintiff intends to file a motion to remand this action to the Supreme Court of the State of New York.  The federal-court caption should not be construed as a waiver of Plaintiffs' arguments that removal was improper, and that this Court lacks subject matter jurisdiction over this action.

# TABLE OF CONTENTS

NATURE OF THE ACTION ........................................................................................1

PARTIES AND RELEVANT NON-PARTIES ............................................................6

JURISDICTION AND VENUE ................................................................................13

BACKGROUND ......................................................................................................14

    A.    Calculation of Libor.................................................................................14

    B.    Libor Governance ...................................................................................15

    C.    Libor's Role in the Financial Marketplace ............................................16

    D.    Worldwide Investigations into Libor Manipulation .............................19

ALLEGATIONS REGARDING DEFENDANTS' MISCONDUCT .........................21

I.    DEFENDANTS MANIPULATED USD LIBOR .........................................21

    A.    Facts Made Public by Barclays' Settlements.........................................21

    B.    Facts Made Public by UBS's Settlements .............................................26

    C.    Facts Made Public by RBS's Settlements..............................................32

    D.    Defendants' Powerful Motives to Manipulate Libor ............................35

    E.    Statistical Evidence of Consistent and Uniform Suppression................38

        1.    Evidence from comparing Libor's movements to those in the similar Eurodollar deposit rate.................................................38

        2.    Evidence from comparing the banks' USD Libor submissions to those in other currencies ..........................................................40

        3.    Evidence from comparing the bank's submissions to movements in the credit default swap market .................................................41

        4.    Evidence from comparing USD Libor's movements to those in other measurements of the banks' likelihood of default...........46

        5.    Evidence from comparing USD Libor's movements to those in the Federal Reserve's Term Auction Facility .................................48

            6.        Evidence from the stability and bunching of the Libor submissions .........49

      F.      Additional Evidence of Defendants' Wrongdoing ................................52

II.     DEFENDANTS' MISCONDUCT HARMED PLAINTIFF AND ITS ASSIGNORS ..........................................................................................57

      A.      The Funds' Basis Package Investment Strategy ...................................57

      B.      Defendants' Libor Suppression Dramatically Altered the Performance of the Transactions .............................................................................58

      C.      Defendants' Misconduct Breached Many of the Terms of their Swap Contracts .........................................................................................59

      D.      Defendants' Misconduct Also Harmed Salix Capital Ltd. and the Fund Managers ........................................................................................62

III.    PLAINTIFF'S CLAIMS ARE TIMELY ...........................................................63

      A.      No Period Could Begin Until Defendants' Last Bad Act .....................63

      B.      Fraudulent Concealment .....................................................................64

      C.      The *American Pipe* Doctrine Applies to Plaintiff's Claims.................72

FIRST CAUSE OF ACTION ....................................................................................73

SECOND CAUSE OF ACTION ...............................................................................74

THIRD CAUSE OF ACTION ...................................................................................75

FOURTH CAUSE OF ACTION ...............................................................................76

FIFTH CAUSE OF ACTION .....................................................................................78

SIXTH CAUSE OF ACTION ....................................................................................79

SEVENTH CAUSE OF ACTION ..............................................................................80

EIGHTH CAUSE OF ACTION .................................................................................81

NINTH CAUSE OF ACTION ...................................................................................82

TENTH CAUSE OF ACTION ...................................................................................84

ELEVENTH CAUSE OF ACTION ...........................................................................85

TWELFTH CAUSE OF ACTION..............................................................................86

THIRTEENTH CAUSE OF ACTION ..................................................................................87

FOURTEENTH CAUSE OF ACTION ..............................................................................91

FIFTEENTH CAUSE OF ACTION ....................................................................................95

SIXTEENTH CAUSE OF ACTION ....................................................................................96

SEVENTEENTH CAUSE OF ACTION ............................................................................98

EIGHTEENTH CAUSE OF ACTION ..............................................................................99

NINETEENTH CAUSE OF ACTION .............................................................................101

TWENTIETH CAUSE OF ACTION ...............................................................................102

TWENTY-FIRST CAUSE OF ACTION .........................................................................104

PRAYER FOR RELIEF ....................................................................................................105

DEMAND FOR JURY TRIAL .........................................................................................106

Plaintiff Salix Capital US Inc. ("Plaintiff" or "Salix Capital US"), as assignee of: (1) FrontPoint Relative Value Opportunities Fund, L.P. ("FRV"), FrontPoint Volatility Opportunities Fund GP, L.P. ("FVO GP"), FrontPoint Volatility Opportunities Fund, L.P. ("FVO"), and FrontPoint Partners, L.P. ("FPP") (collectively, "FrontPoint," the "FrontPoint Funds," or the "Funds"), and as assignee of (2) Daniel Donovan, Eric Grannan, Thomas Felgner (collectively, the "Fund Managers") and Salix Capital Ltd., by and through its attorneys, Quinn Emanuel Urquhart & Sullivan, LLP, brings this action and alleges as follows:

## NATURE OF THE ACTION

1. Defendants' manipulation of the London Interbank Offered Rate ("Libor") over a period of years has touched every corner of the global economy. Libor provides the interest-rate benchmark for hundreds of trillions of dollars in financial instruments. Participants in the financial markets worldwide tie their obligations to Libor because it is purportedly "a reliable indicator of the state of the money markets,"[2] and thus should ensure that payments made over time will bear a reasonable relationship with current market interest rates. The economic interests at stake in Libor's reliability are enormous: a bias of just one basis point (0.01%) distorts payments on Libor-linked financial products by tens of billions of dollars a year.

2. Defendants were members of a panel of banks established by the British Bankers' Association ("BBA") to determine Libor. The BBA determines Libor each day based on the representations of the panel banks as to the rates at which they could borrow in various currencies on the London interbank lending market. Each Defendant was a member of the panel for U.S. Dollar Libor ("USD Libor").

---

[2] British Bankers' Association, Annual Report (2010).

3.　　The panel banks abused their control over Libor in order to reap massive profits at the expense of investors like the Funds. From at least August 2007 to at least May 2010 (the "Relevant Period"), the panel banks artificially lowered their Libor submissions in an effort to suppress Libor, frustrating the expectations of investors while conferring windfall profits upon themselves.

4.　　For years, the banks deceived the public and government regulators about their conduct. As a result, even extremely sophisticated market participants were unaware of this misconduct at the time it was occurring. Former Chairman of the Federal Reserve, Alan Greenspan, for example, admitted that "what [he] never contemplated was that there were bankers who would purposely misrepresent facts to banking authorities. You were honor-bound to report accurately, and it never entered my mind that, aside from a fringe element, it would be otherwise."[3] The panel banks worked with the BBA to hide their conduct and to engage in a campaign of misinformation to mask the widespread systematic suppression that was occurring. This deception was successful, until finally things began to unravel for the panel banks, but only after the results of investigations by governmental bodies armed with subpoena powers began to leak out in 2011 or later.

5.　　Plaintiff brings claims as assignee of two investment funds, the FrontPoint Funds, which suffered significant harm as a result of the systematic suppression of Libor. Plaintiff also brings claims as assignee of Salix Capital Ltd. and the Fund Managers to recover for losses suffered as a result of Defendants' misconduct, including the loss of compensation and other income Salix Capital Ltd. and the Fund Managers would have received absent Defendants'

---

[3]　Liam Vaughan & Gavin Finch, *Libor Lies Revealed in Rigging of $300 Trillion Benchmark*, Bloomberg, Jan. 28, 2013, *available at* http://www.bloomberg.com/news/2013-01-28/libor-lies-revealed-in-rigging-of-300-trillion-benchmark.html.

efforts to harm the financial performance of the Funds. Defendants in bad faith exploited their control over Libor for their own benefit, at the expense of the FrontPoint Funds and other investors worldwide.

6.      Between December 2007 and February 2008 the FrontPoint Funds entered into a series of interest rate swaps and related transactions. In each swap, the Funds contracted with a particular Defendant periodically to receive floating-rate payments pegged to 3-month USD Libor, in exchange for the Funds periodically paying an amount calculated based on a fixed interest rate. Defendants breached the explicit terms of the governing agreements. The relationships, contracts, purchases, and payments at issue with each Defendant are detailed in the Exhibits to this Complaint, which are all incorporated as if set forth fully herein.

7.      The swaps comprised a crucial part of a package of transactions with the counterparty Defendants referred to as corporate bond basis packages. The Funds simultaneously purchased fixed-rate corporate bonds (funded at a spread to the federal funds rate), credit default swaps ("CDS") referencing and in the same amount as the bonds and interest rate swaps with a notional amount equal or almost equal to the principal amount of the bonds. Each basis package was designed to earn returns on the underlying bond, protected from credit risk by way of the CDS, and protected from interest rate risk and bank counterparty risk by the fixed-to-floating Libor-based interest rate swap.

8.      An important concern for the Funds in entering into these basis packages was protection against the consequences of a banking crisis. Because Libor was supposed to reflect the unsecured borrowing costs of the panel banks, Libor should have increased dramatically in the second half of 2008. That is, as the banks became less creditworthy, their borrowing costs, and thus Libor, would rise. As will be shown below, however, the opposite happened. In the

midst of market turmoil, the panel banks suppressed Libor to protect their reputations, to appear more creditworthy than they actually were, and to earn illicit profits. Defendants' suppression of Libor therefore undermined a trading strategy that would have been successful absent Defendants' fraud.

9. The importance of Libor to these basis packages is also evident in how they were structured. Only two components of each package were variable after the trades were executed: Libor and the federal funds rate. The interest rates received on the bonds, the fixed-rate payments made on the swaps, and the fixed amounts paid on the CDS were all predetermined and could not change. The federal funds rate is an interest rate set by the Federal Reserve and thus not subject to manipulation.

10. Only one other component of these trades was variable: the floating Libor payments received on the swaps. The Defendants—as panel banks—had direct control over that component. The Funds relied on the integrity of how Libor was set and the truthfulness of Defendants' representations about how Libor was set in entering into these transactions. By suppressing Libor, Defendants artificially lowered the amount they were contractually obligated to pay to the Funds under the interest rate swaps, while still demanding that the Funds make the contracted-for (comparatively high) fixed-rate payments. In marketing the basis packages, Defendants misrepresented Libor and omitted to disclose their manipulation of Libor. Had the Funds known Defendants were systematically suppressing Libor (by even as little as ten basis points), they never would have entered into the basis packages in the first instance.[4]

11. Libor's suppression widened substantially in 2008. Because the Funds' purported obligations under the interest rate swaps were increasing as 2008 progressed, Defendants in bad

---

[4] A basis point is one one-hundredth of a percentage point (0.01%).

faith demanded that the Funds post collateral to cover their future obligations under those swaps. By late 2008, the Funds experienced significant mark-to-market losses because of Libor manipulation and satisfying Defendants' collateral calls used up much of the Funds' remaining liquidity.

12.     Neither the Fund managers nor investors understood why the basis packages were performing so poorly, or why the interest rate hedges were ineffective. Nor could they given Defendants' hidden Libor manipulation. As a result of these losses, in late 2008 the Funds were confronted with large redemption requests. The Funds were forced to fulfill these redemption requests in a period of extreme market illiquidity, causing them to suffer even greater losses.

13.     As a result, in late 2008 the Funds were forced to liquidate much of the bond portfolio at depressed prices and terminate many of their interest rate swaps, incurring even more losses as their trades were unwound amid a period of extreme Libor suppression. When interest rate swaps are terminated, the termination payment is calculated by using discount factors calculated from the relevant Libor forward curve at the time of the termination. At any given point in time the 3-month Libor forward curve represents the market's view of where Libor will be fixed at 3-month intervals in the future. When the Funds terminated the swaps in November and December 2008, the Libor forward curves during that period projected low Libor rates for the remaining terms of those swaps based upon the prevailing suppressed Libor rates.

14.     Therefore the Funds were effectively forced to lock in an artificially suppressed level of Libor for the remaining terms of the swap transactions, in many cases five to ten years. This resulted in the Funds making termination payments that were artificially and materially inflated in connection with the swap unwinds. Faced with fraudulent collateral calls, inflated

termination payments, and mounting redemption requests, the Funds ultimately had no choice but to shut down in 2009.

**PARTIES AND RELEVANT NON-PARTIES**

15. ***Plaintiff Salix Capital US.*** Plaintiff Salix Capital US Inc. is a Delaware corporation with its principal place of business in New York, New York.

16. ***Relevant Non-Parties: The FrontPoint Funds.*** Salix Capital US brings claims as assignee of the FrontPoint Funds pursuant to the terms of an Amended and Restated Assignment of Claim Agreement between Salix Capital US and the FrontPoint Funds:

    (a)    FrontPoint Relative Value Opportunities Fund, L.P. ("FRV"), formerly known as FrontPoint Fixed Income Opportunities Fund, L.P. ("FIO"), is a limited partnership organized under the laws of Delaware with its principal place of business in Greenwich, Connecticut. Its general partner is FrontPoint Relative Value Opportunities Fund GP, LLC, a limited liability company organized under the laws of Delaware and, until March 1, 2011, an indirect wholly owned subsidiary of Morgan Stanley.

    (b)    FrontPoint Volatility Opportunities Fund, L.P. ("FVO") was a limited partnership organized under the laws of the Cayman Islands with its principal place of business in Greenwich, Connecticut. Its general partner was FrontPoint Volatility Opportunities Fund GP, LLC, a limited liability company organized under the laws of Delaware and, until March 1, 2011, an indirect wholly owned subsidiary of Morgan Stanley.

    (c)    FrontPoint Volatility Opportunities Fund GP, L.P. ("FVO GP") was a limited partnership organized under the laws of Delaware with its principal place of business in Greenwich, Connecticut. Its general partner was FrontPoint Volatility Opportunities Fund GP, LLC, a limited liability company organized under the laws of

Delaware and, until March 1, 2011, an indirect wholly owned subsidiary of Morgan Stanley.

(d)     FrontPoint Partners, L.P. ("FPP") was a limited partnership organized under the laws of Delaware with its principal place of business in Greenwich, Connecticut. Its general partner was FrontPoint Partners LLC ("FrontPoint Partners"), a limited liability company organized under the laws of Delaware and, until March 1, 2011, an indirect wholly-owned subsidiary of Morgan Stanley.

17.     ***Relevant Non-Parties: Salix Capital Ltd. and the Fund Managers.*** Salix Capital US also brings claims as assignee of Salix Capital Ltd. and the Fund Managers pursuant to the terms of an Assignment of Claim Agreement between Salix Capital US, Salix Capital Ltd., Daniel Donovan, Eric Grannan, and Thomas Felgner:

(a)     Salix Capital Ltd., formerly known as GDG Asset Management Ltd. ("GDG"), was an Irish corporation with its principal place of business in Dublin, Ireland. Salix Capital US was a sub-advisor to Salix Capital Ltd. Salix Capital Ltd. served as sub-advisor to the FrontPoint Funds at all relevant times pursuant to investment management agreements.

(b)     Daniel Donovan, a resident of Ireland, was the chief executive officer of Salix Capital Ltd., and was the chief executive officer of GDG throughout the Relevant Period.

(c)     Eric Grannan, a resident of New York, was an employee of FrontPoint Partners during the Relevant Period. During the Relevant Period, Grannan worked at an office located in New York and was responsible for, among other things, trade executions and portfolio management for the Funds.

(d)     Thomas Felgner, a resident of California, was an employee of FrontPoint Partners during the Relevant Period. During the Relevant Period, Felgner worked at an office located in New York and was responsible for, among other things, trade executions and portfolio management for the Funds.

18.     All of the transactions at issue were executed by Eric Grannan and Thomas Felgner, two Fund managers at FrontPoint Partners' office in New York. Grannan and Felgner were authorized to receive information, investigate, make investment decisions, and carry out trades on the Funds' behalf in New York. Though Daniel Donovan, the chief executive officer of Salix Capital Ltd., sometimes executed transactions on behalf of the Funds out of Ireland, he did not execute any of the transactions at issue in this case. (Specifically, Donovan executed certain Euribor-related transactions, none of which are at issue in this case, which focuses entirely on Libor-related transactions.)

19.     Defendants solicited the Funds' investments in New York. The offers for the Funds to buy the bonds and enter into the swaps and CDS were directed to Grannan and Felgner in New York. These transactions were marketed as "basis packages."

20.     New York-based traders reviewed Defendants' offers, negotiated the swap contracts, and decided to enter the transactions in New York. The trades were initiated and executed on the Funds' behalf in New York. Once the trades were executed, confirmations were received by e-mail and via Bloomberg terminals in New York. After the investments had been made, the securities and derivatives were held by Defendant Credit Suisse, the prime broker for the Funds, in New York.

21.     Grannan and Felgner also managed the Funds' portfolios in New York. This included decisions to retain, sell, terminate, or otherwise dispose of securities and derivatives

held by the Funds, including the bonds, swaps, and CDS at issue here. As such, the investment activity at issue in this Complaint took place exclusively in New York.

22.    The offering memoranda for the Funds were also prepared in and distributed out of New York, including to numerous New York investors.

23.    ***Defendants.*** All of the Defendants, or their affiliates, were USD Libor panel banks during the Relevant Period. Most of the Defendants, or their affiliates, were also transactional counterparties with the Funds for the interest rate swap and bond transactions, as detailed in the Exhibits.

24.    ***The Bank of America Defendants.***

(a)    Defendant Bank of America Corp. ("BAC") is a Delaware corporation headquartered in Charlotte, North Carolina and the parent of the other Bank of America defendants.

(b)    Defendant Bank of America, N.A. ("BANA") is a federally chartered national banking association headquartered in Charlotte, North Carolina.

(c)    Defendant Banc of America Securities LLC ("Banc of America Securities") is a Delaware limited liability company with its principal place of business in New York, New York.

(d)    BAC and/or BANA was at all relevant times a member of the USD Libor panel.

(e)    Defendants BAC, BANA, and Banc of America Securities are collectively referred to herein as "Bank of America."

(f)    Bank of America participated in the unlawful conduct alleged in this Complaint both directly and through its subsidiaries and affiliates.

9

25. *The Barclays Defendants.*

(a)     Defendant Barclays Bank plc is a British public limited company headquartered in London, England.

(b)     Defendant Barclays Capital Inc. ("Barclays Capital") is a registered broker-dealer incorporated under the laws of Connecticut and has its principal place of business in New York, New York.

(c)     Barclays Bank plc was at all relevant times a member of the USD Libor panel.

(d)     Defendants Barclays Bank plc and Barclays Capital are collectively referred to herein as "Barclays."

(e)     Barclays participated in the unlawful conduct alleged in this Complaint both directly and through its subsidiaries and affiliates.

26. *The Citi Defendants.*

(a)     Defendant Citigroup, Inc. is a Delaware corporation headquartered in New York, New York.

(b)     Defendant Citibank, N.A. is a federally chartered national banking association headquartered in New York, New York, and is a wholly owned subsidiary of Citigroup, Inc.

(c)     Defendant Citigroup Global Markets Limited ("CGML"), a United Kingdom company headquartered in London, is an indirect wholly owned subsidiary of Citigroup, Inc.

(d)     Defendant Citigroup Global Markets Inc. ("CGMI"), a New York corporation with its principal place of business in New York, New York, is an indirect wholly owned subsidiary of Citigroup, Inc.

(e)     Citigroup, Inc. and/or Citibank, N.A. was at all relevant times a member of the USD Libor panel.

(f)     Defendants Citigroup, Inc., Citibank, CGML, and CGMI are collectively referred to herein as "Citi."

(g)     Citi participated in the unlawful conduct alleged in this Complaint both directly and through its subsidiaries and affiliates.

27.     *The Credit Suisse Defendants.*

(a)     Defendant Credit Suisse Group AG is a Swiss company headquartered in Zurich, Switzerland.

(b)     Defendant Credit Suisse International ("CSIN"), a United Kingdom company headquartered in London, is an indirect wholly owned subsidiary of Credit Suisse Group AG.

(c)     Defendant Credit Suisse Securities (USA) LLC ("Credit Suisse Securities") is a Delaware limited liability company with its principal place of business in New York, New York, and is an indirect wholly owned subsidiary of Credit Suisse Group AG.

(d)     Credit Suisse Group AG was at all relevant times a member of the USD Libor panel.

(e)     Defendants Credit Suisse Group AG, CSIN, and Credit Suisse Securities are collectively referred to herein as "Credit Suisse."

11

(f)     Credit Suisse participated in the unlawful conduct alleged in this Complaint both directly and through its subsidiaries and affiliates.

28.     *The Deutsche Bank Defendants.*

(a)     Defendant Deutsche Bank AG is a German financial services company headquartered in Frankfurt, Germany.

(b)     Defendant Deutsche Bank Securities Inc. ("Deutsche Bank Securities") is a Delaware corporation and registered broker-dealer with its principal place of business in New York, New York, and is an indirect wholly owned subsidiary of Deutsche Bank AG.

(c)     Deutsche Bank AG was at all relevant times a member of the USD Libor panel.

(d)     Defendants Deutsche Bank AG and Deutsche Bank Securities are collectively referred to herein as "Deutsche Bank."

(e)     Deutsche Bank participated in the unlawful conduct alleged in this Complaint both directly and through its subsidiaries and affiliates.

29.     *The JPMorgan Defendants.*

(a)     Defendant JPMorgan Chase & Co. is a Delaware corporation headquartered in New York, New York.

(b)     Defendant JPMorgan Chase Bank, N.A., is a federally chartered national banking association headquartered in New York, New York, and is a wholly owned subsidiary of JPMorgan Chase & Co.

(c)      Defendant J.P. Morgan Securities LLC ("JPMorgan Securities") is a Delaware limited liability company with its principal place of business in New York, New York, and is an indirect wholly owned subsidiary of JPMorgan Chase & Co.

(d)      JPMorgan Chase & Co. and/or JPMorgan Chase Bank, N.A., was at all relevant times a member of the USD Libor panel.

(e)      Defendants JPMorgan Chase & Co., JPMorgan Chase Bank, N.A., and JPMorgan Securities are collectively referred to herein as "JPMorgan."

(f)      JPMorgan participated in the unlawful conduct alleged in this Complaint both directly and through its subsidiaries and affiliates.

30.     ***The RBS Defendant.***  Defendant The Royal Bank of Scotland plc ("RBS") is a United Kingdom public limited company headquartered in the United Kingdom and a wholly-owned subsidiary of non-party The Royal Bank of Scotland Group plc. RBS was at all relevant times a member of the USD Libor panel.

31.     ***The UBS Defendant.***  Defendant UBS AG ("UBS") is a Swiss company based in Basel and Zurich, Switzerland. UBS was at all relevant times a member of the USD Libor panel.

32.     ***Other relevant non-parties.***  In addition to Defendants, various other entities and individuals participated in, conspired with Defendants in furtherance of, and performed acts and made statements that aided and abetted and furthered the unlawful conduct alleged herein.

## JURISDICTION AND VENUE

33.     This action was originally filed in the Supreme Court of the State of New York, New York County, on May 20, 2013. Jurisdiction of the New York Supreme Court was founded upon CPLR §§ 301 and 302. Defendants do business in or derive substantial revenue from activities carried out in the State of New York. Defendants also engaged in significant business activity in New York as it pertains to the transactions at issue, including offering, negotiating,

and marketing the bonds, interest rate swaps, and CDS, and entering into trades with Fund managers located in New York. Venue is proper in New York County pursuant to CPLR § 503(a).

34.     On June 12, 2013, The Royal Bank of Scotland Group plc, which is no longer a party, and Defendants Bank of America, Citi, and JPMorgan removed this action to the United States District Court for the Southern District of New York on the purported grounds that removal is proper under the Foreign Sovereign Immunities Act, 28 U.S.C. §§ 1330, 1441(d), and the Edge Act, 12 U.S.C. §§ 611, *et seq*. Plaintiff intends to file a motion to remand this action back to state court.

## BACKGROUND

### A.     Calculation of Libor

35.     Libor is supposed to be the average interest rate at which lending banks in London could borrow from other banks in a reasonable amount in the interbank market. It is based on a survey of a panel of banks asking the question: "At what rate could you borrow funds, were you to do so by asking for and then accepting inter-bank offers in a reasonable market size just prior to 11 a.m.?" The BBA publishes rules purporting to govern the way that the panel banks determine their submissions. Submissions were not to be based on anything other than a truthful answer to the aforementioned question. Defendants publicly claimed they abided by the BBA's rules and based their submissions on their cost of funds in the London interbank market without reference to rates submitted by other Panel banks or the pricing of any derivative financial instrument.[5]

---

[5]     *See* Letter from Denis J. McInerney, Chief, Fraud Section, Criminal Division, United States Department of Justice, Appendix A (Dec. 18, 2012) ("UBS SOF") ¶ 7; BBA, *Welcome to bbalibor, the Basics*, http://www.bbalibor.com/bbalibor-explained/the-basics; BBA, *Welcome to*

36.     Libor is calculated for different borrowing periods and currencies, each of which had its own panel of banks. Defendants were all members of the USD Libor panel during the Relevant Period.

37.     The panel banks submit their rates every London business day electronically to Thomson Reuters, the agent of the BBA. They are not supposed to know the rates being submitted by other banks. Once each bank has submitted its rate, the submitted rates are ranked. During the relevant period, for USD Libor, the highest and lowest four were excluded (to lessen the impact of outliers), with the rest being averaged to calculate the official rate that would be published.

38.     Thomson Reuters then electronically communicates the official rates—called the Libor "fixings"—to the BBA's licensees, including companies located in the United States such as *The Wall Street Journal* and *Bloomberg News*, who then further publish the rate. Defendants' submissions are also transmitted through the BBA's licensed data vendors. Libor and Defendants' submissions were published on a daily basis.

**B.     Libor Governance**

39.     The BBA is governed by a board of member banks that meets four times each year. The board is composed of senior executives from twelve banks, including Defendants Barclays, Citi, Credit Suisse, Deutsche Bank, JPMorgan, and RBS.

40.     Through 2010, the Foreign Exchange and Money Markets Committee of the BBA had responsibility for Libor. Thirteen "active market participants" comprised this committee. Although the BBA does not disclose who is on this committee, UBS and RBS have admitted that

---

*bbalibor, Setting bbalibor,* http://www.bbalibor.com/technical-aspects/setting-bbalibor; BBA, *Welcome to bbalibor, Definitions,* http://www.bbalibor.com/bbalibor-explained/definitions.

they were represented.[6] Other Defendants also served on the committee. The chair and two deputy chairs were representatives from the panel banks. Though the committee met at least every two months, it did so at undisclosed locations, and did not publish official minutes.

41.    In January 2010, potentially in an effort to limit its liability, the BBA created a new entity, BBA LIBOR Ltd., to assume responsibility for the day-to-day running of the benchmark.[7]

42.    In September 2012, an independent panel recommended that the BBA be stripped of its role in Libor rate setting. Martin Wheatley, head of the United Kingdom's Financial Services Authority ("FSA"), noted at the time, "the BBA acts as the lobby organization for the same submitting banks that they nominally oversee, creating a conflict of interest that precludes strong and credible governance." In February 2013, the BBA agreed to cede control of Libor to a new operator.

## C.    Libor's Role in the Financial Marketplace

43.    As seen above, Libor was held out as a representation of the true borrowing costs of the panel banks in a given day's economic environment, and it was understood by investors to be just that. The BBA has acknowledged that Libor "has always been relied on by the market at a reliable benchmark."[8]

---

[6]    UBS SOF ¶ 85; Financial Services Authority, Final Notice to UBS AG, FSA 186958, ¶ 122 (Dec. 19, 2012) ("UBS FSA Final Notice"); Financial Services Authority, Final Notice to the Royal Bank of Scotland, FSA 121882, ¶ 89 (Feb. 6, 2013) ("RBS FSA Final Notice").

[7]    *See* David Enrich & Max Colchester, *Before Scandal Clash over Control of Libor*, Wall St. J., Sept. 11, 2012, *available at* http://online.wsj.com/article/SB10000872396390443847404577631404235329424.html.

[8]    BBA, *Libor Gets Enhanced Governance and Scrutiny Procedures*, http://www.bbalibor.com/news-releases/libor-gets-enhanced-governance-and-scrutiny-procedures.

44.    The BBA has correctly observed that Libor is "the primary benchmark for short term interest rates globally."[9] Libor was used as a benchmark for many types of transactions to calculate floating interest rates that reset at regular intervals to reflect changing market and credit conditions. A variety of financial instruments—from home mortgages to interest rate swaps—have terms expressing interest rates as Libor plus $x$ basis points ("bps"). Swaps, forwards, futures, options, and other derivatives traded in over-the-counter markets and on exchanges worldwide are priced and settled based on Libor.

45.    As the Department of Justice ("DOJ") explained in its December 19, 2012 Statement of Facts regarding Libor-related misconduct at UBS ("UBS SOF"): "Because of the widespread use of LIBOR and other benchmark interest rates in financial markets, these rates play a fundamentally important role in financial systems around the world." Defendants knew that, given the vast universe of financial instruments Libor impacts, "even a small manipulation" of the rate "could potentially distort capital allocations all over the world."[10]

46.    Corporate debt frequently pays—and all of the relevant bonds purchased by the Funds paid—interest at a fixed rate. This subjects bond investors to interest rate risk, because changes in interest rates over time make fixed-rate investments comparatively more or less valuable. Prudent investors often hedge this risk by entering into interest rate swaps, which typically involve one party agreeing periodically to make payments based on a fixed-rate interest calculation, in exchange for the other party's agreement to make payments based on a floating-

---

[9]    BBA, *Welcome to bbalibor, the Basics*, http://www.bbalibor.com/bbalibor-explained/the-basics.

[10]    Rosa M. Abrantes-Metz & Albert D. Metz, *How Far Can Screens Go in Distinguishing Explicit from Tacit Collusion? New Evidence from the Libor Setting*, CPI Antitrust Chronicle, Mar. 2012.

rate interest calculation.[11] Here, the Funds used fixed interest payments received on the bonds to fund corresponding fixed payment obligations under the interest rate swaps.

47.    As a concrete example, consider an investor who pays $10 million for a bond with a principal amount of $10 million (also known as a "par bond") which pays interest at a fixed rate (or "coupon") of 4%. The investor could convert this into a floating rate instrument by paying the fixed leg of an interest rate swap on the same notional amount of $10 million. Assume that the floating leg of the swap is set by reference to 3-month Libor. If at that point in time the market rate for a swap with the same maturity as the bond happened to be 4%, then the payments on the swap would exactly match the interest received on the bond, leaving the investor with a floating rate instrument where he would receive payments corresponding to 3-month Libor fixings. The fixed bond and swap payments will not often net to zero, but the principle is the same: the swap substantially eliminates the long term interest rate risk of the bond, replacing it with an exposure to the level of short term Libor rates. If under this interest rate swap Libor then rises to 6%, the investor will receive the net 2% from its counterparty, which when added to the bond coupon of 4% gives a net receipt of 6%. If Libor subsequently falls to 3%, the investor will pay the net 1% to its counterparty for that 3-month period, which when subtracted from the bond coupon yields a net receipt of 3%. In effect the investor has "swapped" the 4% fixed coupon for a floating rate that will be reset every 3 months according to market interest rates.

---

[11]    The calculations are performed based on a "notional amount," which is akin to the principal balance on a loan in that the interest rate is multiplied by the notional amount to calculate the payment owed by each side to the other. However, the notional value is never exchanged among the parties. In practice, only the net obligation is paid.

## D. Worldwide Investigations into Libor Manipulation

48.     The first public revelation regarding the existence and focus of government investigations into Libor manipulation occurred on March 15, 2011, when UBS disclosed that the bank had "received subpoenas . . . in connection with investigations regarding submissions to the [BBA]." UBS stated it understood "that the investigations focus on whether there were improper attempts by UBS, either acting on its own or together with others, to manipulate LIBOR rates at certain times." UBS further disclosed that it had "received an order to provide information to the Japan Financial Supervisory Agency concerning similar matters." UBS stated it was "conducting an internal review" and was "cooperating with the investigations."

49.     Shortly thereafter, various news agencies reported that UBS, Bank of America, Citi, and Barclays had also received subpoenas from United States regulators regarding the potential manipulation of USD Libor. *The Financial Times* and others would soon report that investigators had demanded information from "all 16 members of the committee that helped the [BBA] set the dollar Libor rate during 2006-08." Follow-up reports by *Bloomberg* and others confirmed that banks such as Citi, Deutsche Bank, Bank of America, and JPMorgan had even been asked to make employees available for testimony.

50.     In May 2011, the *Daily Telegraph* reported that the FBI had become involved and was working closely with U.S. and foreign regulatory authorities in connection to the Libor investigation. The U.K. Serious Fraud Office, which handles criminal investigations into financial matters, "revealed it is also taking an active interest" in the Libor probe. Such announcements indicated that criminal arrests and charges were not only possible but likely. In the months that followed, many of the Defendants and other panel banks confirmed that they were "cooperating" with investigations into their Libor submissions.

51.     In July 2011, UBS disclosed that it had "been granted conditional leniency or conditional immunity from authorities in certain jurisdictions, including the Antitrust Division of the DOJ, in connection with potential antitrust or competition law violations."

52.     In September 2011, the *Financial Times* reported that, as part of its Libor investigations, the DOJ and the Commodity Futures Trading Commission ("CFTC") were assessing whether Defendants violated the Commodity Exchange Act, which can result in criminal liability, by examining "whether traders placed bets on future yen and dollar rates and colluded with bank treasury departments, who help set the Libor index, to move the rates in their direction," as well as "whether some banks lowballed their Libor submissions to make themselves appear stronger."

53.     In October 2011, the *Financial News* observed that "[a]n investigation into price fixing, first ordered by the [SEC] in 2008, focused on whether banks, including UBS, Citigroup, and Bank of America, had been quoting deliberately low rates."

54.     Throughout the end of 2011 and the beginning of 2012, there were numerous articles relating to government investigations and probes relating to illegal collusion and manipulation of various Libor rates, including USD Libor. For instance, according to *Bloomberg*, the FSA had "received e-mail evidence of potential collusion" and was "probing whether banks' proprietary-trading desks exploited information they had about the direction of Libor to trade interest-rate derivatives, potentially defrauding their firms' counterparties." Reports indicate that RBS, Citi, and Deutsche Bank had fired employees connected with the Libor wrongdoing.

55.     It was also reported in 2012 that European Union antitrust regulators were investigating whether Defendants had formed a global cartel and colluded to understate their

borrowing costs in response to the economic crisis that began in 2007. The Monetary Authority of Singapore disclosed that it had been approached by regulators from other countries to join in the probe of manipulation of global benchmark interest rates. In July 2012 it was confirmed that the DOJ was conducting an unprecedented joint investigation by both the antitrust and criminal divisions into manipulation of Libor rates for various currencies. The investigation reportedly focuses on "whether banks whose funding costs were rising as the financial crisis intensified tried to mask that trend by submitting artificially low readings of their daily borrowing costs."[12] These banks include Bank of America and Citi, among others.

56.     In June 2013, it was announced that the Monetary Authority of Singapore sanctioned twenty banks—including all of the Defendants here—after finding that 133 traders attempted to manipulate benchmark interest rates. All of the banks sanctioned were found to have "deficiencies in the governance, risk management, internal controls and surveillance systems" for their involvement in setting the benchmarks.[13]

## ALLEGATIONS REGARDING DEFENDANTS' MISCONDUCT

## I.     DEFENDANTS MANIPULATED USD LIBOR

### A.     Facts Made Public by Barclays' Settlements

57.     Barclays avoided prosecution in the United Kingdom and the United States by entering into settlements with the FSA, CFTC, and the DOJ's Fraud Section. In the United Kingdom, as part of its settlement with the FSA, Barclays agreed to pay £290 million in fines. The CFTC issued an Order Instituting Proceedings ("Barclays CFTC Order") finding that

---

[12]     John Detrixhe, *Libor Reported as Rigged in '08 Proving 2012's Revelation*, Bloomberg, July 19, 2012, *available at* http://www.bloomberg.com/news/2012-07-18/libor-reported-as-rigged-in-08-crisis-proving-revelation-in-12.html.

[13]     Brooke Masters, *Singapore Punishes 20 banks in Rate Probe*, Fin. Times, June 14, 2013, *available at* http://www.ft.com/intl/cms/s/0/fed38a0a-d4d5-11e2-b4d7-00144feab7de.html#axzz2Ws56Tq4c.

Barclays violated the Commodity Exchange Act. And Barclays admitted to a detailed Statement of Facts ("Barclays SOF"), which cited scores of internal e-mails, as well as communications with other panel banks, in furtherance of their scheme to manipulate and suppress the published Libor rates. Marcus Agius, then-Chairman of Barclays, said in a press release at the time: "The Board takes the issues underlying today's announcement extremely seriously and views them with the utmost regret."

58.     Barclays admitted that, starting at least by August 2007, it submitted USD Libor quotes that were "improperly low" and thus did not reflect Barclays' actual borrowing costs. Barclays confirmed that "all of the Contributor Panel banks, including Barclays, were contributing rates that were too low" during this same period. Following the settlements, Agius and Barclays' CEO Bob Diamond resigned—just before *Barclays' Chief Operating Officer testified that Diamond had instructed him to lower the bank's Libor submissions*.

59.     On November 29, 2007, a Barclays manager contacted a representative of the BBA to advise that "[USD] LIBORs are being set lower than where they ought to be" and informed the BBA that this issue applied to all of the panel banks. *The Barclays manager stated that Defendants were submitting rates that were too low because "banks are afraid to stick their heads above the parapet and post higher numbers because of what happened to [Barclays] when [Barclays] did. You get shot at."* Barclays SOF ¶ 43 (emphasis added).

60.     On November 30, 2007, a private discussion occurred between a representative of Barclays and the FSA. An internal Barclays memorandum reveals that Barclays "didn't say anything along the lines of, you know, we're not posting where we think we should." On December 4, 2007, however, a Barclays Libor submitter sent an internal e-mail stating that Defendants, including Barclays, were in fact making false and dishonest submissions. *Id.* ¶ 45.

61.     ***Barclays' managers specifically instructed Barclays USD Libor submitters to
make artificially low Libor submissions and to stay "within the pack."*** Internal
communications at Barclays further reveal that the other panel banks were doing the same. In
one internal Barclays e-mail, for instance, a Barclays employee noted that Lloyds' USD Libor
submission was artificially low. Similarly, in October 3, 2007, a Barclays employee noted
internally that an unidentified panel bank submitted a Libor rate that was lower than the rate it
actually paid.

62.     According to documents found by the government investigations, on numerous
occasions between January 2005 and June 2009, Barclays' derivatives traders requested that
submitters make false submissions that favored their trading positions. Specifically, the CFTC
found that "Barclays based its LIBOR submissions for U.S. Dollar . . . on the requests of
Barclays' swaps traders, including former Barclays swaps traders, who were attempting to affect
the official published LIBOR, in order to benefit Barclays' derivatives trading positions; those
positions included swaps and futures trading positions." Barclays CFTC Order at 2.

63.     The majority of these requests came from traders on Barclays' New York
Interest Rate Swaps Desk and involved USD Libor, and included requests made on behalf of
other banks. The requests were made openly, sometimes shouted across the office to confirm
that no conflicting requests for manipulation were made. The traders' conduct was common and
pervasive, and known by other traders and trading desk managers located near the New York
Swaps Desk. Some traders made entries in their electronic calendars to remind themselves what
requests to make of Barclays' Libor submitters the next day.

64.     The following provide just a sample of the numerous wrongful requests made by
Barclays' traders, as revealed in documents quoted in Barclays' settlement papers:

- "WE HAVE TO GET KICKED OUT OF THE FIXINGS TOMORROW!! We need a 4.17 fix in 1m (low fix)."

- "You need to take a close look at the reset ladder. We need 3M to stay low for the next 3 sets . . . ."

- "This is the [book's] risk. We need low 1M and 3M libor. Pls ask [submitter] to get 1M set to 82. That would help a lot."

- "Hi Guys, We got a big position in 3m libor for the next 3 days. Can we please keep the lib or fixing at 5.39 for the next few days. It would really help. We do not want it to fix any higher than that. Tks a lot."

- "Hi mate[.] We have an unbelievably large set on Monday (the IMM). We need a really low 3m fix, it could potentially cost a fortune. Would really appreciate any help, I'm being told by my NYK [counterparts in New York] that it's extremely important. Thanks."

- "I really need a very very low 3m fixing on Monday—preferably we get kicked out. We have about 80 yards [billion] fixing for the desk and each 0.1 [one basis point] lower in the fix is a huge help for us. So 4.90 or lower would be fantastic."

65.     The documents revealed by the investigation also confirm that the Libor submitters regularly altered Barclays' USD Libor reports based on the traders' requests. For example, on December 19, 2006, a Barclays trader sent an e-mail to a Barclays submitter with the subject line, "3m Libor," asking, "Can you pls [please] continue to go in for 3m Libor at 5.365 or lower, we are all very long cash here in ny." The submitter asked "How long . . . ?" The trader replied "Until the effective date goes over year end (i.e. turn drops out) if possible." The submitter replied "Will do my best sir." On December 19, 20, and 21, 2006, Barclays' 3-month USD Libor submissions were 5.37%, 5.37%, and 5.375%, respectively.

66.     On December 21, 2006, the submitter created an electronic calendar entry stating, "SET 3 MONTH US$ LIBOR LOW!!!!!!" that was scheduled to begin on December 22, 2006, at 9:00 a.m. and continue until January 1, 2007, at 9:30 a.m. On December 22, 2006, and the subsequent trading days through the end of the year, Barclays' 3-month USD Libor submissions were 5.36%, 5.365%, 5.35%, and 5.36%, respectively.

67.    By way of further examples where the submitters directly agreed to make false submissions:

- "For you . . . anything. I am going to go . . . 92.5. It is difficult to go lower than that in threes. looking at where cash is trading. In fact, if you did not want a low one I would have gone 93 at least."

- "Always happy to help, leave it with me, Sir."

- Trader C: "The big day [has] arrived . . . . My NYK are screaming at me about an unchanged 3m libor. As always, any help wd be greatly appreciated. What do you think you'll go for 3m?" Submitter: "I am going 90 altho[ugh] 91 is what I should be posting." Trader C: "[W]hen I retire and write a book about this business your name will be written in golden letters." Submitter: "I would prefer this [to] not be in any book!"

- Submitter: "Hi All, Just as an FYI, I will be in noon'ish on Monday . . . ." Trader B: "Noonish? Whos going to put my low fixings in? hehehe." Submitter: "[X or Y] will be here if you have any requests for the fixings." Confirming the requests did not go unheeded, Barclays' 3-month USD Libor submission on March 13, 2006, was 4.90%, which was tied for the lowest rate submitted.

- Trader C: "If it's not too late low 1m and 3m would be nice, but please feel free to say 'no' . . . Coffees will be coming your way either way, just to say thank you for your help in the past few weeks." Submitter: "Done . . . for you big boy."

- On February 5, 2008, Manager B instructed Trader B to: "just tell him to keep it, to put it low." Trader B said that he had "begged" the submitter to put in a low Libor submission and the submitter had said he would "see what I can do."

68.    The FSA made similar findings in a Final Notice ("Barclays FSA Final Notice") that imposed a financial penalty of £59.5 million on Barclays in accordance with section 206 of the Financial Services and Markets Act 2000. Based on the evidence it uncovered, the FSA determined Barclays was engaged in widespread and pervasive misconduct with respect to its Libor submissions. The FSA found that between January 2005 and May 2009, derivatives traders made at least 173 requests for USD Libor submissions to Barclays' submitters.

69.    These manipulations were also carried out with the help of, and at the request of, other panel banks. For instance, after a trader at another bank requested a low Libor setting from

Barclays and, when the Barclays trader agreed, the trader responded: "Dude, I owe you big time! Come over one day after work and I'm opening up a bottle of Bollinger! Thanks for the Libor." The FSA found that between February 2006 and October 2007, derivatives traders made at least 63 requests to external traders with the aim that those traders would pass on the requests for USD Libor submissions to their bank's submitters.

70.     According to the FSA's findings, at least 14 derivatives traders at Barclays were involved in this manipulation, including senior derivative traders and trading desk managers. Further demonstrating the complete lack of controls, willingness to conspire, and general corruption in the system, the FSA and other investigations found this problem to extend even beyond USD Libor. For instance, the FSA found that between September 2005 and May 2009, derivatives traders made at least 58 requests for Euribor submissions to Barclays' submitters (including 20 requests based on communications from derivative traders at other banks) and between August 2006 and June 2009, at least 26 requests for Yen Libor submissions were made to Barclays' submitters.

71.     According to an independent review conducted by Anthony Salz, the former senior partner of Freshfields Bruckhaus Deringer LLP, Barclays developed a win-at-all-costs culture that laid the foundation for Barclays' misconduct in the Libor scandal. The Salz Review quoted Alistair Darling, the former Chancellor of the Exchequer: "Quite clearly, there was a culture here that tolerated—if it didn't encourage—this sort of behaviour."[14]

### B.     Facts Made Public by UBS's Settlements

72.     On December 19, 2012, UBS announced a settlement with numerous regulators under which it would pay over $1.5 billion in fines (including $400 million to the DOJ) and have

---

[14]     *Salz Review, An Independent Review of Barclays' Business Practices*, ¶ 3.20 (Apr. 2013).

its Japanese subsidiary plead guilty to felony wire fraud and pay a $100 million fine. The investigations concluded that UBS's managers were well aware of and "actively involved in UBS's attempts to manipulate LIBOR and EURIBOR submissions." The FSA found a "total disregard for proper standards by these Traders and Brokers," which was "clear from the documented communications in which particular individuals referred to each other in congratulatory and exhortatory terms such as 'the three muscateers [sic],' 'superman,' 'be a hero today,' and 'captain caos [sic].'"

73.     In its own corporate statement commenting on the settlements with U.S. and U.K. regulators, UBS conceded that "employees at the bank colluded with employees at other banks and cash brokers to influence certain benchmark rates . . ." and that UBS personnel gave "inappropriate directions to UBS submitters" that were designed to misrepresent the bank's financial condition.[15]

74.     Under the non-prosecution agreement, UBS agreed to admit to a Statement of Facts ("UBS SOF") detailing its manipulation of Libor and other benchmark interest rates. The statement revealed that UBS had *no* systems, controls, policies, or procedures governing its Libor submissions. *No* formal training was even given to those responsible for making the submissions. It was not until August 2008 that UBS tried to enact such procedures—but even then they did not address the inherent conflicts of interest in mixing trading and submission resources.

75.     On December 11, 2012, the U.K. Serious Fraud Office arrested three individuals: Tom Hayes, who had worked as a trader for Defendants UBS and Citigroup, among others, and Terry Farr and Jim Gilmour, both employees of brokerage firm RP Martin Holdings Ltd. It was

---

[15]   Press Release, UBS, *UBS Board of Directors authorizes settlements of LIBOR-related claims with US and UK authorities; Swiss regulator to issue order* (Dec. 19, 2012).

reported that UBS fired 24 employees in connection with the investigation of its Libor manipulation. The same day UBS announced its settlement with regulators, the DOJ's criminal complaint against former senior UBS traders Hayes and Roger Darin was unsealed. Hayes and Darin were charged with conspiracy to commit wire fraud. Hayes was also charged with price fixing. On June 18, 2013, the Serious Fraud Office charged Hayes with eight counts of conspiracy to defraud.

76.     As with Barclays, the investigative materials confirm that the panel banks were manipulating their Libor submissions in a coordinated way to line their own pockets and to make themselves appear healthier than they really were. The FSA's Final Notice succinctly states that "UBS sought to manipulate Libor and Euribor in order to improve the profitability of trading positions."[16] The CFTC reached the same conclusion, and also found that UBS worked with at least four other panel banks to make false submissions, and induced at least five interdealer brokers to disseminate false information or otherwise influence other panel banks' submissions."[17]

77.     As the FSA concluded, UBS "acted improperly" in making false Libor submissions. As summarized by the FSA:

> In reaction to increased media scrutiny of the financial standing of and banks' LIBOR submissions during the financial crisis, UBS directives to its LIBOR submitters intended to: 'protect our franchise in these sensitive markets' . . . . These directives changed over time, but for a significant part of the period from at least 17 June 2008 to at least December 2008, *their purpose was to influence UBS's LIBOR submissions to ensure that they did not attract negative media comment about UBS's creditworthiness*.

---

[16]     *See* UBS FSA Final Notice ¶ 15b.

[17]     *See* Press Release: PR6472-12, U.S. Commodity Futures Trading Commission, *CFTC Orders UBS to Pay $700 Million Penalty to Settle Charges of Manipulation, Attempted Manipulation and False Reporting of LIBOR and Other Benchmark Interest Rates* ("CTFC Press Release") (Dec. 19, 2012).

78.     Similarly, the CFTC concluded that, from August 2007 through mid-2009, UBS managers directed that the bank's USD Libor submissions be artificially suppressed so as to *"place UBS in 'the middle of the pack' of panel bank submissions* . . . . [T]hese directions, at times, caused UBS's U.S. Dollar LIBOR and other benchmark submissions to be knowingly false."

79.     The decision to lower submissions was memorialized in an August 9, 2007 email from the Head of Asset and Liability Management to the Manager of the Derivatives Trading Desk that submitted the majority of UBS's Libor contributions, and others: *"[I]t is highly advisable to err on the low side with fixings for the time being to protect our franchise in these sensitive markets.* Fixing risk and [profit and loss] thereof is secondary priority for now." The next day, UBS dropped its overnight submission 50 basis points.

80.     Consistent with this new practice, a UBS derivatives trader advised a USD Libor submitter that, as to UBS's Libor contribution that day, the "aim should really be to be on the lower side of range." When the submitter described his intended submission, the derivatives trader responded, "this seems probably a tad low right now, but recon [sic] that's what we should try to be," and added, "we just don't want to give the market a wrong impression . . . . so therefore don't want to be on the highs of libors." Later that day, before leaving for vacation, the submitter reminded his replacement to "[p]lease remember to err on the low side." A month later, on September 5, 2007, the USD Libor submitter informed a senior manager in the Investment Bank: "we are fixing on the low side of all other banks in the libor panel in the 4-12 mo period by several bps . . . . [As a] bank we are erring on the low side."

81.     Traders understood that this direction came from UBS's senior management. In a September 5, 2007 electronic chat, for instance, a trader complained about UBS's low Libor

submissions, stating that *"all senior management . . . want to show the world we are the strongest bank with loads of liquidity.* We'd lend at 0 US!"

82.    In June 2008, a UBS Senior Manager instructed USD Libor submitters to lower their submissions over the next three days "to get in line with the competition." UBS's 3-month USD Libor submissions immediately dropped 5 basis points to the "middle of the pack."

83.    Internally, some employees questioned the directive to report false Libor submissions. In one 2008 internal exchange via electronic chat, a UBS employee noted that "Libors are currently even more fictitious than usual." The first UBS employee asks, "isn't Libor meant to represent the rates at which banks lend to each other?" *The response: "it's a made up number" that the panel banks were underreporting at the time "to not show where they really pay in case it creates headlines about . . . being desperate for cash."* Or as one UBS senior manager explained the reason for UBS's "middle of the pack" directive: *"the answer would be 'because the whole street was doing the same and because [UBS] did not want to be an outlier in the Libor fixings, just like everybody else.'"*

84.    As with Barclays, recently released materials show that the bank was also manipulating its submissions to directly line its own pockets. For instance, in reference to USD Libor, a UBS trader in Connecticut emailed that the submitting office had "only one mission . . . We need 3mo Libor set low."

85.    The corrupt nature of the rate-submission process is also seen in how rates other than USD Libor were manipulated. Recently revealed emails show traders asking for Japanese Yen ("JPY") submitters: "Can we pls go for lower Libors tonight, across all tenors," and "hi . . . can we go low 1m and 3m again pls." Like Barclays, the evidence shows the submitters responded favorably writing "will do" and "we can try." The FSA found that UBS traders

"routinely" made requests of UBS's Libor submitters to adjust submissions to benefit UBS trading positions, including "more than 800 documented Internal Requests" to manipulate JPY Libor and "more than 115 Internal Requests" to manipulate other currency-denominated Libor, including USD Libor. The FSA also found that UBS "colluded with interdealer brokers to attempt to influence the JPY Libor submissions of other banks" and were in "regular contact" with at least four other banks.

86. According to the Japanese FSA, Tom Hayes—a former derivatives trader for UBS, RBS, and Citi—"attempted to pressure colleagues and employees at other banks involved in the rate-setting process for the Tokyo Interbank Offered Rate, or Tibor." Hayes joined UBS Securities Japan in 2006 "and traded products linked to the pricing of short-term yen-denominated borrowings."[18] UBS has suspended employees for their involvement in manipulating Libor, including Yvan Ducrot, who was the co-head of UBS's rates business. Holger Seger, the global head of short-term interest rates trading at UBS, was likewise suspended by UBS in connection with international probes and ultimately left his position in April 2012.

87. Also similar to Barclays, the evidence shows that this corruption spread across banks, as UBS traders are seen corresponding with traders at other banks (identified only as "Bank B" and the like in the released materials) along the lines of "if you could ask your guys to keep 3m low wd be massive help," "real big favour to ask, could you try for low 6m fix today pls wld be most appreciated," and "I need you to keep it as low as possible." As with the internal

---

[18] Jean Eaglesham, Atsuko Fukase, & Sam Holmes, *Rate Probe Keys On Traders: Investigators Suspect Employees at Some Banks Tried to Manipulate Rates*, Wall St. J., Feb. 7, 2012.

corruption, the responses at the other (unidentified) banks would be favorable: "will try my best . . . hows u ? ? ?" and "ill try and push a few fictitious offers and this mg see if that helps."

88.    UBS's employees were richly rewarded for their rate-rigging efforts. For example, two traders whose positions depended on Libor rates engaged in wash trades (i.e., risk-free trades that cancelled each other out and which had no legitimate commercial rationale) to gin up "corrupt brokerage payments . . . as reward for their efforts" to manipulate the submissions. In a 2008 phone conversation detailed by the FSA, a UBS trader promised the UBS broker to do "one humongous deal with you" if the JPY Libor rate was kept "as low as possible." The trader went on: "I'll pay you, you know, 50,000 dollars, 100,000 dollars . . . whatever you want . . . I'm a man of my word." UBS made "corrupt payments of £15,000 per quarter to Brokers to reward them for their assistance" in rigging Libor.

## C.    Facts Made Public by RBS's Settlements

89.    Royal Bank of Scotland plc also has admitted to wide-ranging rate-setting misconduct as part of settlements with multiple government authorities. RBS's chief executive officer stated in advance of the settlement that the bank's Libor-related misconduct "is a deeply regrettable thing . . . . the sort of thing the industry has to put behind it." RBS's primary regulator, the FSA, found that RBS's Libor submissions process suffered from pervasive conflicts of interest that undermined the integrity of its submissions.

90.    RBS's USD Libor submissions were in the bottom half of the panel banks more than two-thirds of the time. That RBS was reporting below-median borrowing costs throughout the Relevant Period is remarkable given the depth of RBS's financial problems at the time. Despite mounting concern about RBS's stability in September 2008, the bank's Libor submissions only briefly exceeded their 2007 peak.

91.     RBS delegated responsibility for its daily Libor submissions to fixed-income traders whose "bonuses were linked in part to the profit and loss ('P&L') of their money market trading books." This gave RBS's traders significant incentives to falsify their Libor submissions to influence profits on the bank's own positions. The FSA concluded that the risk traders would alter their Libor submissions to suit their trading strategies "crystallized with respect to RBS's JPY, CHF, and USD LIBOR submissions."

92.     E-mails, instant messages, and telephone transcripts recently made public confirm that RBS's employees knew that *"people are just setting Libors to suit their books"* and *"it's just where you've got your fixing really."* RBS FSA Final Notice ¶ 71 (emphasis in original). That is, the submissions were set only in relation to what would make RBS the most money. One submitter acknowledged that *"I set a rate to benefit my interest as a Money Market trader."* Id. (emphasis in original). According to telephone transcripts obtained by *Bloomberg*, Paul Walker, who headed RBS's money-markets trading and was responsible for its USD Libor submissions, summed up his views in call with another trader: "Libor is what you say it is."[19] Walker was fired in the months before RBS's settlement with regulators.[20]

93.     One RBS trader gloated, "[i]t's just amazing how Libor fixing can make you that much money . . . *It's a cartel now in London*."[21] As for outside investors such as the Funds,

---

[19]     Liam Vaughan & Gavin Finch, *Secret Libor Transcripts Expose Trader Rate-Manipulation*, Bloomberg, Dec. 13, 2012.

[20]     Lindsay Fortado, *RBS Traders Helped UBS's Hayes with Libor Bribes, Regulators Say*, Bloomberg, Feb. 6, 2013.

[21]     Andrea Tan, *RBS Instant Messages Show Libor Rates Skewed for Traders*, Bloomberg, Sept. 26, 2012 (emphasis added).

another RBS trader responded, "Must be damn difficult to trade, man . . . . Especially [if] you [are] not in the loop."[22]

94.     Confirming such exchanges were not mere bravado, the FSA's Final Notice ("RBS FSA Final Notice") described specific instances where traders at Royal Bank of Scotland plc made fraudulent USD Libor submissions to inflate trading profits. For example, in 2007 one trader told an RBS colleague "I've got massive fixing in ones, so I said to [the trader] I just want the really, really low ones." The reference to "massive fixing" was to a $4 billion borrowing facility RBS had that was set to fix at the time the requests were made. RBS's submissions for one-month USD Libor dropped, just in time for RBS's "massive fixing." The trader was unsatisfied, complaining that "we need usd libor to drop faster," and sought confirmation that "on monday, usd libor will drop 5bps."

95.     A similar example took place between March 9 and March 18, 2010, when another trader explained to the submitter how he "wanted to keep [USD Libor] down because of some fixes." The submitter confirmed his understanding that "we do have some big fixes in London so suits for low libors." RBS's USD Libor submissions stayed low while five large, dollar-denominated, floating-rate transactions fixed.

96.     These episodes typified how, according to the RBS FSA Final Notice, Royal Bank of Scotland plc's Libor submitters "inappropriately considered the impact of LIBOR and RBS's LIBOR submissions on the profitability of transactions in its money market trading books as a factor when making (or directing others to make)" Libor submissions, including USD Libor.

97.     As with the other settling banks, the corruptible (and corrupt) nature of the process is further confirmed by the fact that RBS's manipulation extended even beyond USD

---

[22]  *Id.*

Libor. *Bloomberg's* December 13, 2012 article entitled "Libor Transcripts Expose Rate-Rigging With Police Nearby" recites transcripts of instant messages and telephone conversations among RBS's traders agreeing to rig Libor. For example, *Bloomberg* reviewed a transcript of an instant message discussion held on December 3, 2007, wherein Jezri Mohideen, then RBS's head of Yen products in Tokyo, instructed colleagues in the United Kingdom to lower the bank's six-month Libor submission that day, ordering "'We want lower Libors . . . . Let the money market guys know." Will Hall, a trader in London, confirmed, "Sure, I'm setting." Mohideen replied, "Great, set it nice and low." Hall was also named in an affidavit filed by a Canadian Competition Law Officer in Libor-related proceedings in Canada. According to the affidavit, Hall colluded with other traders to manipulate JPY Libor. Other traders at RBS have been implicated in the Libor scandal, including Brent Davies, another trader in London who, like Hall, was named in the Canadian Competition Law Officer's affidavit for manipulation of JPY Libor.[23]

98.     RBS employees have been disciplined or dismissed for their involvement in rigging Libor. For example, Andrew Hamilton, a former investment advisor at RBS in London, was dismissed by RBS on October 21, 2011.

## D.     Defendants' Powerful Motives to Manipulate Libor

99.     As seen in the materials made public by the settlements already announced, Defendants were motivated to understate their borrowing costs to avoid negative publicity, particularly given the financial crisis that began to unfold in 2007 brought the banks under

---

[23]     Further details on the rigging of JPY Libor have been revealed in a Singapore wrongful termination lawsuit. In that case, Tan Chi Min, former head of delta trading for RBS's global banking and markets division in Singapore (who worked for RBS from August 12, 2006 to November 9, 2011), alleges that RBS fired him "because he tried to improperly influence the bank's rate setters from 2007 to 2011 to persuade them to offer Libor submissions that would benefit his trading positions."

increasing scrutiny about their liquidity and creditworthiness. The BBA published the rates reported by every panel bank. If a panel bank's published rate revealed that its peers were charging it higher rates than were being charged to the other banks, this would signal that that bank was thought to be less creditworthy and riskier. In the worst case, fears could snowball and create a run on the bank. Therefore, Defendants had a motive to falsify the rates that they submitted to give the appearance that their funding costs were lower than they actually were, as to portray to the market a (false) appearance of financial health despite the deteriorating condition of themselves and the marketplace.

100. The business press focused on high USD Libor submissions as a sign of distress. Such publicity increased Defendants' motivation to coordinate and lower their submissions. For example, in early September 2007, when Barclays reported higher USD Libor rates than its peers, a *Bloomberg* article entitled "Barclays Takes a Money-Market Beating" questioned "So what the hell is happening at Barclays and its Barclays Capital securities unit that is prompting its peers to charge it premium interest in the money market?" Other newspapers, including the *Financial Times* and *The Standard*, ran similar articles.

101. By way of another example, an April 23, 2008 Société Générale report questioned the strength of RBS, and noted that RBS had left itself "no capital headroom," and recommended shareholders not invest further. Later reports noted the "loss of confidence in the bank's ability to continue to operate as a private sector player . . . In this instance, the shares could have very limited value, if at all."

102. As also confirmed by the settlement materials described above, Defendants were additionally motivated by the more direct desire to line their own pockets by way of their own exposure to interest-rate risk. An academic study by UCLA economics professor Connan Snider

and University of Minnesota economics professor Thomas Youle, discussed below, concludes that bank portfolio exposure to Libor is a "source of misreporting incentive." That is, by manipulating Libor, Defendants were able to control how much they were paying out to their own counterparties and affect the value of other instruments that could be traded.

103.     One direct impact of suppressing Libor for a panel bank would be that it would have to pay less interest on its own portfolio. Defendants had "unbalanced" portfolios, meaning they often stood to pay more on floating-rate instruments than they stood to receive on floating-rate instruments. Suppression of Libor, then, would save the panel banks billions. For example, according to Snider and Youle, JPMorgan reported significant exposure to rising interest rates in 2009, stating that if interest rates increased by 1%, it would lose over $500 million in revenue.

104.     As of September 30, 2008, Deutsche Bank calculated it could gain or lose €68 million for every basis point of change in the spread between Libor and Euribor, and had similar exposure to changes in the Libor "yield curve" (the relationship between short- and long-term rates).[24] Deutsche Bank reportedly earned more than $650 million in profit during 2008 from trades tied to Libor because Libor was low.

105.     Citibank's 2007 Annual Report calculated that the bank would profit between $540 and $837 million from a 1% decrease in interest rates. In 2009, Citibank reported it would make $936 million in net interest revenue if rates would fall by 25 basis points per quarter over the next year and $1.935 billion if rates fell 1%.

106.     Bank of America's 2007 Annual report estimated that a 1% drop in USD interest rates would yield a profit of more than $800 million.

---

[24]     Jean Eaglesham, *Bank Made Huge Bet, and Profit, on Libor*, Wall St. J., Jan. 9, 2013.

107.    These motives were not just reason to submit misleadingly low reports, but to work together to do so. A single bank's "low" submission may not move the published rate far enough for the banks to make their ill-gotten gains—and may have been excluded from the calculation as an "outlier." And not wanting to appear "too risky" would mean the banks were incentivized to make sure that their "low" submissions were "low enough" relative to the others as to not still appear as the riskiest bank—but not "too low" as to draw scrutiny.

### E.    Statistical Evidence of Consistent and Uniform Suppression

108.    With the clarity the above evidence has brought, numerous statistical analyses of Libor can be and have been conducted. No matter how the data is sliced, the conclusion is the same: During the Relevant Period, there is a consistent gap between the actual behavior of USD Libor at the time, and what one would expect when comparing Libor to the behavior of other benchmark measurements both before and after the Relevant Period. Because of the turbulence created by the financial crisis, it was not clear at the time that this gap was the result of Defendants' fraudulent conduct. At the same time, the panel banks were falsely assuring the public of the integrity of the Libor rate-setting process. But with the now-public revelations discussed above, these statistical anomalies confirm that USD Libor was being continually, intentionally, and artificially suppressed.

#### 1.    Evidence from comparing Libor's movements to those in the similar Eurodollar deposit rate

109.    Like Libor, Eurodollar deposit rates published by the Federal Reserve Bank of New York reflect the cost at which Defendants and other banks lend dollars to one another in the London interbank market. The Federal Reserve's data are less susceptible to manipulation because they are based on polls of a larger sample of banks.

110.     As can be seen in Figure A below, USD Libor and the Federal Reserve Eurodollar

rates historically moved in lockstep—until the outbreak of the financial crisis in August 2007.

The Federal Reserve's reported Eurodollar rates were consistently above Libor after that point,

including by an average margin exceeding 100 bps from the day Lehman Brothers filed for

bankruptcy on September 15 through the remainder of 2008.

*Figure A:  Spread (bps) Between 3-Month Eurodollar Deposit Rate & 3-Month USD Libor*



111.     Figure B sets out this same data in number of basis points, breaking out the data

both by panel bank and by time in relation to the basis packages entered into by the Funds.  Libor

manipulation intensified shortly after the Funds entered into the last of the swaps in February

2008:  the average spread of the Eurodollar rate over three-month USD Libor was 16.7 bps.  The

spread jumped in September 2008, averaging 100.2 bps (*i.e.*, more than a full percentage point)

for the remainder of the year.  Libor remained more than 35 bps below the Eurodollar rate on

average throughout 2009, as the Funds terminated the remainder of their bond and swap portfolios.

*Figure B:  Spread, 3-Month USD Libor Submissions vs. 3-Month Eurodollar Deposit Rate*

|  | Pre-Purchase Period[25] | Purchase Period[26] | Post-Purchase 2008[27] | 2008 Terminations[28] | 2009 Terminations[29] |
|---|---|---|---|---|---|
| **3M USD Libor** | 0.0 | -7.8 | -16.7 | -100.2 | -35.4 |
| Bank of America | 0.2 | -7.6 | -18.0 | -105.6 | -36.5 |
| Barclays | 0.6 | -4.7 | -15.3 | -72.7 | -34.8 |
| Citigroup | -0.6 | -7.9 | -17.4 | -109.1 | -37.3 |
| Credit Suisse | 0.1 | -7.9 | -16.1 | -89.3 | -34.1 |
| Deutsche | -0.2 | -7.7 | -16.5 | -97.2 | -38.8 |
| JPMorgan | 0.1 | -8.8 | -18.2 | -126.2 | -40.7 |
| RBS | -0.6 | -9.5 | -17.2 | -90.8 | -28.2 |
| UBS | -0.4 | -8.4 | -16.7 | -100.5 | -33.8 |

112.    To put these figures in perspective, the average Federal Reserve three-month Eurodollar deposit rate between September 16 and December 31, 2008 was 3.84% (384 bps). Suppression by 100.2 bps would thus represent a *more than 26% decrease* in the rate itself.

### 2.    Evidence from comparing the banks' USD Libor submissions to those in other currencies

113.    The USD Libor Panel banks also made submissions as members of Libor panels in many other currencies.  Borrowing rates will vary across these currencies to reflect the risk of

---

[25]    Time period prior to the Funds entering into the basis packages (January 3, 2006 through December 11, 2007 ).

[26]    Time period while the Funds were entering into the basis packages (December 12, 2007 through February 15, 2008 ).

[27]    Time period after the Funds entered into the basis packages (February 16, 2008 through September 15, 2008 ).

[28]    Time period during which the Funds sold most of the bonds and terminated most of the swaps (September 16, 2008 through December 31, 2008).

[29]    Time period during which the Funds sold the rest of the bonds and terminated the rest of the swaps (January 1, 2009 through December 8, 2009).

fluctuations in foreign-exchange rates and other costs specific to a given currency. However, a bank with comparatively low borrowing costs in one currency should not experience comparatively high borrowing costs in another currency. That is, a bank with a given default risk should stand in a similar position relative to its peers no matter which currency is analyzed. Accordingly, the consistent submission of relatively low USD rates alongside a relatively high submission in other currencies is evidence that the bank was strategically underreporting USD Libor.

114. Defendants' Libor submissions displayed suspicious "cross-currency risk reversals." For example, a study by Connan Snider and Thomas Youle found that Defendants Bank of America and Citi submitted relatively high JPY Libor reports during the Relevant Period even as they submitted relatively low USD Libor reports.[30] Defendants Barclays and JPMorgan exhibited similar cross-currency discrepancies. The authors found the results highly anomalous because "most of the variables that [economists] would expect to be important for pricing debt either do not vary across banks or do not vary across currencies."

### 3. Evidence from comparing the bank's submissions to movements in the credit default swap market

115. A credit default swap ("CDS") is an agreement whereby one party accepts periodic payments in exchange for a commitment to make a payment if a "credit event" occurs (such as a bankruptcy filing) in relation to the issuer of a particular debt security.

116. The price of this "insurance" (typically expressed in bps as "spreads") fluctuates with the perceived chances the credit event will occur. Similarly, in a competitive interbank lending market, the banks' borrowing costs should be related to their perceived credit risk. As

---

[30] Connan Snider & Thomas Youle, *Does Libor Reflect Banks' Borrowing Costs?* 5-6 (Working Paper, Apr. 2, 2010).

one commentator observed, "The cost of bank default insurance has generally been positively correlated with LIBOR. That is, in times when banks were thought to be healthy, both the cost of bank insurance and LIBOR decreased or remained low, but when banks were thought to be in poor condition, both increased."[31] Thus, one would not expect to see banks with materially different "costs" of default insurance to report the same cost of borrowing.

117. During the Relevant Period, CDS spreads should have been an especially accurate predictor of Libor submissions. Because Libor is supposed to represent the interest rate at which panel banks can borrow in the interbank market, it (when accurately reported) contains both a risk-free rate component and a credit spread component that reflects the banks' creditworthiness. CDS, on the other hand, do not contain a risk-free component. As noted above, they are contracts that pay when a credit event occurs, and thus provide a direct market rate for the credit risk of the reference entity. Because the risk-free rate was extremely (and consistently) low during the Relevant Period, Libor should have almost exclusively reflected the panel banks' credit risk. The CDS spread and Libor submission of a panel bank, then, should have been exceedingly close together.

118. Yet during the Relevant Period, Defendants' Libor submissions were unnaturally clustered together despite wide variation in their CDS spreads. The discrepancy between the panel banks' Libor submissions and CDS spreads was detailed in a May 29, 2008 article in the *Wall Street Journal*. According to the *Wall Street Journal's* analysis, numerous panel banks caused Libor, "which is supposed to reflect the average rate at which banks lend to each other," to "act as if the banking system was doing better than it was at critical junctures in the financial

---

[31] Justin Wong, *LIBOR Left in Limbo: A Call for More Reform*, 13 North Carolina Banking Institute 365, 371 (2009).

crisis."[32] The article further found that "reported LIBOR rates fail[ed] to reflect rising default-insurance costs." Because CDS spreads were set by the market, thus providing an accurate measure of the panel banks' credit risk, discrepancies between CDS spreads and Libor submissions provide powerful evidence of Libor suppression.

119.    The *Wall Street Journal* observed that the widest gaps existed with respect to the Libor submissions of a group of panel banks that included Citi, JPMorgan, and UBS. Citi's submissions, in particular, differed the most from what the CDS market indicated the bank's creditworthiness was. On average, Citi's three-month Libor quote was about 87 basis points *lower* than its borrowing rate as calculated with CDS data. JPMorgan and UBS likewise exhibited significant discrepancies—of 43 and 42 bps respectively—while Credit Suisse, Deutsche Bank, Barclays, and RBS each exhibited discrepancies of about 30 basis points.

120.    The *Wall Street Journal* further noted the uncanny equivalence between the panel banks' Libor submissions: their three-month Libor quotes fell within a range of only 6 bps, even though at the time their CDS spreads varied far more widely, reflecting the market's differing views as to the banks' creditworthiness. David Juran, a statistics professor at Columbia University who reviewed the *Wall Street Journal*'s methodology, concluded its calculations demonstrate "very convincingly" that reported Libor is lower, to a statistically significant degree, than what the market thinks it should be.

121.    Calculating an alternate borrowing rate incorporating CDS spreads, the *Wall Street Journal* estimated that misreporting of Libor had a $45 billion effect on the market over just a four-month period, these losses falling on investors receiving Libor-based payments under derivatives, such as the Funds, and floating rate notes.

---

[32] *See* Carrick Mollenkamp & Mark Whitehouse, *Study Casts Doubt on Key Rate*, Wall St. J., May 29, 2008.

122.     Further academic studies support the *Wall Street Journal's* analysis.  The Snider and Youle study, cited above, concluded Libor did not accurately reflect average bank borrowing costs, its "ostensible target."  Noting that "[i]n a competitive interbank lending market, banks' borrowing costs should be significantly related to their perceived credit risk," Snider and Youle posited that if Libor quotes "express true, competitively determined borrowing costs," they should "be related to measures of credit risks, such as the cost of default insurance." According to Snider and Youle, however, quotes provided by panel banks in fact deviated from their costs of borrowing as reflected in CDS spreads

123.     For example, Snider and Youle observed that Citi exhibited substantially higher CDS spreads than Bank of Tokyo-Mitsubishi during the crisis, suggesting that the market perceived Citi as much riskier.  Yet its USD Libor submissions tell the opposite story, as they were slightly lower than Bank of Tokyo-Mitsubishi's submissions.  This is shown in the graph below:

*Figure C: Citi and Bank of Tokyo's One-Year Libor Quotes and CDS Spreads*



124. Evidence from the CDS market also reveals a second anomaly. As Snider and Youle explained: "Given that purchasing credit protection for a loan makes the loan risk free, one would expect [the] difference between the loan rate and the CDS spread to roughly equal the risk free rate. This corresponds to the idea that a loan's interest rate contains a credit premium, here measured by the CDS spread." But the authors observed that Citi's Libor submissions were often "significantly below its CDS spread" implying "there were interbank lenders willing to lend to Citigroup at rates which, after purchasing credit protection, would earn them *a*

*guaranteed 5 percent loss.*" (Emphasis added). This discrepancy contravenes basic rules of economics, indicating that Citi was underreporting its borrowing costs to the BBA.

125.    A 2012 analysis published in the *Journal of Banking & Finance* similarly found that the Libor submissions of Defendants Bank of America, Citi, JPMorgan, and UBS consistently reported below-median borrowing costs in April-May 2008 despite exhibiting relatively high CDS spreads.[33] *The Wall Street Journal* concluded in 2012 that "banks' submissions used to calculate the London interbank offered rate . . . sometimes fail to track the market's view of the credit risk posed by each firm."[34]

### 4.    Evidence from comparing USD Libor's movements to those in other measurements of the banks' likelihood of default

126.    The consulting experts for other plaintiffs in the multidistrict Libor litigation using a proprietary database provided by Kamakura Risk Information Services ("KRIS") conducted yet another study concluding that the USD Libor submissions were being moved by factors other than the panel banks' borrowing costs.

127.    The KRIS data estimates each panel bank's default risk on a daily basis by applying multiple models to each bank's equity and bond prices, accounting information, the level of interest rates and other objective and observable indicators. The KRIS data measures the probability of default of a borrower. Each Defendant's borrowing costs should be positively correlated with their perceived probability of default—as a bank's objectively measured riskiness

---

[33]    Rosa M. Abrantes-Metz, *et al.*, *Libor Manipulation?*, 36 J. Banking & Fin. 136, 148 tbl.7 (2012).

[34]    Jean Eaglesham, Rob Barry & Tom McGinty, *Libor Furor: Key Rate Gets New Scrutiny*, Wall St. J., Sept. 12, 2012; *see also* Jennie Bai & Pierre Collin-Dufresne, *The CDS-Bond Basis During the Financial Crisis of 2007-2009* (Working Paper Apr. 30, 2012); Alessandro Fontana, *The Persistent Negative CDS-Bond Basis During the 2007/08 Financial Crisis* (Working Paper 2009).

moved up during 2008, so too should its Libor submissions.  To the contrary, the KRIS analysis

found negative correlation—that is, as the perceived risk actually went up, the purported

borrowing cost (Libor) went down.

*Figure D:  Correlation Coefficient Between 1-Month USD Libor Submissions and 1-Month Probability of Default*



(Note:  PDs are estimated daily using the reduced form model of Kamakura Risk Information Services.)

*Figure E: Correlation Coefficient Between 3-Month USD Libor Submissions and 3-Month Probability of Default*



(Note: PDs are estimated daily using the reduced form model of Kamakura Risk Information Services.)

### 5. Evidence from comparing USD Libor's movements to those in the Federal Reserve's Term Auction Facility

128. Libor suppression is also apparent in the discrepancy between Defendants' Libor submissions and the rates at which banks were borrowing from the Federal Reserve's Term Auction Facility.

129. From late 2007 to mid 2010, the Federal Reserve conducted periodic auctions in which it made secured loans. The facility extended only loans secured by acceptable collateral, which carried lower risk than the unsecured interbank borrowings measured by Libor. Thus, the banks should not have been willing to put in a bid (which required the posting of collateral) at a lower rate than its purported unsecured interbank lending rate.

130.    In fact, Defendants were submitting auction bids substantially above their purported Libor borrowing rates.[35] For example, Defendants Bank of America, Citi, Credit Suisse, Deutsche Bank, JPMorgan, RBS, and UBS were all reporting USD Libor borrowing costs of up to 70 bps below the auction rate.

### 6.    Evidence from the stability and bunching of the Libor submissions

131.    As discussed above, the panel banks were not supposed to know each other's daily submissions. Thus consistent clustering would support a conclusion of manipulation and conspiratorial behavior.

132.    A group of banks seeking to manipulate Libor would want to submit the lowest bids possible, without drawing attention to themselves by being outliers. By making low submissions that were among the lowest but not so low as to be excluded as being in the lowest quartile, the banks could place maximum downward pressure on Libor while at the same time deflecting potential suspicion from being too low. Accordingly, any clustering of submissions around the fourth-lowest bid would indicate that banks were acting together to drive the Libor rate downward.

133.    In fact, during the Relevant Period rate submissions by Bank of America, Citi, and JPMorgan exhibited suspicious "bunching" patterns around the bottom of the second quartile. Citi and Bank of America frequently submitted USD Libor quotes that were *identical* to the fourth-lowest submission.

---

[35]   Carrick Mollenkamp, *Libor's Accuracy Becomes Issue Again*, Wall St. J., Sept. 24, 2008.

*Figure F*



*Figure G*





134.   Studies have found that other measures of bank creditworthiness—such as the spreads on CDS referencing each of these three banks—did not exhibit this bunching behavior during the Relevant Period. Snider & Youle at 2. This undermines any claim that the Libor bunching was the result of these banks actually having similar borrowing costs. Figure I below illustrates this discrepancy with information comparing spreads on CDS referencing the panel banks with a term of one year with quotes submitted by the panel banks for one-year USD Libor.

*Figure I*



135. Similarly, a 2012 analysis found statistically significant evidence of non-random "joint participation" in the deciding group for USD Libor during the summer of 2008.[36] This means certain groups of banks tended to enter the deciding group on the same day at a suspiciously high frequency, providing further evidence of collusion.

### F. Additional Evidence of Defendants' Wrongdoing

136. *As to Barclays, UBS, and RBS*, these banks' wrongdoings were detailed at length in their respective regulatory settlements discussed above.

137. *As to Bank of America,* as discussed above Bank of America had a very unbalanced USD Libor portfolio, providing it with a powerful incentive to have Libor set low. Unsurprisingly, then, as also discussed above, the bank was among those that "bunched" among the lowest submitters, and has been a repeated target of the many ongoing Libor probes. In June

---

[36] Abrantes-Metz, *Libor Manipulation?*, 36 J. Banking & Fin. at 144-147.

2013, it was reported that Bank of America was required by the Monetary Authority of Singapore to increase its reserves by S$ 700-800 million ($549-627 million) as a sanction for artificially manipulating benchmark interest rates. This development in addition to Bank of America's bunching and other statistical evidence discussed above demonstrate that it suppressed its Libor submissions during the Relevant Period.

138. *As to Citi,* the bunching behavior described above is particularly suspect given its serious financial problems during the Relevant Period. On November 21, 2008, for instance, the *Wall Street Journal* reported that Citi executives "began weighing the possibility of auctioning off pieces of the financial giant or even selling the company outright" after the company faced a plunging stock price. The article noted Citi executives and directors "rushing to bolster the confidence of investors, clients and employees" in response to uncertainty about Citigroup's exposure to risk concerning mortgage-related holdings. On November 24, 2008, *CNNMoney* wrote:

> If you combine opaque structured-finance products with current fair-value accounting rules, almost none of the big banks are solvent because that system equates solvency with asset liquidity. So at this moment Citi isn't solvent. Some argue that liquidity, not solvency, is the problem. But in the end it doesn't matter. Fear will drive illiquidity to such a point that Citi could be rendered insolvent under the current fair-value accounting system.

139. On January 20, 2009, *Bloomberg* reported that Citigroup "posted an $8.29 billion fourth-quarter loss," completing its worst year, and planned to split in two under Chief Executive Officer Vikram Pandit's plan to rebuild a capital base eroded by the credit crisis. The article further stated, "[t]he problems of Citi, Bank of America and others suggest the system is bankrupt."

140.    Despite Citi's financial woes, which necessarily raised its actual borrowing costs, the bank's Libor submissions did not appreciably increase. Instead, Citi made low submissions bunched around those of other panel banks.

141.    Tom Hayes, discussed above, was lured from UBS to Citi with a $5 million job offer. According to the Japanese FSA, Hayes proceeded to attempt to pressure colleagues and employees at other banks into manipulating Tibor. Christopher Cecere was the head of G10 trading and sales for Asia at Citibank. The Japanese FSA found that Cecere "and another Citigroup trader engaged in 'seriously unjust and malicious' conduct by asking bankers to alter data they submitted while setting a benchmark Japanese lending rate." Citi's manipulation of Libor in other currencies was part of a broad scheme to benefit its trading positions and protect its reputation, which, as shown by the facts above, included suppression of its USD Libor submissions.

142.    *As to Deutsche Bank*, Guillaume Adolph was a derivatives trader at Deutsche Bank named in the Canadian Competition Law Officer's affidavit as a trader involved in the manipulation of JPY Libor. According to the affidavit, Trader A communicated to Mr. Adolph his trading positions, his desire for a certain movement in JPY Libor and instructions to get Deutsche Bank to make JPY Libor submissions consistent with his wishes, and Mr. Adolph agreed to do so. Deutsche Bank's manipulation of JPY Libor was part of a broader scheme to benefit its trading positions, including through suppression of USD Libor, and enabled it to make substantial ill-gotten gains.

143.    Deutsche Bank was also implicated in a wrongful termination lawsuit filed by Tan Chi Min, the former head of delta trading for RBS's global banking and markets division in Singapore. Those proceedings revealed an August 19, 2007 message from Tan to a trader at

Deutsche Bank stating "[i]t's just amazing how Libor-fixing can make you that much money or lose it if opposite." "It is a cartel now in London," Tan added.

144.    On July 31, 2012, Deutsche Bank confirmed that certain of its employees improperly manipulated Libor.  For example, Deutsche Bank discovered that Christian Bittar, the head of its money markets derivatives group, colluded with a trader at Barclays to rig Libor.  As a proprietary trader, Bittar bet on Libor with the bank's own money, and was paid a percentage of his trading profits.  The profits Deutsche Bank earned from these bets were substantial. According to the *Wall Street Journal*, Deutsche Bank made $654 million by betting on small changes in Libor during 2008.  Bittar was suspended and eventually fired for his misconduct. Bittar was reportedly forced to give up €40 million (over $52.1 million) in deferred pay due to his involvement in the Libor scandal.  Deutsche Bank has dismissed or suspended a total of seven employees due to their roles in rigging Libor.

145.    As reported by *Bloomberg* on January 22, 2013, Deutsche Bank's co-CEO Anshu Jain told clients and investors during a panel discussion that "[t]he Libor sickens us all. . . .  It sickens me the most of all scandals."[37]  According to Jain, multiple banks were engaged in wrongdoing related to Libor.

146.    BaFin, the German financial regulator, has launched an investigation into Libor manipulation by Deutsche Bank, as have regulators in the United States, Japan, and Singapore. BaFin President Elke König urged banks involved in the scandal to make "provisions for anticipated losses," and said the magnitude of the manipulations has rendered her speechless.  On March 21, 2013, it was reported that BaFin's investigation had exposed "organisational flaws" at Deutsche Bank.  BaFin's report is expected to feed into Libor-related settlement talks between

---

[37]  Nicholas Comfort, *Deutsche Bank's Jain Sickened by Libor Manipulation Scandal*, Bloomberg, Jan. 22, 2013.

Deutsche Bank and regulators in the United States and United Kingdom. Deutsche Bank recently increased the amount it has set aside for the potential legal actions it could face to approximately $781 million.

147.    In recently filed criminal charges, the Serious Fraud Office alleges that Tom Hayes conspired with traders at Deutsche Bank to manipulate Libor.

148.    *As to JPMorgan,* as discussed above, the bank had a very unbalanced exposure to USD Libor that benefitted greatly from suppressed USD Libor—and thus it is not surprising that the bank was another whose submissions were suspiciously bunched among the lowest ones.

149.    Paul Glands and Stewart Wiley were derivatives traders with JPMorgan, who were named in the Canadian Competition Law Officer's affidavit as involved in the manipulation of JPY Libor. According to the affidavit, Trader A communicated to the traders his trading positions, his desire for a certain movement in JPY Libor and instructions for the traders to get JPMorgan to make JPY Libor submissions consistent with his wishes, and the traders agreed to do so. JPMorgan's manipulation of JPY Libor was part of a broader scheme to benefit its trading positions, including through manipulation of USD Libor. JPMorgan was also among the banks recently sanctioned by the Monetary Authority of Singapore for manipulating benchmark interest rates. Finally, JPMorgan was named in criminal charges recently filed by the Serious Fraud Office as one of the banks with which Tom Hayes conspired to manipulate Libor.

150.    *As to Credit Suisse,* in February 2012, the bank disclosed that the Swiss Competition Commission had commenced an investigation involving the bank concerning alleged collusive behavior among traders to affect the bid ask spread for derivatives tied to the Libor and Tibor reference rates fixed with respect to certain currencies, and collusive agreements to influence these rates. In October 2012, it was reported that New York Attorney General Eric

Schneiderman had issued subpoenas to nine banks, including Credit Suisse, as part of an investigation into Libor manipulation. In June 2013, it was reported that Credit Suisse was sanctioned by the Monetary Authority of Singapore for manipulating benchmark interest rates. This development and the statistical evidence discussed above—including the negative correlation between Credit Suisse's probability of default and its Libor submissions—demonstrate that Credit Suisse suppressed its Libor quotes during the Relevant Period.

## II.  DEFENDANTS' MISCONDUCT HARMED PLAINTIFF AND ITS ASSIGNORS

### A.  The Funds' Basis Package Investment Strategy

151.  As detailed in the Exhibits, the Funds entered into many basis packages with Defendants, in reliance on the integrity of Libor.

152.  First, as detailed in Exhibit B, the Funds purchased corporate fixed-rate bonds from Defendants. Second, the Funds simultaneously entered into, with the same selling Defendants, CDS referencing and in the same amount as the bonds and interest rate swaps with a notional amount matching or almost matching the principal amount of the bonds.[38] The terms of the swaps are set forth in Exhibit A. The CDS were designed to hedge credit risk while the swaps were meant to hedge interest rate and bank counterparty risk. These trades were lucrative to Defendants, who earned substantial fees and profits in connection with the bond and swap trades. The Funds should have benefited from rising USD Libor rates due to the declining credit quality of USD Libor panel banks in 2008.

---

[38]  For example, on December 13, 2007, FRV purchased a $24,945,000 bond issued by Freeport McMoRan Copper & Gold Inc. ("FCX") from Defendant JPMorgan. To hedge its interest-rate risk, on December 13, 2007, the Fund entered into a $25,000,000 fixed-to-floating interest rate swap with JPMorgan under which the Fund paid interest at a fixed rate in exchange for 3-month USD Libor.

153.    The integrity of Libor was critical to the Funds' investment strategy for the basis packages. Had Libor reflected the bank credit risk that was clearly recognized by the market in CDS spreads for the Libor panel banks, Libor would have been significantly higher. During the periods of highest stress in late 2008 and early 2009, the same time period when the Funds were forced to terminate the interest rate swaps, true bank borrowing costs (as demonstrated by those CDS spreads) were several hundred basis points higher than where Libor was being fixed. But for Defendants' fraudulent suppression of Libor, the Funds would have made significant profits on the interest rate swaps, which would have more than offset the losses on the bonds (as rising Libor rates should have meant the Funds were net in the money as the recipient of the floating leg of the fixed-for-floating swaps).

## B.    Defendants' Libor Suppression Dramatically Altered the Performance of the Transactions

154.    The point of the Funds' purchase of the bonds alongside a swap transaction was to ensure that the Funds would benefit from rising interest rates and deteriorating bank credit. But due to the Defendants' misconduct, Libor did not rise as it should have. Defendants' misconduct thus left the Funds with precisely the unprofitable bond portfolio that they had entered the swaps to avoid. This caused harm to the Funds in multiple ways.

155.    First, suppressed Libor means that investors on the floating side of fixed-for-floating swaps (like the Funds) received less than they should have on each and every payment date.

156.    Second, collateral support annexes attached to the Funds' swap agreements permitted the party that was receiving net payments (here the Defendants) to request the party making net payments (here the Funds) to post cash collateral equal to the mark-to-market value of the swaps. Libor suppression caused substantial mark-to-market losses on the swaps. The

resulting collateral demands would not have been made but for Defendants' misconduct, and caused further harm to the Funds. Satisfying these collateral calls used up much of the Funds' remaining liquidity. Redemption demands due to losses on the basis packages and the collateral calls led to forced sales of many of the bonds and early termination of many of the swaps on very unfavorable terms in November and December 2008. These forced sales locked in substantial losses for the Funds.

157. Third, at the time of early termination of the swaps, the Funds made inflated payments directly linked to then-prevailing suppressed USD Libor rates because Libor was artificially low. Many times, Defendants themselves terminated the swaps on a negotiated basis, using the manipulated Libor as a pretext to demand inflated termination payments from the Funds. The Funds also terminated the swaps by transferring their obligations to a third party. When the swaps were terminated in this manner, the original counterparty Defendant knew about it because the ISDA Master Agreement requires consent for the assignment of any transaction. In the case of those assignments, Defendants therefore knew that the Funds were transferring their obligations under the swaps at inflated amounts. Defendants thus acted in bad faith to deprive the Funds of the benefit of their bargain.

## C. Defendants' Misconduct Breached Many of the Terms of their Swap Contracts

158. The exact terms of the Funds' contracts with each Defendant are set forth in the Exhibits and are also summarized in the Counts below. The contractual relationships between the Funds and each Defendant followed the same pattern. The swaps in particular were documented under ISDA Master Agreements.

159. ISDA Master Agreements are market-standard agreements that provide a common set of terms to be used in a series of swaps between two parties.[39] The parties may customize the ISDA Master Agreement through use of a Schedule, which contains elections, additions, and amendments. ISDA Master Agreements are also typically supplemented by a Credit Support Annex ("CSA"), which governs the amount of collateral to be delivered on the demand of a party. While the ISDA Master Agreement and the Credit Support Annex set the general terms of a relationship, a Confirmation is used to document a particular transaction. The Confirmation supplements and forms part of the ISDA Master Agreement between the two parties.

160. Confirmations for the interest rate swaps involved here (detailed in the Exhibits) provided that the banks were to pay the "Floating Amount," calculated by a "Calculation Agent" with reference to 3-month USD Libor. Either the Confirmations or the Schedules to the ISDA Master Agreements involved here specified that each Defendant would act as "Calculation Agent" for its interest rate swaps with the Funds. As that term was defined, the Calculation Agent was to calculate its floating-rate payments "in good faith and in a commercially reasonable manner." Defendants breached such terms, and others, in each of their respective agreements when floating payments were calculated not based on Libor as properly calculated, but based on knowingly manipulated and suppressed Libor rates.

161. The ISDA Master Agreements also have a term requiring that each party "comply in all material respects with all applicable laws . . . to which it may be subject if failure so to comply would materially impair its ability to perform its obligations under this Agreement." Defendants breached such terms, and others, in each of their respective agreements when they

---

[39] As documented in Exhibits C-L, the Schedules to each ISDA Master Agreement specified that New York law would govern, while the Derivatives Trading Arrangement between FRV and JPMorgan Chase Bank specified that English law would govern.

violated numerous laws by manipulating, and colluding to manipulate, Libor. For example, on June 27, 2012, the DOJ stated that "[f]or years, traders at Barclays encouraged the manipulation of LIBOR and EURIBOR submissions in order to benefit their financial positions; and, in the midst of the financial crisis, Barclays management directed that U.S. Dollar LIBOR submissions be artificially lowered. For this illegal conduct, Barclays is paying a steep price."

162. UBS entered into a non-prosecution agreement with the DOJ while its subsidiary, UBS Securities Japan Co. Ltd., pleaded guilty to felony wire fraud for manipulating JPY Libor and Tibor. In addition, two senior UBS traders—Tom Hayes and Roger Darin—were charged in a criminal complaint alleging conspiracy and antitrust violations based on the same misconduct. According to Assistant Attorney General Lanny A. Breuer, "[t]he scheme alleged is epic in scale." Breuer added that the "agreement by UBS Japan to plead guilty, the charges against individual alleged perpetrators of these crimes, and our agreement recognizing the steps being taken by UBS AG to right itself demonstrate the Justice Department's determination to hold accountable those in the financial marketplace who break the law."

163. Similarly, RBS Securities Japan Limited, pleaded guilty to felony wire fraud based on its manipulation of JPY Libor. As part of a deferred prosecution agreement, the DOJ also filed a criminal information charging RBS with wire fraud and antitrust violations for its role in manipulating JPY and Swiss Franc Libor. As discussed above, UBS and RBS engaged in the same misconduct with respect to USD Libor, and thus clearly broke numerous laws due to their manipulation of USD Libor as well.

164. As noted above, a CSA governs the amount of collateral to be delivered on the demand of a party. Under the terms of a CSA, this amount is calculated based on the mark-to-market value of the transactions governed by the related ISDA Master Agreement. The CSAs

here had an express term requiring the calculations of collateral demands to be made "in good faith and in a commercially reasonable manner." Defendants breached such terms, and others, in each of their respective agreements when Defendants instead calculated their collateral demands based on Libor figures they knew were being manipulated and suppressed.[40]

165. Each Defendant's conduct also breached its implied duty of good faith and fair dealing created by its contractual relationships with the Funds. The Libor suppression allowed each Defendant to reap windfall profits, first calculating and then paying artificially low floating rates substantially below the fixed rates owed by the Funds. The Defendants further breached their duties of good faith and fair dealing by making collateral calls that used up much of the Funds' remaining liquidity, without disclosing that those demands were being calculated based on a manipulated Libor figure. Finally, each Defendant committed fraud-by-omission, by entering into swaps in which it would make payments based on USD Libor and then making lower payments and higher collateral demands than it should have, without disclosing that USD Libor was being and would continue to be manipulated and suppressed.

### D. Defendants' Misconduct Also Harmed Salix Capital Ltd. and the Fund Managers

166. During the Relevant Period, Salix Capital Ltd. served as a sub-advisor to the FrontPoint Funds. Pursuant to investment advisory agreements, Salix Capital Ltd. agreed to manage the assets of the Funds subject to certain investment guidelines and restrictions. The investment advisory agreements provided that in consideration of its services, Salix Capital Ltd.

---

[40] Because Funds were obligated under the swaps to pay a fixed amount and receive a Libor-based amount in return, legitimately "low" Libor would expose a Fund to collateral calls to account for the growing gap between what it "owed" and what it would be "paid" under the swaps. Thus, Libor suppression caused the collateral calls to be much, much higher than they would have been absent Defendants' wrongful conduct. In fact, without Libor suppression, the Funds probably would have been required to post very little or no collateral.

would be entitled to receive a portion of the management and incentive fees paid by Fund investors to the Funds.

167.    Pursuant to each Fund's offering memorandum, the management fee was calculated as 1.5% of the Fund's net asset value while the incentive fee was calculated as 20% of the realized and unrealized net profits of the limited partners. Thus, the management and incentive fees were directly linked to the Funds' performance.

168.    In October 2006, FrontPoint Partners, LLC, Salix Capital Ltd.,[41] Daniel Donovan, and Richard Grindon entered into an Amended and Restated Services and Collaboration Agreement. Pursuant to that agreement, FrontPoint Partners, LLC agreed to pay Salix Capital Ltd. each calendar year an amount calculated as a percentage of FrontPoint's management fees, plus a portion of various incentive fees tied to the performance of the Funds.

169.    As CEO of Salix Capital Ltd., Donovan received compensation based on the management and incentive fees Salix Capital Ltd. earned in its role as sub-advisor to the Funds. Eric Grannan and Thomas Felgner each generally received one-third of Salix Capital Ltd.'s fees as compensation for their role in executing trades and managing the Funds' investments.

170.    As discussed above, Defendants' misconduct artificially lowered the performance of the Funds in dramatic ways. Thus, Defendants' misconduct also dramatically altered the compensation due to Salix Capital Ltd. and the Fund Managers.

## III.    PLAINTIFF'S CLAIMS ARE TIMELY

### A.    No Period Could Begin Until Defendants' Last Bad Act

171.    Defendants' misconduct occurred and continued on a daily basis with each false submission to the BBA. Each false submission artificially lowered Libor, reducing the Libor-

---

[41]    The agreement was in fact entered with GDG Asset Management Ltd., which, as noted above, later became known as Salix Capital Ltd.

based payments the Funds were entitled to under the swaps and subjecting the Funds to fraudulent collateral demands. Because Libor remained suppressed when the Funds terminated the swaps, the Funds were forced to pay inflated termination fees. The Funds would not have been harmed to the extent they were had Defendants' wrongs been only a few isolated acts. Rather, it was the sustained suppression of Libor over a multi-year period that inflicted heavy, ultimately fatal losses on the Funds.

172.    The acts of manipulation described herein were not carried out by individuals, but through a conspiracy between and amongst, among others, the panel banks. Such collusion was necessary because of the way Libor is calculated and has been confirmed by government investigations, as discussed above. Defendants committed numerous overt acts in furtherance of their conspiracy, including making false submissions to the BBA and actively concealing their misconduct by, among other things, making false or misleading public statements concerning Libor.

173.    These facts require the tolling of any otherwise-applicable statute of limitation until, at the very earliest, the occurrence of Defendants' last bad act.

### B.    Fraudulent Concealment

174.    In reality, the statutes of limitations on Plaintiff's claims did not begin to run until much later. This is because during the Relevant Period, Defendants effectively, affirmatively, and fraudulently concealed their wrongful acts from Plaintiff, its assignors, and the public. Plaintiff and its assignors did not know, nor could they reasonably have known, facts indicating that Defendants were engaging in misconduct that caused Libor to be artificially depressed until, at the earliest and likely even much later, March 15, 2011, when UBS disclosed that it was being investigated by the U.S. government with regard to Libor manipulation in coordination with other banks.

175. Defendants engaged in affirmative acts to conceal their misconduct. As a result, even extremely sophisticated market participants were unaware that this misconduct was occurring. Former Chairman of the United States Federal Reserve, Alan Greenspan, commented: "Through all of my experience, what I never contemplated was that there were bankers who would purposely misrepresent facts to banking authorities. You were honor-bound to report accurately, and it never entered my mind that, aside from a fringe element, it would be otherwise."

176. Defendants, in conjunction with the BBA, actively denied the existence of a conspiracy and engaged in a campaign of misinformation to mask the widespread systematic suppression that was occurring. For example, on November 29, 2007, a Barclays manager contacted a representative of the BBA to advise that USD "LIBORs are being set lower than where they ought to be" and informed the BBA that this issue applied to all of Defendants. The Barclays manager stated that Defendants were submitting rates that were too low because "banks are afraid to stick their heads above the parapet and post higher numbers because of what happened to [Barclays] when [Barclays] did. You get shot at." The Barclays manager identified certain other Defendants that were submitting Libor rates lower than where those banks could actually borrow funds. In order to protect its members, however, the BBA kept this information from the public. It was only released much later, in connection with Barclays' settlement agreements.

177. The Foreign Exchange and Money Markets Committee—which was responsible for the functioning and development of Libor and counted certain of Defendants among its members—likewise covered up Defendants' fraudulent and collusive scheme. UBS's representative on the Foreign Exchange and Money Markets Committee in 2009, for instance,

knew that Libor was being rigged but directed employees to "be careful" not to expose Defendants' wrongdoing.

178.    Regulators themselves have emphasized the secretive nature of Defendants' conspiracy. In its findings against UBS, the FSA stated that: "[t]he misconduct was extensive and widespread" and included "an unquantifiable number of oral requests, which by their nature would not be documented. . . ."[42] Because UBS and other Defendants made a concerted effort to hide their misconduct from regulators and the public, the FSA concluded that the "routine and widespread manipulation of the submissions was not detected by Compliance or by Group Internal Audit," despite five audits of the relevant business area during the Relevant Period.

179.    Defendants also concealed their misconduct from regulators through outright falsehoods. For example, on March 5, 2008, the FSA asked Barclays what it was paying for funding in certain tenors and currencies. A Barclays manager stated internally that he did not want to disclose that Barclays was borrowing USD "way over LIBOR" and would rather indicate that it was paying a rate equal to Libor. A Barclays submitter agreed that if he responded with "the honest truth" it might open a "can of worms." Barclays responded to the FSA that it was paying for twelve-month USD at Libor "flat," which was false.

180.    Even when regulators began to uncover evidence that Defendants' were falsifying their Libor submissions, they did not immediately reveal that information to the public. On April 11, 2008, for instance, a Barclays employee told an employee of the New York Federal Reserve that he was aware Defendants were making Libor submissions lower than what they were

---

[42]    Financial Services Authority, FSA/PN/116/2012, *UBS fined £160 million for significant failings in relation to LIBOR and EURIBOR* (Dec. 19, 2012), http://www.fsa.gov.uk/library/communication/pr/2012/116.shtml.

actually paying and that "the ones that need the cash most put in the lowest, lowest rates."[43] The

Barclays employee said that Barclays could not borrow money at the rates submitted by other

Defendants and that "if we can't borrow money at that rate, then no one else could really. . . . I

mean we, you-you know we speak to everyone that everyone else does so, um, yeah, it's quite,

quite an uncomfortable feeling and I don't know if at some stage LIBORs will correct

themselves." This information was not publicly disclosed until July 2012.

181.    Similarly, on October 10, 2008, a Barclays employee privately reported to the

New York Federal Reserve that its USD Libor submissions were "unrealistic."[44] And on

October 24, 2008, another Barclays employee privately reported to the New York Federal

Reserve that USD Libor rates were "absolute rubbish," citing submissions by WestLB and

Deutsche Bank as being artificially low.[45] The employee stated he was aware of banks that were

making Libor submissions that were below what they actually paid to borrow funds. Again,

none of this was revealed to the public until recently.

182.    Not only did Defendants and the BBA hide the fact that Libor was being

artificially manipulated, but they also actively misled investors and the public by making false

representations about the integrity of the Libor fixing process. In 2008, the BBA's "LIBOR

Governance and Scrutiny" report stated that "[t]he BBA employs a full time manager to

supervise on a day-to-day basis all aspects of LIBOR calculation and dissemination to the

---

[43]    New York Federal Reserve Bank, Unofficial Transcript, ID09274211, at 7 (Apr. 11, 2008), *available at* http://www.newyorkfed.org/newsevents/news/markets/2012/Barclays_LIBOR_Matter.html.

[44]    New York Federal Reserve Bank, Unofficial Transcript of Telephone Call, BARC-MAY6-000091-97, at 95 (Oct. 10, 2008), *available at* http://www.newyorkfed.org/newsevents/news/markets/2012/Barclays_LIBOR_Matter.html.

[45]    New York Federal Reserve Bank, Unofficial Transcript of Telephone Call, BARC-MAY6-00098-100, at 000098, 000100 (Oct. 24, 2008), *available at* http://www.newyorkfed.org/newsevents/news/markets/2012/Barclays_LIBOR_Matter.html.

marketplace. The LIBOR manager works with a team of professionals both in-house and externally to ensure all processes operate to the highest standards."[46] The report further explained that "Thomson Reuters . . . act[s] as the 'designated distributor' of BBA LIBOR rates. All contributions to the LIBOR rate-setting process are collected by Thomson Reuters, who currently perform checking procedures, supervised by the LIBOR manager, on all the submissions before running the calculation and distributing the fixes." Investors such as the Funds had no reason to disbelieve assurances by the BBA that Libor was not being manipulated.

183.    Defendants also engaged in a media campaign that was designed to avoid public scrutiny of their Libor submissions. On April 21, 2008, for instance, Dominic Konstam of Credit Suisse affirmatively stated that low Libor rates were attributable to the fact that U.S. banks, such as Citi and JPMorgan, had access to large customer deposits and borrowing from the Federal Reserve and did not need more expensive loans from other banks: "Banks are hoarding cash because funding from the asset-backed commercial paper market has fallen sharply while money market funds are lending on a short term basis and are restricting their supply." Through statements such as this, Defendants sought to provide alternative explanations for low Libor rates (such as cash hoarding) that would be plausible to investors and prevent them from discovering the truth, which was that Defendants were engaged in a massive conspiracy to manipulate Libor.

184.    In an April 28, 2008 interview with the *Financial Times*, Konstam continued to defend Libor's reliability: "Libor has been a barometer of the need for banks to raise capital. The main problem with Libor is the capital strains facing banks. . . . Initially there was some confusion that Libor itself was the problem, with talk of the rate being manipulated and not

---

[46]    BBA, *LIBOR gets enhanced governance and scrutiny procedures* (Dec. 18, 2008), http://www.bbalibor.com/news-releases/libor-gets-enhanced-governance-and-scrutiny-procedures.

representative of the true cost of borrowing." As a result of these statements, Credit Suisse misled investors to believe that low Libor rates were a function of readily available alternative sources of cash, which lessened the need for interbank borrowing, rather than any collusive effort to suppress Libor.

185.    JPMorgan similarly defended Libor in a May 16, 2008 Reuters report:

The Libor interbank rate-setting process is not broken, and recent rate volatility can be blamed largely on reluctance among banks to lend to each other amid the current credit crunch.

*    *    *

Everyone is funding at a similar level, but when credit conditions worsen and we have periods like this of unprecedented turmoil, the reality is there is not a single borrowing rate."

In that same report, Colin Withers of Citi claimed Libor was reliable because its methods were time-tested: "[T]he measures we are using are historic- up to 30 to 40 years old."

186.    On May 29, 2008, Citi falsely stated it continued to "submit [its] Libor rates at levels that accurately reflect [its] perception of the market." HBOS, another panel bank, likewise asserted its Libor quotes constituted a "genuine and realistic" indication of the bank's borrowing costs. All of these representations were false, and were designed to prevent investors like the Funds from discovering that Libor was being rigged.

187.    Libor's brief rise in September 2008 and the subsequent creation and expansion of liquidity and bailout facilities in the United States and globally made it difficult or impossible to discern signs of manipulation contemporaneously. Consequently, Libor's movements from September 2008 to at least December 2009 were widely accepted as valid and incorporated into government, investor, and academic analyses in reliance on their integrity. For example, through at least December 2009 it was widely accepted that the spread between Libor and the OIS spread during the Relevant Period was an appropriate index of interbank liquidity risk.

188. A search of the academic literature on Libor after September 2008 overwhelmingly returns analyses accepting the integrity of Libor during this period. Almost no one suspected that Libor had been suppressed between September 2008 and December 2009, let alone by the magnitude now apparent.

189. It is only in retrospect that Libor's deviation from publicly available benchmarks provides hints of Defendants' misconduct: the upheaval in the markets, the lack of available data on interbank lending, and in particular the bailout facilities made available to the panel banks were widely understood to be the factors causing interest rates to behave anomalously during the period, as almost every other economic indicator—from the price of crude oil, to the rate of inflation, to the interest rates on short-term deposits—were during the period. Thus, Libor was understood to be sending meaningful economic signals about the crisis rather than exhibiting signs of tampering.

190. Because Defendants took affirmative steps to conceal their misconduct, no reasonable investor could have discovered facts indicating that Defendants were unlawfully manipulating Libor until at the earliest March 15, 2011—the date that UBS first announced that it was being investigated for Libor manipulation.

191. Even then, however, Plaintiff and its assignors did not realize the true extent of Defendants' conspiracy. It was not until the recent revelations from the Barclays, UBS, and RBS settlements, as well as the news of mass arrests and indictments, that Defendants' misconduct began to come to light. These revelations surfaced after a year-and-a-half intensive global probe that involved investigators and regulatory authorities from around the world, something that investors like the Funds could not have done on their own. Even today, the full scope of the conspiracy continues to evolve as investigations uncover additional evidence.

192.    For years after Defendants' and the BBA's denials were issued, there were virtually no indications that Libor manipulation had persisted beyond May 2008. For example, even in March 2011, when government investigations into rate-setting misconduct first came to light, it was universally reported that the inquiry was focused on this early period.[47] In contrast, the bulk of the damages suffered by Plaintiff and its assignors were sustained due to misconduct occurring well after that period, in late 2008 and 2009.

193.    Yet between December 2009 and March 2011—more than a year after the end of the Relevant Period—no news reports indicated even a suspicion that Libor had experienced continued manipulation. If investors should have recognized signs that Libor was manipulated in late 2008 and 2009, one would expect there to be at least some discussion in the public record. Instead, virtually no suspicions were aired.

194.    Investors could not have detected Defendants' Libor manipulation because the integrity of Defendants' submissions were within their exclusive knowledge: only Defendants could know whether they were accurately reporting the rates at which they could borrow. Throughout the Relevant Period, the Funds diligently sought to maximize its investment returns including by actively researching and analyzing events publicly disclosed in the market. Despite the exercise of active and reasonable diligence, however, Plaintiff and its assignors could not and did not uncover Defendants' misconduct due to the self-concealing nature of their scheme and their active efforts to hide it from the public. For these reasons, any statute of limitations affecting or limiting the rights of action by Plaintiff was tolled until at least March 15, 2011, under the doctrine of fraudulent concealment.

---

[47]    Brooke Masters, *et al.*, *Big banks investigated over Libor*, Fin. Times, March 15, 2011, *available at* http://www.ft.com/intl/cms/s/0/ab563882-4f08-11e0-9c25-00144feab49a.html.

## C. The *American Pipe* Doctrine Applies to Plaintiff's Claims

195. On April 15, 2011, a class action was filed against certain panel banks on behalf of those who transacted Libor-based contracts in the over-the-counter market between 2006 and June 2009. See *FTC Capital Gmbh v. Credit Suisse Grp., et al.*, Case No. 11-cv-2613 (S.D.N.Y. Apr. 15, 2011). On August 12, 2011, this action was consolidated as Case No. 11-md-02262. The *FTC Capital* complaint alleged claims for (a) manipulation in violation of the Commodity Exchange Act, 7 U.S.C. § 1, *et seq.*, (b) vicarious liability for manipulation under the Commodity Exchange Act, (c) violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, and (d) unjust enrichment and restitution. Plaintiff here brings a claim for unjust enrichment and restitution. In addition, proof of Plaintiff's other claims will require evidence of the same or similar wrongful acts as would proof of the claims asserted in *FTC Capital* and other class actions in the Libor MDL proceeding.

196. Plaintiff and its assignors were originally included in the defined class in *FTC Capital* in addition to other class actions.

197. Defendants BAC, Barclays Bank plc, Citibank, Credit Suisse Group AG, Deutsche Bank AG, JPMorgan Chase & Co., and UBS are defendants in *FTC Capital* as is Royal Bank of Scotland Group plc, the parent company of Defendant RBS.

198. Plaintiff and its assignors reasonably and justifiably relied on the named plaintiffs in *FTC Capital* and other class actions in the Libor MDL proceeding to protect their rights, and they reasonably and justifiably relied on the class-action doctrines articulated in *American Pipe & Construction Co. v. Utah*, 414 U.S. 538 (1974), and *In re WorldCom Securities Litigation*, 496 F.3d 245, 256 (2d Cir. 2007), to satisfy the statutes of limitations and repose on their claims.

199.    Under *American Pipe*, all putative class members are treated as if they filed their own individual actions, until they either opt out or a certification decision excludes them. *American Pipe*, 414 U.S. at 255.

200.    Accordingly, the claims here are deemed to have been brought as of the date they or similar claims were brought in the related class actions.

## FIRST CAUSE OF ACTION
### (Breach of Contract Against Defendant Bank of America)

201.    Plaintiff realleges each allegation above as if fully set forth herein.

202.    This count is brought by Salix Capital US as assignee of the Funds. This count is against Defendant Bank of America.

203.    FRV entered into an ISDA Master Agreement with Defendant BANA dated September 13, 2005, which is accompanied by a Schedule, a Credit Support Annex, and Swap Confirmations as detailed in the Exhibits.

204.    As detailed in the Exhibits, this agreement (the "Bank of America Agreement") required Bank of America to:

   a.  Calculate and pay to FRV a Floating Amount determined in good faith and in a commercially reasonable manner and based on a Libor untainted by manipulation; and

   b.  Calculate and demand from FRV collateral amounts determined in good faith and in a commercially reasonable manner and based on a Libor untainted by manipulation.

205.    Bank of America knowingly breached and defaulted on the Bank of America Agreement through its fraudulent conduct, its failure to disclose its fraudulent conduct and improper collusion with other Defendants, its intentional misrepresentation and manipulation of

Libor, its collection of overpayments from (or making underpayments to) FRV based on the artificially suppressed Libor, and its collateral calls based on the artificially suppressed Libor.

206.    Had Libor not been suppressed by Bank of America's fraudulent conduct, FRV's basis packages would have been profitable. As a result of Bank of America's breaches of the Bank of America Agreement, FRV has suffered economic losses and damages in an amount to be determined at trial, and is entitled to be placed in the same situation as if the Bank of America Agreement had been fully performed. Plaintiff seeks all losses caused by Libor suppression, including loss of interest, lost profits, and all losses on the swaps and bonds, including when FRV was forced to unwind. Plaintiff has also incurred reasonable out-of-pocket expenses, including legal fees, to enforce and protect FRV's rights under the Bank of America Agreement.

## SECOND CAUSE OF ACTION
### (Breach of Implied Covenant of Good Faith and Fair Dealing Against Defendant Bank of America)

207.    Plaintiff realleges each allegation above as if fully set forth herein.

208.    This count is brought by Salix Capital US as assignee of the Funds. This count is against Defendant Bank of America.

209.    The Bank of America Agreement contained the provisions described above. Implied in this agreement was a covenant that the parties would deal with each other in good faith and would not engage in any conduct to deprive the other of the benefits of the agreement.

210.    Bank of America failed to perform its obligations in good faith under this agreement by knowingly, intentionally, and secretly suppressing Libor to reduce its payments under the swaps to its advantage at the expense of the Funds; by making collateral calls based on the artificially suppressed Libor; and by negotiating settlement amounts to terminate swaps based on artificially suppressed Libor. Bank of America knew that an important FRV objective was to

hedge interest-rate risk, and that FRV was willing to purchase the bonds or enter into the swaps only in reliance on the integrity of Libor.

211.     As Bank of America knew, however, its manipulation of Libor deprived FRV of the benefit of the bargain by causing payments to FRV under the swaps that were much lower than they should have been and forcing FRV to satisfy inflated collateral demands and make inflated termination payments. Had Libor not been suppressed by Bank of America's fraudulent conduct, FRV's basis packages would have been profitable. As a direct and proximate result of Bank of America's knowing, intentional and bad faith violation of the Bank of America Agreement's implied covenants of good faith and fair dealing, FRV has suffered damages in an amount to be determined at trial. Plaintiff seeks all losses caused by Libor suppression, including loss of interest, lost profits, and all losses on the swaps and bonds, including when FRV was forced to unwind.

### THIRD CAUSE OF ACTION
**(Breach of Contract Against Defendant Barclays)**

212.     Plaintiff realleges each allegation above as if fully set forth herein.

213.     This count is brought by Salix Capital US as assignee of the Funds. This count is against Defendant Barclays.

214.     FRV entered into an ISDA Master Agreement with Defendant Barclays Bank dated January 16, 2002, which is accompanied by a Schedule, a Credit Support Annex, and Swap Confirmations as detailed in the Exhibits.

215.     FVO entered into an ISDA Master Agreement with Defendant Barclays Bank dated March 1, 2007, which is accompanied by a Schedule, a Credit Support Annex, and Swap Confirmations as detailed in the Exhibits.

216. As detailed in the Exhibits, these agreements (the "Barclays Agreements") collectively required Barclays to:

> a. Calculate and pay to FrontPoint a Floating Amount determined in good faith and in a commercially reasonable manner and based on a Libor untainted by manipulation; and
>
> b. Calculate and demand from FrontPoint collateral amounts determined in good faith and in a commercially reasonable manner and based on a Libor untainted by manipulation.

217. Barclays knowingly breached and defaulted on the Barclays Agreements through its fraudulent conduct, its failure to disclose its fraudulent conduct and improper collusion with other Defendants, its intentional misrepresentation and manipulation of Libor, its collection of overpayments from (or making underpayments to) the Funds based on the artificially suppressed Libor, and its collateral calls based on the artificially suppressed Libor.

218. Had Libor not been suppressed by Barclays' fraudulent conduct, the Funds' basis packages would have been profitable. As a result of Barclays' breaches of the Barclays Agreements, the Funds have suffered an economic loss and damages in an amount to be determined at trial, and are entitled to be placed in the same situation as if the Barclays Agreements had been fully performed. Plaintiff seeks all losses caused by Libor suppression, including loss of interest, lost profits, and all losses on the swaps and bonds, including when the Funds were forced to unwind. Plaintiff has also incurred reasonable out-of-pocket expenses, including legal fees, to enforce and protect the Funds' rights under the Barclays Agreements.

## FOURTH CAUSE OF ACTION
### (Breach of Implied Covenant of Good Faith and Fair Dealing Against Defendant Barclays)

219. Plaintiff realleges each allegation above as if fully set forth herein.

220. This count is brought by Salix Capital US as assignee of the Funds. This count is against Defendant Barclays.

221. The Barclays Agreements contained the provisions described above. Implied in these agreements was a covenant that the parties would deal with each other in good faith and would not engage in any conduct to deprive the other of the benefits of the agreements.

222. Barclays failed to perform its obligations in good faith under these agreements by knowingly, intentionally, and secretly suppressing Libor to reduce its payments under the swaps to its advantage at the expense of the Funds; by making collateral calls based on the artificially suppressed Libor; and by negotiating settlement amounts to terminate swaps based on artificially suppressed Libor. Barclays knew that an important Fund objective was to hedge interest-rate risk, and that the Funds were willing to purchase the bonds or enter into the swaps only in reliance on the integrity of Libor.

223. As Barclays knew, however, its manipulation of Libor deprived the Funds of the benefit of the bargain by causing payments to the Funds under the swaps that were much lower than they should have been and forcing the Funds to satisfy inflated collateral demands and make inflated termination payments. Had Libor not been suppressed by Barclays' fraudulent conduct, the Funds' basis packages would have been profitable. As a direct and proximate result of Barclays' knowing, intentional and bad faith violation of the Barclays Agreements' implied covenants of good faith and fair dealing, the Funds have suffered damages in an amount to be determined at trial. Plaintiff seeks all losses caused by Libor suppression, including loss of interest, lost profits, and all losses on the swaps and bonds, including when the Funds were forced to unwind.

## FIFTH CAUSE OF ACTION
### (Breach of Contract Against Defendant Citi)

224. Plaintiff realleges each allegation above as if fully set forth herein.

225. This count is brought by Salix Capital US as assignee of the Funds. This count is against Defendant Citi.

226. FRV entered into an ISDA Master Agreement with Defendant CGML dated September 15, 2003, which is accompanied by a Schedule, a Credit Support Annex, and Swap Confirmations as detailed in the Exhibits.

227. FVO entered into an ISDA Master Agreement with Defendant CGML dated January 16, 2008, which is accompanied by a Schedule, a Credit Support Annex, and Swap Confirmations as detailed in the Exhibits.

228. As detailed in the Exhibits, these agreements (the "Citi Agreements") collectively required Citi to:

    a. Calculate and pay to FrontPoint a Floating Amount determined in good faith and in a commercially reasonable manner and based on a Libor untainted by manipulation; and

    b. Calculate and demand from FrontPoint collateral amounts determined in good faith and in a commercially reasonable manner and based on a Libor untainted by manipulation.

229. Citi knowingly breached and defaulted on the Citi Agreements through its fraudulent conduct, its failure to disclose its fraudulent conduct and improper collusion with other Defendants, its intentional misrepresentation and manipulation of Libor, its collection of overpayments from (or making underpayments to) the Funds based on the artificially suppressed Libor, and its collateral calls based on the artificially suppressed Libor.

230. Had Libor not been suppressed by Citi's fraudulent conduct, the Funds' basis packages would have been profitable. As a result of Citi's breaches of the Citi Agreements, the Funds have suffered an economic loss and damages in an amount to be determined at trial, and are entitled to be placed in the same situation as if the Citi Agreements had been fully performed. Plaintiff seeks all losses caused by Libor suppression, including loss of interest, lost profits, and all losses on the swaps and the bonds, including when the Funds were forced to unwind. Plaintiff has also incurred reasonable out-of-pocket expenses, including legal fees, to enforce and protect the Funds' rights under the Citi Agreements.

## SIXTH CAUSE OF ACTION
### (Breach of Implied Covenant of Good Faith and Fair Dealing Against Defendant Citi)

231. Plaintiff realleges each allegation above as if fully set forth herein.

232. This count is brought by Salix Capital US as assignee of the Funds. This count is against Defendant Citi.

233. The Citi Agreements contained the provisions described above. Implied in these agreements was a covenant that the parties would deal with each other in good faith and would not engage in any conduct to deprive the other of the benefits of the agreements.

234. Citi failed to perform its obligations in good faith under these agreements by knowingly, intentionally, and secretly suppressing Libor to reduce its payments under the swaps to its advantage at the expense of the Funds; by making collateral calls based on the artificially suppressed Libor; and by negotiating settlement amounts to terminate swaps based on artificially suppressed Libor. Citi knew that an important Fund objective was to hedge interest-rate risk, and that the Funds were willing to purchase the bonds or enter into the swaps only in reliance on the integrity of Libor.

235. As Citi knew, however, its manipulation of Libor deprived the Funds of the benefit of the bargain by causing payments to the Funds under the swaps that were much lower than they should have been and forcing the Funds to satisfy inflated collateral demands and make inflated termination payments. Had Libor not been suppressed by Citi's fraudulent conduct, the Funds' basis packages would have been profitable. As a direct and proximate result of Citi's knowing, intentional and bad faith violation of the Citi Agreements' implied covenants of good faith and fair dealing, the Funds have suffered damages in an amount to be determined at trial. Plaintiff seeks all losses caused by Libor suppression, including loss of interest, lost profits, and all losses on the swaps and bonds, including when the Funds were forced to unwind.

## SEVENTH CAUSE OF ACTION
### (Breach of Contract Against Defendant Credit Suisse)

236. Plaintiff realleges each allegation above as if fully set forth herein.

237. This count is brought by Salix Capital US as assignee of the Funds. This count is against Defendant Credit Suisse.

238. FRV entered into an ISDA Master Agreement with Defendant CSIN dated June 18, 2003, which is accompanied by a Schedule, a Credit Support Annex, and Swap Confirmations as detailed in the Exhibits.

239. As detailed in the Exhibits, this agreement (the "Credit Suisse Agreement") required Credit Suisse to:

    a. Calculate and pay to FRV a Floating Amount determined in good faith and in a commercially reasonable manner and based on a Libor untainted by manipulation; and

b. Calculate and demand from FRV collateral amounts determined in good faith and in a commercially reasonable manner and based on a Libor untainted by manipulation.

240.     Credit Suisse knowingly breached and defaulted on the Credit Suisse Agreement through its fraudulent conduct, its failure to disclose its fraudulent conduct and improper collusion with other Defendants, its intentional misrepresentation and manipulation of Libor, its collection of overpayments from (or making underpayments to) FRV based on the artificially suppressed Libor, and its collateral calls based on the artificially suppressed Libor.

241.     Had Libor not been suppressed by Credit Suisse's fraudulent conduct, FRV's basis packages would have been profitable. As a result of Credit Suisse's breaches of the Credit Suisse Agreement, FRV has suffered an economic loss and damages in an amount to be determined at trial, and is entitled to be placed in the same situation as if the Credit Suisse Agreement had been fully performed. Plaintiff seeks all losses caused by Libor suppression, including loss of interest, lost profits, and all losses on the swaps and bonds, including when FRV was forced to unwind. Plaintiff has also incurred reasonable out-of-pocket expenses, including legal fees, to enforce and protect FRV's rights under the Credit Suisse Agreement.

## EIGHTH CAUSE OF ACTION
### (Breach of Implied Covenant of Good Faith
### and Fair Dealing Against Defendant Credit Suisse)

242.     Plaintiff realleges each allegation above as if fully set forth herein.

243.     This count is brought by Salix Capital US as assignee of the Funds. This count is against Defendant Credit Suisse.

244.    The Credit Suisse Agreement contained the provisions described above. Implied in this agreement was a covenant that the parties would deal with each other in good faith and would not engage in any conduct to deprive the other of the benefits of the agreement.

245.    Credit Suisse failed to perform its obligations in good faith under this agreement by knowingly, intentionally, and secretly suppressing Libor to reduce its payments under the swaps to its advantage at the expense of FRV; by making collateral calls based on the artificially suppressed Libor; and by negotiating settlement amounts to terminate swaps based on artificially suppressed Libor. Credit Suisse knew that an important FRV objective was to hedge interest-rate risk, and that FRV was willing to purchase the bonds or enter into the swaps only in reliance on the integrity of Libor.

246.    As Credit Suisse knew, however, its manipulation of Libor deprived FRV of the benefit of the bargain by causing payments to FRV under the swaps that were much lower than they should have been and forcing FRV to satisfy inflated collateral demands and make inflated termination payments. Had Libor not been suppressed by Credit Suisse's fraudulent conduct, FRV's basis packages would have been profitable. As a direct and proximate result of Credit Suisse's knowing, intentional and bad faith violation of the Credit Suisse Agreement's implied covenants of good faith and fair dealing, FRV has suffered damages in an amount to be determined at trial. Plaintiff seeks all losses caused by Libor suppression, including loss of interest, lost profits, and all losses on the swaps and bonds, including when FRV was forced to unwind.

## NINTH CAUSE OF ACTION
### (Breach of Contract Against Defendant Deutsche Bank)

247.    Plaintiff realleges each allegation above as if fully set forth herein.

248. This count is brought by Salix Capital US as assignee of the Funds. This count is against Defendant Deutsche Bank.

249. FRV entered into an ISDA Master Agreement with Defendant Deutsche Bank AG dated January 11, 2002, which is accompanied by a Schedule, a Credit Support Annex, and Swap Confirmations as detailed in the Exhibits.

250. FVO entered into an ISDA Master Agreement with Defendant Deutsche Bank AG dated August 22, 2006, which is accompanied by a Schedule, a Credit Support Annex, and Swap Confirmations as detailed in the Exhibits.

251. As detailed in the Exhibits, these agreements (the "Deutsche Bank Agreements") collectively required Deutsche Bank to:

      a. Calculate and pay to FrontPoint a Floating Amount determined in good faith and in a commercially reasonable manner and based on a Libor untainted by manipulation; and

      b. Calculate and demand from FrontPoint collateral amounts determined in good faith and in a commercially reasonable manner and based on a Libor untainted by manipulation.

252. Deutsche Bank knowingly breached and defaulted on the Deutsche Bank Agreements through its fraudulent conduct, its failure to disclose its fraudulent conduct and improper collusion with other Defendants, its intentional misrepresentation and manipulation of Libor, its collection of overpayments from (or making underpayments to) the Funds based on the artificially suppressed Libor, and its collateral calls based on the artificially suppressed Libor.

253. Had Libor not been suppressed by Deutsche Bank's fraudulent conduct, the Funds' basis packages would have been profitable. As a result of Deutsche Bank's breaches of

the Deutsche Bank Agreements, the Funds have suffered an economic loss and damages in an amount to be determined at trial, and are entitled to be placed in the same situation as if the Deutsche Bank Agreements had been fully performed. Plaintiff seeks all losses caused by Libor suppression, including loss of interest, lost profits, and all losses on the swaps and bonds, including when the Funds were forced to unwind. Plaintiff has also incurred reasonable out-of-pocket expenses, including legal fees, to enforce and protect the Funds' rights under the Deutsche Bank Agreements.

## TENTH CAUSE OF ACTION
### (Breach of Implied Covenant of Good Faith and Fair Dealing Against Defendant Deutsche Bank)

254.    Plaintiff realleges each allegation above as if fully set forth herein.

255.    This count is brought by Salix Capital US as assignee of the Funds. This count is against Defendant Deutsche Bank.

256.    The Deutsche Bank Agreements contained the provisions described above. Implied in these agreements was a covenant that the parties would deal with each other in good faith and would not engage in any conduct to deprive the other of the benefits of the agreements.

257.    Deutsche Bank failed to perform its obligations in good faith under these agreements by knowingly, intentionally, and secretly suppressing Libor to reduce its payments under the swaps to its advantage at the expense of the Funds; by making collateral calls based on the artificially suppressed Libor; and by negotiating settlement amounts to terminate swaps based on artificially suppressed Libor. Deutsche Bank knew that an important Fund objective was to hedge interest-rate risk, and that the Funds were willing to purchase the bonds or enter into the swaps only in reliance on the integrity of Libor.

258.    As Deutsche Bank knew, however, its manipulation of Libor deprived the Funds of the benefit of the bargain by causing payments to the Funds under the swaps that were much lower than they should have been and forcing the Funds to satisfy inflated collateral demands and make inflated termination payments. Had Libor not been suppressed by Deutsche Bank's fraudulent conduct, the Funds' basis packages would have been profitable. As a direct and proximate result of Deutsche Bank's knowing, intentional and bad faith violation of the Deutsche Bank Agreements' implied covenants of good faith and fair dealing, the Funds have suffered damages in an amount to be determined at trial. Plaintiff seeks all losses caused by Libor suppression, including loss of interest, lost profits, and all losses on the swaps and bonds, including when the Funds were forced to unwind.

### ELEVENTH CAUSE OF ACTION
### (Breach of Contract Against Defendant JPMorgan)

259.    Plaintiff realleges each allegation above as if fully set forth herein.

260.    This count is brought by Salix Capital US as assignee of the Funds. This count is brought against Defendant JPMorgan.

261.    FVO entered into an ISDA Master Agreement with Defendant JPMorgan Chase Bank, N.A. dated March 15, 2007, which is accompanied by a Schedule, a Credit Support Annex, and Swap Confirmations as detailed in the Exhibits.

262.    FRV entered into a Derivatives Trading Arrangement with Defendant JPMorgan Chase Bank, N.A. dated January 10, 2002 as detailed in the Exhibits.

263.    As detailed in the Exhibits, these agreements (the "JPMorgan Agreements") collectively required JPMorgan to:

  a. Calculate and pay to FrontPoint a Floating Amount determined in good faith and in a commercially reasonable manner and based on a Libor untainted by manipulation; and

  b. Calculate and demand from FrontPoint collateral amounts determined in good faith and in a commercially reasonable manner and based on a Libor untainted by manipulation.

264. JPMorgan knowingly breached and defaulted on the JPMorgan Agreements through its fraudulent conduct, its failure to disclose its fraudulent conduct and improper collusion with other Defendants, its intentional misrepresentation and manipulation of Libor, its collection of overpayments from (or making underpayments to) the Funds based on the artificially suppressed Libor, and its collateral calls based on the artificially suppressed Libor.

265. Has Libor not been suppressed by JPMorgan's fraudulent conduct, the Funds' basis packages would have been profitable. As a result of JPMorgan's breaches of the JPMorgan Agreements, the Funds have suffered an economic loss and damages in an amount to be determined at trial, and are entitled to be placed in the same situation as if the JPMorgan Agreements had been fully performed. Plaintiff seeks all losses caused by Libor suppression, including loss of interest, lost profits, and all losses on the swaps and bonds, including when the Funds were forced to unwind. Plaintiff has also incurred reasonable out-of-pocket expenses, including legal fees, to enforce and protect the Funds' rights under the JPMorgan Agreements.

## TWELFTH CAUSE OF ACTION
### (Breach of Implied Covenant of Good Faith and Fair Dealing Against Defendant JPMorgan)

266. Plaintiff realleges each allegation above as if fully set forth herein.

267.   This count is brought by Salix Capital US as assignee of the Funds. This count is against Defendant JPMorgan.

268.   The JPMorgan Agreements contained the provisions described above. Implied in these agreements was a covenant that the parties would deal with each other in good faith and would not engage in any conduct to deprive the other of the benefits of the agreements.

269.   JPMorgan failed to perform its obligations in good faith under these agreements by knowingly, intentionally, and secretly suppressing Libor to reduce its payments under the swaps to its advantage at the expense of the Funds; by making collateral calls based on the artificially suppressed Libor; and by negotiating settlement amounts to terminate swaps based on artificially suppressed Libor. JPMorgan knew that an important Fund objective was to hedge interest-rate risk, and that the Funds were willing to purchase the bonds or enter into the swaps only in reliance on the integrity of Libor.

270.   As JPMorgan knew, however, its manipulation of Libor deprived the Funds of the benefit of the bargain by causing payments to the Funds that were much lower than they should have been and forcing the Funds to satisfy inflated collateral demands and make inflated termination payments. Had Libor not been suppressed by JPMorgan's fraudulent conduct, the Funds' basis packages would have been profitable. As a direct and proximate result of Defendants' knowing, intentional and bad faith violation of the JPMorgan Agreements' implied covenants of good faith and fair dealing, the Funds have suffered in an amount to be determined at trial. Plaintiff seeks all losses caused by Libor suppression, including loss of interest, lost profits, and all losses on the swaps and bonds, including when the Funds were forced to unwind.

## THIRTEENTH CAUSE OF ACTION
### (Common-Law Fraud Against All Defendants)

271.   Plaintiff realleges each allegation above as if fully set forth herein.

272. This count is brought by Salix Capital US as assignee of the Funds. This count is against all Defendants, for joint and several liability for all losses associated with all of the transactions identified in Exhibits A and B.

273. Defendants were USD Libor panel banks throughout the Relevant Period and submitted false Libor submissions to the BBA on a daily basis. The panel banks participated in the fraudulent conduct alleged herein both directly and through their subsidiaries and affiliates.

274. Defendants made, authorized, or caused the following material misrepresentations and omissions:

    a. Each counterparty Defendant made, authorized, and caused false statements or omissions to be made to the Funds to induce them to enter into the basis packages.

    b. Each Defendant also made, authorized, or caused false submissions to be made to the BBA for the purposes of determining Libor.

    c. By their false submissions, each Defendant caused Libor to misrepresent actual panel bank borrowing rates.

    d. Each Defendant had a duty to disclose the manipulation of Libor to its counterparties and the public, including the Funds, but omitted to do so.

    e. By their omissions and affirmative denials, each Defendant participated in concealing the falsity of its submissions and the manipulation of Libor from the Funds and the public.

    f. Each counterparty Defendant misrepresented the basis of payments the Funds would receive under the swaps, and omitted to disclose that the Floating Amounts would be calculated by reference to manipulated Libor.

g. In the collateral demands to the Funds, each counterparty Defendant misrepresented the amount of collateral owed by the Funds under the CSAs, and omitted that the inflated amounts were calculated by reference to manipulated Libor.

h. Each counterparty Defendant misrepresented the amount of the payments owed by the Funds on early termination of the swaps, and omitted to disclose that the inflated amounts were calculated by reference to manipulated Libor.

275. Defendants made these misrepresentations and omissions knowing that they were false or misleading, or with reckless disregard for their truth, in part to avoid detection and to perpetuate the fraudulent and collusive conduct described in this Complaint.

276. Defendants had reason to expect that the Funds were among the class of persons who would receive and rely on their misrepresentations, including the statements and omissions passed through the BBA to the investing public.

277. Defendants had an obligation and a duty to disclose that they were artificially manipulating Libor, which directly and negatively impacted Libor-linked transactions between the Funds and Defendants. Such duties were triggered not only by the contractual relationship between the parties, but also by their exclusive knowledge over the true (manipulated) nature of Libor, among other things, submitting Libor bids to the BBA without disclosing they were suppressed and falsely denying any manipulation had taken place.

278. Defendants knew or recklessly disregarded material facts demonstrating that their misrepresentations and omissions were false and/or misleading at the time they were made. Defendants further knew that they were failing to disclose material facts that they had a duty to

disclose. Defendants made the false and misleading statements with intent to induce the reliance of the Funds and to defraud them.

279. At the time these misrepresentations were made and the material facts not disclosed, the Funds were ignorant of the true facts. If the Funds had known the truth, they would not have entered into the basis packages, accepted or made payments calculated based on artificially low Libor, responded to collateral calls calculated based on artificially low Libor, agreed to artificially inflated termination payments, or engaged in any other of the transactions triggered by such calculations and collateral calls.

280. The Funds reasonably and justifiably relied on Defendants' false representations and misleading omissions. This includes the false submissions that each Defendant made on a daily basis, which was a necessary input for calculating Libor. Accordingly, the Funds relied on *each* Defendant's false submission with respect to *each* basis package involving the bond and swap transactions listed in Exhibits A and B—including those where another Defendant or a non-panel bank was counterparty.

281. As a direct and proximate result of the wrongful conduct of each of the Defendants, the Funds entered into the basis packages; traded in financial instruments linked to Libor and other instruments in reliance on Libor's integrity; made inflated payments (or received depressed payments) calculated in reliance on Libor's integrity; posted inflated collateral amounts in reliance on Libor's integrity; and entered into termination agreements for inflated consideration in reliance on Libor's integrity. The Funds were forced to liquidate their portfolios, including the bonds, at substantial economic loss. Again, because each Defendant's submission was a necessary input for calculating Libor, *each* Defendant caused the foregoing harm to the Funds with respect to *each* basis package involving the swap and bond transactions

listed in Exhibits A and B—including those where another Defendant or a non-panel bank was counterparty.

282. As a result of the foregoing, the Funds have the right to rescissory damages; in the alternative to rescissory damages, the Funds have suffered damages according to proof. In addition, because Defendants' fraud was willful and wanton, and because, by their acts, they knowingly affected the general public, including but not limited to all persons with interests in Libor, Plaintiff is entitled to recover punitive damages.

### FOURTEENTH CAUSE OF ACTION
**(Common-Law Fraud Against All Defendants)**

283. Plaintiff realleges each allegation above as if fully set forth herein.

284. This count is brought by Salix Capital US as assignee of Salix Capital Ltd. and the Fund Managers. This count is against all Defendants, for joint and several liability for lost management and incentive fees associated with all of the transactions identified in Exhibits A and B.

285. Defendants were USD Libor panel banks throughout the Relevant Period and submitted false Libor submissions to the BBA on a daily basis. The panel banks participated in the fraudulent conduct alleged herein both directly and through their subsidiaries and affiliates.

286. Defendants made, authorized, or caused the following material misrepresentations and omissions:

      a. Each counterparty Defendant made, authorized, and caused false statements or omissions to be made to Salix Capital Ltd. and the Fund Managers to induce them to enter into the basis packages.

      b. Each Defendant also made, authorized, or caused false submissions to be made to the BBA for the purposes of determining Libor.

c. By their false submissions, each Defendant caused Libor to misrepresent actual panel bank borrowing rates.

d. Each Defendant had a duty to disclose the manipulation of Libor to its counterparties and the public, including Salix Capital Ltd. and the Fund Managers, but omitted to do so.

e. By their omissions and affirmative denials, each Defendant participated in concealing the falsity of its submissions and the manipulation of Libor from Salix Capital Ltd., the Fund Managers and the public.

f. Each counterparty Defendant misrepresented the basis of payments the Funds would receive under the swaps, and omitted to disclose that the Floating Amounts would be calculated by reference to manipulated Libor.

g. In the collateral demands to the Funds, each counterparty Defendant misrepresented the amount of collateral owed by the Funds under the CSAs, and omitted that the inflated amounts were calculated by reference to manipulated Libor.

h. Each counterparty Defendant misrepresented the amount of the payments owed by the Funds on early termination of the swaps, and omitted to disclose that the inflated amounts were calculated by reference to manipulated Libor.

287.    Defendants made these misrepresentations and omissions knowing that they were false or misleading, or with reckless disregard for their truth, in part to avoid detection and to perpetuate the fraudulent and collusive conduct described in this Complaint.

288.     Defendants had reason to expect that Salix Capital Ltd. and the Fund Managers were among the class of persons who would receive and rely on their misrepresentations, including the statements and omissions passed through the BBA to the investing public.

289.     Defendants had an obligation and a duty to disclose that they were artificially manipulating Libor, which directly and negatively impacted Libor-linked transactions between the Funds and Defendants. Such duties were triggered not only by the contractual relationship between the parties, but also by their exclusive knowledge over the true (manipulated) nature of Libor by, among other things, submitting Libor bids to the BBA without disclosing they were suppressed and falsely denying any manipulation had taken place.

290.     Defendants knew or recklessly disregarded material facts demonstrating that their misrepresentations and omissions were false and/or misleading at the time they were made. Defendants further knew that they were failing to disclose material facts that they had a duty to disclose. Defendants made the false and misleading statements with intent to induce the reliance of Salix Capital Ltd. and the Fund Managers and to defraud them.

291.     At the time these misrepresentations were made and the material facts not disclosed, Salix Capital Ltd. and the Fund Managers were ignorant of the true facts. If Salix Capital Ltd. and the Fund Managers had known the truth, they would not have entered the basis packages or any related transactions on behalf of the Funds; that is, they would not have entered into the basis packages, accepted or made payments calculated based on artificially low Libor, responded to collateral calls calculated based on artificially low Libor, agreed to artificially inflated termination payments, or engaged in any other of the transactions triggered by such calculations and collateral calls.

292.    Salix Capital Ltd. and the Fund Managers reasonably and justifiably relied on Defendants' false representations and misleading omissions. This includes the false submissions that each Defendant made on a daily basis, which was a necessary input for calculating Libor. Accordingly, Salix Capital Ltd. and the Fund Managers relied on *each* Defendant's false submission with respect to *each* basis package involving the bond and swap transactions listed in Exhibits A and B—including those where another Defendant or a non-panel bank was counterparty.

293.    As a direct and proximate result of the wrongful conduct of each of the Defendants, Salix Capital Ltd. and the Fund Managers entered into the basis packages on behalf of the Funds. The Funds traded in financial instruments linked to Libor and other instruments in reliance on Libor's integrity; made inflated payments (or received depressed payments) calculated in reliance on Libor's integrity; posted inflated collateral amounts in reliance on Libor's integrity; and entered into termination agreements for inflated consideration in reliance on Libor's integrity. The Funds were forced to liquidate their portfolios, including the bonds, at substantial economic loss.

294.    Because Salix Capital Ltd. and the Fund Managers earned management and incentive fees tied to the Funds' performance, they suffered substantial economic loss because of Defendants' fraud. Again, because each Defendant's submission was a necessary input for calculating Libor, *each* Defendant caused the foregoing harm to Salix Capital Ltd. and the Fund Managers with respect to *each* basis package involving the swap and bond transactions listed in Exhibits A and B—including those where another Defendant or a non-panel bank was counterparty.

295.     As a result of the foregoing, Salix Capital Ltd. and the Fund Managers have suffered damages according to proof. In addition, because Defendants' fraud was willful and wanton, and because, by their acts, they knowingly affected the general public, including but not limited to all persons with interests in Libor, Plaintiff is entitled to recover punitive damages.

### FIFTEENTH CAUSE OF ACTION
### (Aiding and Abetting Fraud Against All Defendants)

296.     Plaintiff realleges each allegation above as if fully set forth herein.

297.     This count is brought by Salix Capital US as assignee of the Funds. This count is against all Defendants, for joint and several liability for all losses associated with all of the transactions identified in Exhibits A and B.

298.     Defendants aided and abetted the fraud and breaches of contract of the other panel banks.

299.     By falsifying its own Libor submissions, each Defendant gave substantial assistance to the other panel banks in their conspiratorial efforts to suppress Libor.

300.     By misrepresenting the integrity of Libor and omitting to disclose its manipulation, each Defendant gave substantial assistance to the other panel banks in their efforts to suppress Libor.

301.     Each of the Defendants knew of the fraud perpetrated by the other panel banks, including other Defendants. Each knew of the representations and omissions made by the others. Each also knew that the representations and omissions made by each of the other Defendants were false and/or misleading at the time they were made.

302.     Each Defendant gave substantial assistance to and/or facilitated and encouraged each of the other panel banks in their fraud by colluding to artificially suppress USD Libor. Each Defendant's submission was a necessary input for calculation of the published Libor. And,

95

because Libor is calculated as an average and excludes outlier submissions, Defendants could not have manipulated Libor as they did without assisting one another.

303. The Funds reasonably and justifiably relied on Defendants' false representations and misleading omissions when entering into the basis packages.

304. As a direct and proximate result of the wrongful conduct of each of the Defendants, the Funds entered into the basis packages; traded in financial instruments linked to Libor and other instruments in reliance on Libor's integrity; made inflated payments (or received depressed payments) calculated in reliance on Libor's integrity; posted inflated collateral amounts in reliance on Libor's integrity; and entered into termination agreements for inflated consideration in reliance on Libor's integrity. The Funds were forced to terminate their portfolios at substantial economic loss.

305. As a result of the foregoing, the Funds have the right to rescissory damages; in the alternative to rescissory damages, the Funds have suffered damages according to proof. In addition, because Defendants' fraud was willful and wanton, and because, by their acts, they knowingly affected the general public, including but not limited to all persons with interests in Libor, Plaintiff is entitled to recover punitive damages.

## SIXTEENTH CAUSE OF ACTION
### (Aiding and Abetting Fraud Against All Defendants)

306. Plaintiff realleges each allegation above as if fully set forth herein.

307. This count is brought by Salix Capital US as assignee of Salix Capital Ltd. and the Fund Managers. This count is against all Defendants, for joint and several liability for lost management and incentive fees associated with all of the transactions identified in Exhibits A and B.

308. Defendants aided and abetted the fraud and breaches of contract of the other panel banks.

309. By falsifying its own Libor submissions, each Defendant gave substantial assistance to the other panel banks in their conspiratorial efforts to suppress Libor.

310. By misrepresenting the integrity of Libor and omitting to disclose its manipulation, each Defendant gave substantial assistance to the other panel banks in their efforts to suppress Libor.

311. Each of the Defendants knew of the fraud perpetrated by the other panel banks, including other Defendants. Each knew of the representations and omissions made by the others. Each also knew that the representations and omissions made by each of the other Defendants were false and/or misleading at the time they were made.

312. Each Defendant gave substantial assistance to and/or facilitated and encouraged each of the other panel banks in their fraud by colluding to artificially suppress USD Libor. Each Defendant's submission was a necessary input for calculation of the published Libor. And, because Libor is calculated as an average and excludes outlier submissions, Defendants could not have manipulated Libor as they did without assisting one another.

313. Salix Capital Ltd. and the Fund Managers reasonably and justifiably relied on Defendants' false representations and misleading omissions when deciding to enter the basis packages on behalf of the Funds.

314. As a direct and proximate result of the wrongful conduct of each of the Defendants, Salix Capital Ltd. and the Fund Managers entered into the basis packages on behalf of the Funds. The Funds traded in financial instruments linked to Libor and other instruments in reliance on Libor's integrity; made inflated payments (or received depressed payments)

calculated in reliance on Libor's integrity; posted inflated collateral amounts in reliance on Libor's integrity; and entered into termination agreements for inflated consideration in reliance on Libor's integrity. The Funds were forced to terminate their portfolios at substantial economic loss.

315. Because Salix Capital Ltd. and the Fund Managers earned management and incentive fees tied to the Funds' performance, they suffered substantial economic loss because of Defendants' fraud.

316. As a result of the foregoing, Salix Capital Ltd. and the Fund Managers have suffered damages according to proof. In addition, because Defendants' fraud was willful and wanton, and because, by their acts, they knowingly affected the general public, including but not limited to all persons with interests in Libor, Plaintiff is entitled to recover punitive damages.

## SEVENTEENTH CAUSE OF ACTION
### (Unjust Enrichment/Restitution Against Defendants Bank of America, Barclays, Citi, Credit Suisse, Deutsche Bank, and JP Morgan)

317. Plaintiff realleges each allegation above as if fully set forth herein.

318. This count is brought by Salix Capital US as assignee of the Funds. This count is against Defendants Bank of America, Barclays, Citi, Credit Suisse, Deutsche Bank, and JPMorgan (collectively, the "Counterparty Defendants") with respect to the role each of the foregoing played in the agreements in which it (or a subsidiary or affiliate of it) served as a counterparty.

319. By their wrongful acts and omissions, the Counterparty Defendants were unjustly enriched at the expense of and to the detriment of the Funds and have interfered with the Funds' protected interests.

320. As described above, the Counterparty Defendants knowingly acted in an unfair, unconscionable, and oppressive manner towards the Funds by suppressing Libor, and acted in

conscious disregard for the Funds' rights. Through their unlawful conduct, the Counterparty Defendants knowingly received and retained wrongful financial and other benefits at the Funds' expense.

321.    As a result of their unlawful conduct, the Counterparty Defendants have realized substantial ill-gotten gains by misreporting their borrowing costs, manipulating Libor, and receiving windfall trading profits.

322.    As a direct and proximate result of the Counterparty Defendants' unlawful and improper conduct, as set forth above, the Counterparty Defendants have been unjustly enriched and the Funds have suffered damages. The Counterparty Defendants' retention of funds under these circumstances constitutes unjust enrichment as the Counterparty Defendants have no right to the benefits that were obtained through their unlawful conduct.

323.    The financial benefits that the Counterparty Defendants derived from their unlawful manipulation of Libor and other misconduct alleged above rightfully belong to Plaintiff as assignee of the Funds. Plaintiff may have no adequate remedy at law for the Counterparty Defendants' misappropriated gains. The Court should compel the Counterparty Defendants to disgorge to Plaintiff all unlawful or inequitable proceeds that the Counterparty Defendants received.

### EIGHTEENTH CAUSE OF ACTION
**(Tortious Interference with Contract Against All Defendants)**

324.    Plaintiff realleges each allegation above as if fully set forth herein.

325.    This count is brought by Salix Capital US as assignee of the Funds. This count is against all Defendants for their intentional interference with the Funds' contracts and agreements with other Defendants and non-parties as set forth in Exhibits A and B.

326.    The Funds had valid, enforceable contracts with Bank of America, Barclays, Citi, Credit Suisse, Deutsche Bank, JPMorgan and numerous unnamed parties, including Goldman Sachs, Lehman Brothers, and Merrill Lynch.

327.    Each Defendant's fraudulent and unlawful conduct described above, including each Defendant's false Libor submissions, was an intentional interference with the Funds' contracts with other Defendants and non-parties. Defendants' misconduct interfered with and disrupted the Funds' contracts by causing the Funds to receive reduced payments (or make inflated payments) in connection with the swaps due to an artificially suppressed Libor.

328.    As described above, by their regular dealings with the Funds and others who dealt with the Funds, Defendants knew that the Funds had entered into financial instruments that incorporated Libor such as the swaps at issue here. Defendants acted intentionally and with knowledge that their misconduct and wrongful acts would interfere with the Funds' contracts.

329.    For example, Defendant Credit Suisse served as prime broker to the Funds throughout the Relevant Period and received confidential information regarding all of the Funds' contracts.

330.    As described above, Defendants acted solely out of malice and acted solely by dishonest, unfair, and improper means, including fraud or misrepresentation.

331.    Each Defendant's interference with the Funds' contracts and agreements with other Defendants and non-parties injured the Funds. Because of Defendants' unlawful manipulation of Libor, the Funds received lower payments (or made higher payments) on the swaps than they otherwise would have; the Funds also received fraudulent collateral demands and were forced to terminate the swaps by paying inflated termination fees and to sell the bonds at depressed prices.

332.   As a direct and proximate result of Defendants' misconduct, the Funds have suffered damages. In addition, because Defendants' fraud was willful and wanton, and because, by their acts, Defendants knowingly affected the general public, including but not limited to all persons with interests in Libor, Plaintiff is entitled to recover punitive damages.

## NINETEENTH CAUSE OF ACTION
### (Tortious Interference with Prospective Business Advantage Against All Defendants)

333.   Plaintiff realleges each allegation above as if fully set forth herein.

334.   This count is brought by Salix Capital US as assignee of the Funds. This count is against all Defendants for their intentional interference with the Funds' business relations with other Defendants and non-parties as set forth in Exhibits A and B.

335.   During the Relevant Period, the Funds had business relations with issuers or sellers of Libor-based financial instruments, including Bank of America, Barclays, Citi, Credit Suisse, Deutsche Bank, JPMorgan and numerous unnamed parties, including Goldman Sachs, Lehman Brothers, and Merrill Lynch. The Funds also had business relations with the bond issuers listed in Exhibit B.

336.   Defendants' fraudulent and unlawful conduct described above, including Defendants' false Libor submissions and fraudulent demands for payment and/or cash from the Funds, interfered with and disrupted these business relations by defeating the Funds' expectations that Libor would be set honestly and accurately and would provide a fair benchmark for the swaps and other Libor-based financial instruments.

337.   As described above, by their regular dealings with the Funds and others who dealt with the Funds, Defendants knew of the Funds' business relations and acted intentionally and with knowledge that their misconduct and wrongful acts would interfere with and disrupt the Funds' business relations.

338.     For example, Defendant Credit Suisse served as prime broker to the Funds throughout the Relevant Period and received confidential information regarding all of the Funds' business relations.

339.     As described above, Defendants acted solely out of malice and acted solely by dishonest, unfair, and improper means, including fraud or misrepresentation.

340.     Defendants' misconduct injured the Funds' business relations with other Defendants and non-parties.  Because of Defendants' unlawful manipulation of Libor, the Funds received lower payments (or made higher payments) on the swaps than they otherwise would have; the Funds also received fraudulent collateral demands and were forced to terminate the swaps by paying inflated termination fees and to sell the bonds at depressed prices.

341.     As a direct and proximate result of Defendants' misconduct, the Funds have suffered damages.  In addition, because Defendants' fraud was willful and wanton, and because, by their acts, Defendants knowingly affected the general public, including but not limited to all persons with interests in Libor, Plaintiff is entitled to recover punitive damages.

### TWENTIETH CAUSE OF ACTION
### (Civil Conspiracy Against All Defendants)

342.     Plaintiff realleges each allegation above as if fully set forth herein.

343.     This count is brought by Salix Capital US as assignee of the Funds.  This count is for civil conspiracy to commit a fraud on the Funds and to tortiously interfere with the Funds' contracts and business relations, brought against all Defendants for joint and several liability for all losses associated with all of the transactions identified in Exhibits A and B.  Accordingly, each Defendant is being sued both individually as a primary violator of the law, as stated in this Complaint, and as a co-conspirator.

344. Defendants entered into a corrupt agreement to manipulate and suppress their Libor submissions during the Relevant Period.

345. Defendants each committed numerous overt acts in furtherance of that agreement, as detailed above, including submitting false Libor quotes to the BBA on a daily basis and actively concealing their misconduct, including by making false or misleading public statements about Libor's integrity.

346. Defendants intentionally took these and other overt acts described above to further the corrupt agreement between Defendants and to carry out a common plan to execute a fraud on the Funds, to tortiously interfere with the Funds' contracts and business relations, and to benefit Defendants.

347. Each Defendant was at all relevant times fully aware of the conspiracy and substantially furthered it as set forth above.

348. As a direct and proximate result of Defendants' conspiracy, the Funds entered into the basis packages; traded in financial instruments linked to Libor and other instruments in reliance on Libor's integrity; made inflated payments (or received depressed payments) calculated in reliance on Libor's integrity; posted inflated collateral amounts in reliance on Libor's integrity; and entered into termination agreements for inflated consideration in reliance on Libor's integrity. The Funds were forced to liquidate their portfolios, including the bonds, at substantial economic loss.

349. As a result of Defendants' unlawful conspiracy, the Funds have the right to rescissory damages; in the alternative to rescissory damages, the Funds have suffered damages according to proof. In addition, because Defendants' fraud was willful and wanton, and because,

by their acts, they knowingly affected the general public, including but not limited to all persons with interests in Libor, Plaintiff is entitled to recover punitive damages.

## TWENTY-FIRST CAUSE OF ACTION
### (Civil Conspiracy Against All Defendants)

350.    Plaintiff realleges each allegation above as if fully set forth herein.

351.    This count is brought by Salix Capital US as assignee of Salix Capital Ltd. and the Fund Managers. This count is for civil conspiracy to commit a fraud on Salix Capital Ltd. and the Fund Managers, brought against all Defendants for joint and several liability for lost management and incentive fees associated with all of the transactions identified in Exhibits A and B. Accordingly, each Defendant is being sued both individually as a primary violator of the law, as stated in this Complaint, and as a co-conspirator.

352.    Defendants entered into a corrupt agreement to manipulate and suppress their Libor submissions during the Relevant Period.

353.    Defendants each committed numerous overt acts in furtherance of that agreement, as detailed above, including submitting false Libor quotes to the BBA on a daily basis and actively concealing their misconduct, including by making false or misleading public statements about Libor's integrity.

354.    Defendants intentionally took these and other overt acts described above to further the corrupt agreement between Defendants and to carry out a common plan to execute a fraud on Salix Capital Ltd. and the Fund Managers to Defendants' benefit.

355.    Each Defendant was at all relevant times fully aware of the conspiracy and substantially furthered it as set forth above.

356.    As a direct and proximate result of Defendants' conspiracy, Salix Capital Ltd. and the Fund Managers entered into the basis packages on behalf of the Funds. The Funds traded in

financial instruments linked to Libor and other instruments in reliance on Libor's integrity; made inflated payments (or received depressed payments) calculated in reliance on Libor's integrity; posted inflated collateral amounts in reliance on Libor's integrity; and entered into termination agreements for inflated consideration in reliance on Libor's integrity. The Funds were forced to liquidate their portfolios, including the bonds, at substantial economic loss. Because Salix Capital Ltd. and the Fund Managers earned management and incentive fees tied to the Funds' performance, they suffered substantial economic loss because of Defendants' conspiracy.

357.    As a result of the foregoing, Salix Capital Ltd. and the Fund Managers have suffered damages according to proof. In addition, because Defendants' fraud was willful and wanton, and because, by their acts, they knowingly affected the general public, including but not limited to all persons with interests in Libor, Plaintiff is entitled to recover punitive damages.

## **PRAYER FOR RELIEF**

WHEREFORE Plaintiff prays for relief as follows:

An award in favor of Plaintiff against Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, but including at a minimum:

a.    The monetary losses suffered by Plaintiff and its assignors, including from inflated payments to Defendants, reduced payments from Defendants, losses incurred during the termination and liquidation process triggered by the bad-faith collateral demands, lost profits, and consequent lost management and incentive fees in an amount to be determined at trial but not less than $250 million;

b.    Consequential damages;

c.    Punitive damages;

d.    Attorneys' fees and costs;

e.  Prejudgment interest at the maximum legal rate;

f.  Rescission;

g.  Indemnification; and

h.  Such other and further relief as the Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a trial by jury on all issues so triable.

DATED:  New York, New York       QUINN EMANUEL URQUHART &
       June 26, 2013               SULLIVAN, LLP

By: _____

Daniel L. Brockett
Daniel P. Cunningham
Steig D. Olson
Nathan Goralnik
51 Madison Avenue, 22nd Floor
New York, New York  10010-1601
Telephone:  (212) 849-7000
Fax:  (212) 849-7100
danbrockett@quinnemanuel.com
danielcunningham@quinnemanuel.com
steigolson@quinnemanuel.com
nathangoralnik@quinnemanuel.com

Jeremy D. Andersen (*pro hac vice*
application forthcoming)
865 South Figueroa Street, 10th Floor
Los Angeles, California 90017
Telephone:  (213) 443-3000
Fax:  (213) 443-3100
jeremyandersen@quinnemanuel.com

Matthew J. MacDonald
1299 Pennsylvania Avenue, NW
Suite 825
Washington, D.C. 20004
Telephone:  (202) 538-8000
Fax:  (202) 538-8100
mattmacdonald@quinnemanuel.com

*Attorneys for Plaintiff Salix Capital US Inc.*

## EXHIBIT A
### FrontPoint's Confirmed Interest-Rate Swaps to Receive 3-Month USD Libor

| Fund | Counterparty | Notional Amount | Trade Date | Termination | Payment Dates |
|------|--------------|-----------------|------------|-------------|---------------|
| FRV | Barclays Bank | $10,000,000 | 12/13/07 | 11/10/08 | 3/20, 6/20, 9/20, 12/20 |
| FRV | Barclays Bank | $10,000,000 | 12/14/07 | 8/28/09 | 3/20, 6/20, 9/20, 12/20 |
| FRV | Barclays Bank | $11,000,000 | 12/14/07 | 9/22/09 | 3/20, 6/20, 9/20, 12/20 |
| FRV | Barclays Bank | $10,000,000 | 12/17/07 | 9/29/08 | 3/20, 6/20, 9/20, 12/20 |
| FRV | Barclays Bank | $10,000,000 | 12/17/07 | 11/6/08 | 3/20, 6/20, 9/20, 12/20 |
| FRV | Barclays Bank | $25,000,000 | 1/8/08 | 10/15/09 | 3/20, 6/20, 9/20, 12/20 |
| FRV | BANA | $29,000,000 | 1/7/08 | 11/18/08 | 2/15, 5/15, 8/15, 11/15 |
| FRV | BANA | $45,000,000 | 1/7/08 | 11/18/08 | 1/16, 4/16, 7/16, 10/16 |
| FRV | BANA | $14,400,000 | 1/8/08 | 11/18/08 | 2/15, 5/15, 8/15, 11/15 |
| FRV | BANA | $20,000,000 | 2/14/08 | 11/18/08 | 1/15, 4/15, 7/15, 10/15 |
| FRV | CGML | $25,000,000 | 12/14/07 | 3/26/09 | 3/1, 6/1, 9/1, 12/1 |
| FRV | CGML | $35,000,000 | 12/14/07 | 12/3/09 | 1/1, 4/1, 7/1, 10/1 |
| FRV | CGML | $38,000,000 | 12/14/07 | 12/8/08 | 1/15, 4/15, 7/15, 10/15 |
| FRV | CGML | $50,000,000 | 12/14/07 | 10/15/08 | 3/1, 6/1, 9/1, 12/1 |
| FRV | CGML | $60,000,000 | 12/14/07 | 10/24/08 | 3/1, 6/1, 9/1, 12/1 |
| FRV | CGML | $15,000,000 | 12/17/07 | 12/3/09 | 1/1, 4/1, 7/1, 10/1 |
| FRV | CGML | $30,000,000 | 12/17/07 | 12/1/08 | 3/15, 6/15, 9/15, 12/15 |
| FRV | CGML | $18,000,000 | 12/28/07 | 10/15/09 | 1/15, 4/15, 7/15, 10/15 |
| FRV | CGML | $20,000,000 | 12/28/07 | 11/9/09 | 2/15, 5/15, 8/15, 11/15 |
| FRV | CGML | $22,000,000 | 12/28/07 | 11/19/08 | 2/23, 5/23, 8/23, 11/23 |

| Fund | Counterparty | Notional Amount | Trade Date | Termination | Payment Dates |
|------|-------------|----------------|-----------|-------------|---------------|
| FRV | CGML | $26,000,000 | 12/28/07 | 10/15/09 | 1/1, 4/1, 7/1, 10/1 |
| FRV | CGML | $50,000,000 | 12/28/07 | 1/14/09 | 3/15, 6/15, 9/15, 12/15 |
| FRV | CGML | $20,000,000 | 2/11/08 | 12/10/08 | 3/1, 6/1, 9/1, 12/1 |
| FRV | CGML | $12,000,000 | 2/12/08 | 9/25/09 | 2/1, 5/1, 8/1, 11/1 |
| FRV | CGML | $31,000,000 | 2/12/08 | 10/15/09 | 3/1, 6/1, 9/1, 12/1 |
| FRV | CGML | $35,000,000 | 2/12/08 | 11/19/08 | 3/1, 6/1, 9/1, 12/1 |
| FRV | CGML | $25,000,000 | 2/14/08 | 10/21/09 | 2/15, 5/15, 8/15, 11/15 |
| FRV | CGML | $10,000,000 | 2/15/08 | 12/8/09 | 2/15, 5/15, 8/15, 11/15 |
| FRV | CGML | $25,000,000 | 2/15/08 | 9/24/09 | 2/15, 5/15, 8/15, 11/15 |
| FRV | CSIN | $5,000,000 | 12/17/07 | 9/28/09 | 3/17, 6/17, 9/17, 12/17 |
| FRV | CSIN | $6,000,000 | 12/18/07 | 2/5/09 | 3/20, 6/20, 9/20, 12/20 |
| FRV | CSIN | $25,000,000 | 12/18/07 | 3/6/09 | 3/20, 6/20, 9/20, 12/20 |
| FRV | CSIN | $26,300,000 | 1/8/08 | 11/10/08 | 3/20, 6/20, 9/20, 12/20 |
| FRV | Deutsche Bank | $20,000,000 | 12/13/07 | 11/5/08 | 3/8, 6/8, 9/8, 12/8 |
| FRV | Deutsche Bank | $20,000,000 | 12/13/07 | 12/1/08 | 2/1, 5/1, 8/1, 11/1 |
| FRV | Deutsche Bank | $25,000,000 | 12/13/07 | 10/29/08 | 2/1, 5/1, 8/1, 11/1 |
| FRV | Deutsche Bank | $25,000,000 | 12/13/07 | 11/6/08 | 3/1, 6/1, 9/1, 12/1 |
| FRV | Deutsche Bank | $20,000,000 | 12/14/07 | 12/5/08 | 2/15, 5/15, 8/15, 11/15 |
| FRV | Deutsche Bank | $25,000,000 | 12/14/07 | 10/20/08 | 3/1, 6/1, 9/1, 12/1 |
| FRV | Deutsche Bank | $76,000,000 | 12/14/07 | 11/10/08 | 1/15, 4/15, 7/15, 10/15 |
| FRV | Deutsche Bank | $10,000,000 | 2/12/08 | 12/9/08 | 1/15, 4/15, 7/15, 10/15 |

| Fund | Counterparty | Notional Amount | Trade Date | Termination | Payment Dates |
|------|--------------|-----------------|------------|-------------|---------------|
| FRV | Goldman Sachs | $20,000,000 | 1/11/08 | 11/19/08 | 1/15, 4/15, 7/15, 10/15 |
| FRV | Goldman Sachs | $25,907,000 | 2/11/08 | 11/14/08 | 3/1, 6/1, 9/1, 12/1 |
| FRV | Goldman Sachs | $22,840,000 | 2/13/08 | 9/29/08 | 3/1, 6/1, 9/1, 12/1 |
| FRV | Goldman Sachs | $20,000,000 | 2/14/08 | 3/6/09 | 3/1, 6/1, 9/1, 12/1 |
| FRV | JPMorgan Chase Bank | $25,000,000 | 12/13/07 | 11/10/08 | 3/14, 6/14, 9/14, 12/14 |
| FRV | JPMorgan Chase Bank | $50,000,000 | 12/18/07 | 3/4/09 | 2/15, 5/15, 8/15, 11/15 |
| FRV | Lehman Brothers | $20,000,000 | 1/15/08 | 9/16/08 | 1/15, 4/15, 7/15, 10/15 |
| FRV | Merrill Lynch | $26,500,000 | 12/12/07 | 12/9/08 | 3/15, 6/15, 9/15, 12/15 |
| FRV | Merrill Lynch | $15,000,000 | 12/17/07 | 11/4/08 | 1/30, 4/30, 7/30, 10/30 |
| FRV | Merrill Lynch | $25,000,000 | 2/11/08 | 10/29/08 | 2/1, 5/1, 8/1, 11/1 |
| FRV | Merrill Lynch | $25,000,000 | 2/12/08 | 10/29/08 | 2/1, 5/1, 8/1, 11/1 |
| FVO | Barclays Bank | $15,000,000 | 12/14/07 | 12/3/08 | 3/20, 6/20, 9/20, 12/20 |
| FVO | Barclays Bank | $15,000,000 | 12/14/07 | 12/15/08 | 3/20, 6/20, 9/20, 12/20 |
| FVO | Barclays Bank | $12,000,000 | 12/18/07 | 1/13/09 | 3/20, 6/20, 9/20, 12/20 |
| FVO | Deutsche Bank | $5,000,000 | 12/13/07 | 12/1/08 | 2/1, 5/1, 8/1, 11/1 |
| FVO | Deutsche Bank | $10,000,000 | 12/14/07 | 11/13/08 | 1/15, 4/15, 7/15, 10/15 |
| FVO | Deutsche Bank | $8,500,000 | 2/11/08 | 12/8/08 | 3/15, 6/15, 9/15, 12/15 |
| FVO | Goldman Sachs | $10,000,000 | 12/17/07 | 11/18/08 | 3/1, 6/1, 9/1, 12/1 |
| FVO | JPMorgan Chase Bank | $5,400,000 | 12/13/07 | 1/23/09 | 1/15, 4/15, 7/15, 10/15 |
| FVO | JPMorgan Chase Bank | $10,000,000 | 12/13/07 | 1/14/09 | 2/15, 5/15, 8/15, 11/15 |
| FVO | JPMorgan Chase Bank | $5,000,000 | 12/17/07 | 9/29/08 | 3/15, 6/15, 9/15, 12/15 |

| Fund | Counterparty | Notional Amount | Trade Date | Termination | Payment Dates |
|---|---|---|---|---|---|
| FVO | JPMorgan Chase Bank | $5,000,000 | 12/17/07 | 1/21/09 | 3/15, 6/15, 9/15, 12/15 |
| FVO | JPMorgan Chase Bank | $5,000,000 | 2/12/08 | 1/14/09 | 3/1, 6/1, 9/1, 12/1 |
| FVO | JPMorgan Chase Bank | $15,000,000 | 2/12/08 | 12/9/08 | 1/1, 4/1, 7/1, 10/1 |
| FVO | Merrill Lynch | $5,500,000 | 12/17/07 | 1/13/09 | 2/1, 5/1, 8/1, 11/1 |
| FVO | Merrill Lynch | $5,000,000 | 12/18/07 | 11/19/08 | 2/15, 5/15, 8/15, 11/15 |
| FVO | Merrill Lynch | $7,000,000 | 1/30/08 | 12/5/08 | 3/15, 6/15, 9/15, 12/15 |

## EXHIBIT B
### Bonds Purchased by the Funds

| Fund | Counterparty | CUSIP | Principal Amount | Purchase Date | Sale Date |
|------|-------------|-------|------------------|---------------|-----------|
| FRV | Barclays Capital | 02635PTS2 | $10,000,000 | 12/17/07 | 9/22/09 |
| FRV | Barclays Capital | 091797AM2 | $11,000,000 | 12/14/07 | 12/11/07 |
| FRV | Barclays Capital | 257867AS0 | $10,000,000 | 12/14/07 | 12/3/08 |
| FRV | Barclays Capital | 670346AG0 | $10,000,000 | 12/13/07 | 2/28/08 |
| FRV | Barclays Capital | 743263AJ4 | $10,000,000 | 12/17/07 | 3/7/08 |
| FRV | Barclays Capital | 844741AW8 | $25,000,000 | 1/8/08 | 10/15/09, 10/27/09, 12/3/09 |
| FRV | Barclays Capital | 92857WAD2 | $10,000,000 | 12/13/07 | 3/7/08 |
| FRV | Banc of America Securities | 126117AM2 | $15,000,000 | 1/8/08 | 1/8/08 |
| FRV | Banc of America Securities | 205944AB7 | $21,685,000 | 2/14/08 | 2/27/09, 3/12/09 |
| FRV | Banc of America Securities | 205944AB7 | $50,000,000 | 1/7/08 | 3/12/09 |
| FRV | Banc of America Securities | 786514BM0 | $30,000,000 | 1/7/08 | 12/9/08, 3/6/09 |
| FRV | CGMI | 013817AP6 | $22,000,000 | 12/28/07 | 4/9/08 |
| FRV | CGMI | 031162AS9 | $60,000,000 | 12/14/07 | 10/24/08, 11/14/08, 12/2/08 |
| FRV | CGMI | 257867AR2 | $25,000,000 | 2/14/08 | 3/7/08 |
| FRV | CGMI | 26439RAH9 | $26,000,000 | 12/28/07 | 12/22/08 |
| FRV | CGMI | 305915AD2 | $31,000,000 | 2/12/08 | 11/20/08 |
| FRV | CGMI | 437076AP7 | $20,000,000 | 2/11/08 | 12/10/08, 9/28/09 |
| FRV | CGMI | 437076AP7 | $25,000,000 | 12/14/07 | 11/13/08 |
| FRV | CGMI | 437076AP7 | $50,000,000 | 12/14/07 | 4/28/08 |
| FRV | CGMI | 478366AR8 | $38,000,000 | 12/14/07 | 3/7/08 |
| FRV | CGMI | 571903AG8 | $29,650,000 | 12/17/07 | 12/9/09 |
| FRV | CGMI | 629568AR7 | $1,000,000 | 2/14/08 | 12/8/09 |
| FRV | CGMI | 629568AR7 | $9,000,000 | 2/15/08 | 12/8/09 |
| FRV | CGMI | 629568AR7 | $25,000,000 | 2/15/08 | 12/8/09 |
| FRV | CGMI | 63534PAG2 | $25,000,000 | 12/18/07 | 11/13/08, 12/9/08 |
| FRV | CGMI | 655422AT0 | $18,000,000 | 12/28/07 | 12/9/08 |
| FRV | CGMI | 759509AD4 | $20,000,000 | 12/28/07 | 11/20/08 |

| Fund | Counterparty | CUSIP | Principal Amount | Purchase Date | Sale Date |
|---|---|---|---|---|---|
| FRV | CGMI | 828807BV8 | $35,000,000 | 2/12/08 | 10/29/07 |
| FRV | CGMI | 844741AW8 | $15,000,000 | 12/17/07 | 10/15/09, 10/27/09, 12/3/09 |
| FRV | CGMI | 844741AW8 | $35,000,000 | 12/14/07 | 10/15/09, 10/27/09, 12/3/09 |
| FRV | CGMI | 918204AS7 | $12,000,000 | 2/12/08 | 11/20/08 |
| FRV | CGMI | 947074AF7 | $30,000,000 | 12/17/07 | 9/24/09 |
| FRV | CGMI | 963320AN6 | $50,000,000 | 12/28/07 | 7/30/08 |
| FRV | Credit Suisse Securities | 257867AT8 | $5,000,000 | 12/17/07 | 3/7/08 |
| FRV | Credit Suisse Securities | 29078EAB1 | $25,000,000 | 12/18/07 | 1/17/08 |
| FRV | Credit Suisse Securities | 532716AH0 | $26,285,000 | 1/8/08 | 1/8/08 |
| FRV | Credit Suisse Securities | 690742AA9 | $6,415,000 | 12/18/07 | 3/7/08 |
| FRV | Deutsche Bank Securities | 571748AC6 | $30,000,000 | 12/12/07 | 11/5/08 |
| FRV | Deutsche Bank Securities | 852061AE0 | $15,000,000 | 12/13/07 | 4/2/08 |
| FRV | Deutsche Bank Securities | 00209AAE6 | $25,000,000 | 12/13/07 | 9/5/07 |
| FRV | Deutsche Bank Securities | 205363AF1 | $20,000,000 | 12/14/07 | 1/6/09 |
| FRV | Deutsche Bank Securities | 23383FBU8 | $20,000,000 | 12/13/07 | 12/13/07 |
| FRV | Deutsche Bank Securities | 50075NAU8 | $25,000,000 | 12/13/07 | 4/28/08 |
| FRV | Deutsche Bank Securities | 532716AL1 | $20,000,000 | 12/13/07 | 3/7/08 |
| FRV | Deutsche Bank Securities | 571748AC6 | $30,000,000 | 12/12/07 | 11/5/08 |
| FRV | Deutsche Bank Securities | 655664AK6 | $10,000,000 | 2/12/08 | 4/28/08 |
| FRV | Deutsche Bank Securities | 655664AK6 | $10,000,000 | 2/12/08 | 9/9/08 |
| FRV | Deutsche Bank Securities | 681919AS5 | $76,000,000 | 12/14/07 | 11/13/08, 11/19/08, 12/9/08, 9/23/09 |

| Fund | Counterparty | CUSIP | Principal Amount | Purchase Date | Sale Date |
|------|-------------|-------|------------------|---------------|-----------|
| FRV | Deutsche Bank Securities | 893830AS8 | $25,000,000 | 12/14/07 | 10/20/08, 11/7/08 |
| FRV | Goldman Sachs | 02635PTC7 | $22,840,000 | 2/13/08 | 7/29/09, 8/7/09, 9/8/09 |
| FRV | Goldman Sachs | 071813AW9 | $25,907,000 | 2/11/08 | 11/14/08, 11/19/08 |
| FRV | Goldman Sachs | 29078EAB1 | $20,000,000 | 2/14/08 | 2/14/08 |
| FRV | Goldman Sachs | 501044CH2 | $20,000,000 | 1/11/08 | 7/30/08 |
| FRV | JPMorgan Securities | 35671DAQ8 | $10,000,000 | 12/11/07 | 11/10/08 |
| FRV | JPMorgan Securities | 35671DAQ8 | $24,945,000 | 12/13/07 | 11/10/08 |
| FRV | JPMorgan Securities | 69352JAH0 | $50,000,000 | 12/18/07 | 12/17/07 |
| FRV | Lehman Brothers | 5252M0BZ9 | $5,000,000 | 1/15/08 | 4/28/08 |
| FRV | Lehman Brothers | 87612EAS5 | $10,000,000 | 1/14/08 | 9/29/08 |
| FRV | Lehman Brothers | 87612EAS5 | $10,000,000 | 1/15/08 | 7/11/07 |
| FRV | Merrill Lynch | 50075NAU8 | $25,000,000 | 2/11/08 | 3/7/08 |
| FRV | Merrill Lynch | 50075NAU8 | $25,000,000 | 2/12/08 | 3/7/08 |
| FRV | Merrill Lynch | 88947EAC4 | $28,500,000 | 12/12/07 | 3/22/07 |
| FVO | Barclays Capital | 257867AS0 | $15,000,000 | 12/14/07 | 3/7/08 |
| FVO | Barclays Capital | 571903AF0 | $12,000,000 | 12/18/07 | 3/7/08 |
| FVO | Barclays Capital | 65473QAQ6 | $15,000,000 | 12/14/07 | 12/13/07 |
| FVO | CGMI | 33938EAJ6 | $5,000,000 | 2/5/08 | 2/5/08 |
| FVO | Deutsche Bank Securities | 532716AL1 | $5,000,000 | 12/13/07 | 9/23/08 |
| FVO | Deutsche Bank Securities | 540424AN8 | $8,500,000 | 2/11/08 | 11/20/08 |
| FVO | Deutsche Bank Securities | 681919AS5 | $10,000,000 | 12/14/07 | 3/7/08 |
| FVO | Goldman Sachs | 437076AP7 | $10,000,000 | 12/17/07 | 12/11/07 |
| FVO | JPMorgan Securities | 126408GD9 | $5,000,000 | 12/17/07 | 11/10/08 |
| FVO | JPMorgan Securities | 32055RAH0 | $5,400,000 | 12/13/07 | 12/13/07 |
| FVO | JPMorgan Securities | 648053AE6 | $5,000,000 | 12/17/07 | 1/8/08 |
| FVO | JPMorgan Securities | 690742AA9 | $5,000,000 | 2/12/08 | 3/27/08 |
| FVO | JPMorgan Securities | 81180RAD4 | $15,000,000 | 2/12/08 | 12/9/08, 12/10/08 |
| FVO | JPMorgan Securities | 98417EAB6 | $10,000,000 | 12/18/07 | 4/8/08 |
| FVO | Merrill Lynch | 224044AY3 | $5,510,000 | 12/17/07 | 4/2/08 |
| FVO | Merrill Lynch | 48666KAN9 | $7,955,000 | 1/30/08 | 11/7/08 |
| FVO | Merrill Lynch | 984121BN2 | $5,043,000 | 12/18/07 | 11/10/08 |

## Exhibit C
## Express Contractual Terms Between FRV and Defendant Bank of America

1. On September 13, 2005, FRV entered into an ISDA Master Agreement (the "Bank of America Master Agreement") and Schedule (the "Bank of America Schedule") with Defendant BANA.

2. The Bank of America Schedule provided: "This Agreement will be governed by and construed in accordance with the laws of the State of New York (without reference to its conflict of laws doctrine.)." Part 4(h).

3. FRV entered into the swaps with BANA listed in Exhibit A, each of which was evidenced in a Confirmation (the "Bank of America Confirmations").

    a. Each of the Bank of America Confirmations provided that BANA, as the "Calculation Agent" and the "Floating Rate Payer," would determine and pay the "Floating Amount" as each term is defined in the 2006 ISDA Definitions.

    b. The Bank of America Schedule provided: "The Calculation Agent is [BANA] . . . . All determinations by [BANA] shall be made in good faith and in a commercially reasonable manner." Part 4(e).

    c. The 2006 ISDA Definitions provide that the Calculation Agent is "responsible for: (a) calculating the applicable Floating Rate [and] (b) calculating any Floating Amount payable on each Payment Date. . . . Whenever the Calculation Agent is required to act, make a determination or to exercise judgment in any other way, it will do so in good faith and in a commercially reasonable manner." 2006 ISDA Definitions § 4.14.

    d. Bank of America breached the Bank of America Schedule and each of the Bank of America Confirmations for the reasons set forth in the Complaint.

4. On September 13, 2005, FRV also entered into a Credit Support Annex with BANA (the "Bank of America CSA").

    a. Bank of America breached the following contractual provisions in the Bank of America CSA for the reasons set forth in the Complaint.

        i. "[U]pon a demand made by the Secured Party . . . the Pledgor will Transfer to the Secured Party Eligible Credit Support having a Value as of the date of the Transfer at least equal to the applicable Delivery Amount . . . . [which] will equal the amount by which: (i) the Credit Support Amount exceeds (ii) the Value . . . of all Posted Credit Support held by the Secured Party." ¶ 3(a).

        ii. "Credit Support Amount" includes, *inter alia*, the Secured Party's "Exposure," which as defined in the Bank of America CSA includes"

the amount, if any, that would be payable to a party that is the Secured Party by the other party (expressed as a positive number) or by a party that is the Secured Party to the other party (expressed as a negative number) pursuant to Section 6(e)(ii)(2)(A) of this Agreement as if all Transactions (or Swap Transactions) were being terminated as of the relevant Valuation Time; *provided that* Market Quotation will be determined by the Valuation Agent using its estimates at mid-market of the amounts that would be paid for Replacement Transactions (as that term is defined in the definition of "Market Quotation"). ¶ 12.

iii.   Paragraph 13(c)(i) of the Bank of America CSA provides that "'Valuation Agent' means, for the purposes of Paragraph 3 . . . the Secured Party . . . unless otherwise specified here: Valuation Agent shall be [BANA]."

iv.   Section 6(e)(ii)(2)(A) of the Bank of America Master Agreement provides:

if Market Quotation applies, each party will determine a Settlement Amount in respect of the Terminated Transactions, and an amount will be payable equal to (I) the sum of (a) one-half of the difference between the Settlement Amount of the party with the higher Settlement Amount ("X") and the Settlement Amount of the party with the lower Settlement Amount ("Y") and (b) the Termination Currency Equivalent of the Unpaid Amounts owing to X less (II) the Termination Currency Equivalents of the Unpaid Amounts owing to Y . . . .

v.   The definition of "Market Quotation" in the Bank of America Master Agreement provides that a Replacement Transaction "would have the effect of preserving for such party the economic equivalent of any payment or delivery . . . by the parties . . . in respect of such Terminated Transaction or group of Termination Transactions that would, but for the occurrence of the relevant Early Termination Date, have been required after that Date." § 14.

vi.   ***Good Faith and Commercially Reasonable Manner.*** Performance of all obligations under this Annex, including, but not limited to, all calculations, valuations and determinations made by either party, will be made in good faith and in a commercially reasonable manner. ¶ 11(d).

5.   Bank of America further breached provisions of the Bank of America Master Agreement under which: "[BANA] agrees with [FRV] that, so long as either party may have an obligation under this Agreement or under any Credit Support Document to which it is a party . . . [it] will comply in all material respects with all applicable laws . . . to which it

may be subject if failure so to comply would materially impair its ability to perform its obligations under this Agreement." § 4(c).

6.    Under the Bank of America Master Agreement, Bank of America is liable for reasonable costs and attorney's fees incurred in this action: "A Defaulting Party will, on demand, indemnify and hold harmless the other party for and against all reasonable out-of-pocket expenses, including legal fees . . . incurred by such other party by reason of the enforcement and protection of its rights under this Agreement or any Credit Support Document to which the Defaulting Party is a party." § 11.

**Express Contractual Terms Between FRV and Defendant Barclays**

1.   On January 16, 2002, FRV entered into an ISDA Master Agreement (the "FRV-Barclays Master Agreement") and Schedule (the "FRV-Barclays Schedule") with Defendant Barclays Bank.

2.   The FRV-Barclays Schedule provided: "This Agreement will be governed by and construed in accordance with the laws of the State of New York (without reference to choice of law doctrine.)." Part 4(h) (emphasis omitted).

3.   FRV entered into the swaps with Barclays Bank listed in Exhibit A, each of which was evidenced in a Confirmation (the "FRV-Barclays Confirmations").

   a.   Each of the FRV-Barclays Confirmations provided that Barclays Bank, as the "Calculation Agent" and the "Floating Rate Payer," would determine and pay the "Floating Amount" as each term is defined in the 2006 ISDA Definitions.

   b.   The FRV-Barclays Schedule provided: "The Calculation Agent will be [Barclays Bank] unless otherwise specified in a Confirmation in relation to the relevant Transaction." Part 4(e).

   c.   The 2006 ISDA Definitions provide that the Calculation Agent is "responsible for: (a) calculating the applicable Floating Rate [and] (b) calculating any Floating Amount payable on each Payment Date. . . . Whenever the Calculation Agent is required to act, make a determination or to exercise judgment in any other way, it will do so in good faith and in a commercially reasonable manner." 2006 ISDA Definitions § 4.14.

   d.   Barclays breached the FRV-Barclays Schedule and each of the FRV-Barclays Confirmations for the reasons set forth in the Complaint.

4.   On January 16, 2002, FRV also entered into a Credit Support Annex with Barclays Bank (the "FRV-Barclays CSA").

   a.   Barclays breached the following contractual provisions in the FRV-Barclays CSA for the reasons set forth in the Complaint.

      i.   "[U]pon a demand made by the Secured Party . . . the Pledgor will Transfer to the Secured Party Eligible Credit Support having a Value as of the date of the Transfer at least equal to the applicable Delivery Amount . . . . [which] will equal the amount by which: (i) the Credit Support Amount exceeds (ii) the Value . . . of all Posted Credit Support held by the Secured Party." ¶ 3(a).

      ii.   "Credit Support Amount" includes, *inter alia*, the Secured Party's "Exposure," which as defined in the FRV-Barclays CSA includes"

the amount, if any, that would be payable to a party that is the Secured Party by the other party (expressed as a positive number) or by a party that is the Secured Party to the other party (expressed as a negative number) pursuant to Section 6(e)(ii)(2)(A) of this Agreement as if all Transactions (or Swap Transactions) were being terminated as of the relevant Valuation Time; *provided* that Market Quotation will be determined by the Valuation Agent using its estimates at mid-market of the amounts that would be paid for Replacement Transactions (as that term is defined in the definition of "Market Quotation"). ¶ 12.

iii. Paragraph 13(c)(i) of the FRV-Barclays CSA provides that "'Valuation Agent' means, for all purposes of this Credit Support Annex, Barclays Bank."

iv. Section 6(e)(ii)(2)(A) of the FRV-Barclays Master Agreement provides:

> if Market Quotation applies, each party will determine a Settlement Amount in respect of the Terminated Transactions, and an amount will be payable equal to (I) the sum of (a) one-half of the difference between the Settlement Amount of the party with the higher Settlement Amount ("X") and the Settlement Amount of the party with the lower Settlement Amount ("Y") and (b) the Termination Currency Equivalent of the Unpaid Amounts owing to X less (II) the Termination Currency Equivalents of the Unpaid Amounts owing to Y . . . .

v. The definition of "Market Quotation" in the FRV-Barclays Master Agreement provides that a Replacement Transaction "would have the effect of preserving for such party the economic equivalent of any payment or delivery . . . by the parties . . . in respect of such Terminated Transaction or group of Termination Transactions that would, but for the occurrence of the relevant Early Termination Date, have been required after that date." § 14.

vi. ***Good Faith and Commercially Reasonable Manner.*** Performance of all obligations under this Annex, including, but not limited to, all calculations, valuations and determinations made by either party, will be made in good faith and in a commercially reasonable manner. ¶ 11(d).

5. Barclays further breached provisions of the FRV-Barclays Master Agreement under which: "[Barclays Bank] agrees with [FRV] that, so long as either party has or may have any obligation under this Agreement or under any Credit Support Document to which it is a party . . . [it] will comply in all material respects with all applicable laws . . . to which it may be subject if failure so to comply would materially impair its ability to perform its obligations under this Agreement." § 4(c).

6.  Under the FRV-Barclays Master Agreement, Barclays is liable for reasonable costs and attorney's fees incurred in this action: "A Defaulting Party will, on demand, indemnify and hold harmless the other party for and against all reasonable out-of-pocket expenses, including legal fees . . . incurred by such other party by reason of the enforcement and protection of its rights under this Agreement or any Credit Support Document to which the Defaulting Party is a party." § 11.

## Exhibit E
## Express Contractual Terms Between FVO and Defendant Barclays

1.  On March 1, 2007, FVO entered into an ISDA Master Agreement (the "FVO-Barclays Master Agreement") and Schedule (the "FVO-Barclays Schedule") with Defendant Barclays Bank.

2.  The FVO-Barclays Schedule provided: "This Agreement will be governed by and construed in accordance with the laws of the State of New York (without reference to choice of law doctrine.)." Part 4(h) (emphasis omitted).

3.  FVO entered into the swaps with Barclays Bank listed in Exhibit A, each of which was evidenced in a Confirmation (the "FVO-Barclays Confirmations").

    a.  Each of the FVO-Barclays Confirmations provided that Barclays Bank, as the "Calculation Agent" and the "Floating Rate Payer," would determine and pay the "Floating Amount" as each term is defined in the 2006 ISDA Definitions.

    b.  The FVO-Barclays Schedule provided: "The Calculation Agent will be [Barclays Bank] unless otherwise specified in a Confirmation in relation to the relevant Transaction." Part 4(e).

    c.  The 2006 ISDA Definitions provide that the Calculation Agent is "responsible for: (a) calculating the applicable Floating Rate [and] (b) calculating any Floating Amount payable on each Payment Date. . . . Whenever the Calculation Agent is required to act, make a determination or to exercise judgment in any other way, it will do so in good faith and in a commercially reasonable manner." 2006 ISDA Definitions § 4.14.

    d.  Barclays breached the FVO-Barclays Schedule and each of the FVO-Barclays Confirmations for the reasons set forth in the Complaint.

4.  On March 1, 2007, FVO also entered into a Credit Support Annex with Barclays Bank (the "FVO-Barclays CSA").

    a.  Barclays breached the following contractual provisions in the FVO-Barclays CSA for the reasons set forth in the Complaint.

        i.  "[U]pon a demand made by the Secured Party . . . the Pledgor will Transfer to the Secured Party Eligible Credit Support having a Value as of the date of the Transfer at least equal to the applicable Delivery Amount . . . . [which] will equal the amount by which: (i) the Credit Support Amount exceeds (ii) the Value . . . of all Posted Credit Support held by the Secured Party." ¶ 3(a).

        ii.  "Credit Support Amount" includes, *inter alia*, the Secured Party's "Exposure," which as defined in the FVO-Barclays CSA includes"

the amount, if any, that would be payable to a party that is the Secured Party by the other party (expressed as a positive number) or by a party that is the Secured Party to the other party (expressed as a negative number) pursuant to Section 6(e)(ii)(2)(A) of this Agreement as if all Transactions (or Swap Transactions) were being terminated as of the relevant Valuation Time; *provided* that Market Quotation will be determined by the Valuation Agent using its estimates at mid-market of the amounts that would be paid for Replacement Transactions (as that term is defined in the definition of "Market Quotation"). ¶ 12.

iii.  Paragraph 13(c)(i) of the FVO-Barclays CSA provides that "'Valuation Agent' means, for all purposes of this Credit Support Annex, Barclays Bank."

iv.  Section 6(e)(ii)(2)(A) of the FVO-Barclays Master Agreement provides:

> if Market Quotation applies, each party will determine a Settlement Amount in respect of the Terminated Transactions, and an amount will be payable equal to (I) the sum of (a) one-half of the difference between the Settlement Amount of the party with the higher Settlement Amount ("X") and the Settlement Amount of the party with the lower Settlement Amount ("Y") and (b) the Termination Currency Equivalent of the Unpaid Amounts owing to X less (II) the Termination Currency Equivalents of the Unpaid Amounts owing to Y . . . .

v.  The definition of "Market Quotation" in the FVO-Barclays Master Agreement provides that a Replacement Transaction "would have the effect of preserving for such party the economic equivalent of any payment or delivery . . . by the parties . . . in respect of such Terminated Transaction or group of Termination Transactions that would, but for the occurrence of the relevant Early Termination Date, have been required after that date." § 14.

vi.  ***Good Faith and Commercially Reasonable Manner.*** Performance of all obligations under this Annex, including, but not limited to, all calculations, valuations and determinations made by either party, will be made in good faith and in a commercially reasonable manner. ¶ 11(d).

5.  Barclays further breached provisions of the FVO-Barclays Master Agreement under which: "[Barclays Bank] agrees with [FVO] that, so long as either party has or may have any obligation under this Agreement or under any Credit Support Document to which it is a party . . . [it] will comply in all material respects with all applicable laws . . . to which it may be subject if failure so to comply would materially impair its ability to perform its obligations under this Agreement." § 4(c).

6.  Under the FVO-Barclays Master Agreement, Barclays is liable for reasonable costs and attorney's fees incurred in this action: "A Defaulting Party will, on demand, indemnify and hold harmless the other party for and against all reasonable out-of-pocket expenses, including legal fees . . . incurred by such other party by reason of the enforcement and protection of its rights under this Agreement or any Credit Support Document to which the Defaulting Party is a party." § 11

## Exhibit F
## Express Contractual Terms Between FRV and Defendant Citi

1.    On September 15, 2003, FRV entered into an ISDA Master Agreement (the "FRV-Citi Master Agreement") and Schedule (the "FRV-Citi Schedule") with Defendant CGML.

2.    The FRV-Citi Schedule provided: "This Agreement will be governed by and construed in accordance with the laws of the State of New York." Part 4(i).

3.    FRV entered into the swaps with CGML listed in Exhibit A, each of which was evidenced in a Confirmation (the "FRV-Citi Confirmations").

    a.    Each of the FRV-Citi Confirmations provided that CGML, as the "Calculation Agent" and the "Floating Rate Payer," would determine and pay the "Floating Amount" as each term is defined in the 2006 ISDA Definitions.

    b.    The FRV-Citi Schedule provided: "The Calculation Agent will be [CGML] unless otherwise specified in a Confirmation in relation to the relevant Transaction." Part 4(f).

    c.    The 2006 ISDA Definitions provide that the Calculation Agent is "responsible for: (a) calculating the applicable Floating Rate [and] (b) calculating any Floating Amount payable on each Payment Date. . . . Whenever the Calculation Agent is required to act, make a determination or to exercise judgment in any other way, it will do so in good faith and in a commercially reasonable manner." 2006 ISDA Definitions § 4.14.

    d.    Citi breached the FRV-Citi Schedule and each of the FRV-Citi Confirmations for the reasons set forth in the Complaint.

4.    On September 15, 2003, FRV also entered into a Credit Support Annex with CGML (the "FRV-Citi CSA").

    a.    Citi breached the following contractual provisions in the FRV-Citi CSA for the reasons set forth in the Complaint.

        i.    "[U]pon a demand made by the Secured Party . . . the Pledgor will Transfer to the Secured Party Eligible Credit Support having a Value as of the date of the Transfer at least equal to the applicable Delivery Amount . . . . [which] will equal the amount by which: (i) the Credit Support Amount exceeds (ii) the Value . . . of all Posted Credit Support held by the Secured Party." ¶ 3(a).

        ii.    "Credit Support Amount" includes, *inter alia*, the Secured Party's "Exposure," which as defined in the FRV-Citi CSA includes"

            the amount, if any, that would be payable to a party that is the Secured Party by the other party (expressed as a positive number)

or by a party that is the Secured Party to the other party (expressed as a negative number) pursuant to Section 6(e)(ii)(2)(A) of this Agreement as if all Transactions (or Swap Transactions) were being terminated as of the relevant Valuation Time; *provided* that Market Quotation will be determined by the Valuation Agent using its estimates at mid-market of the amounts that would be paid for Replacement Transactions (as that term is defined in the definition of "Market Quotation"). ¶ 12.

iii. Paragraph 13(c)(i) of the FRV-Citi CSA provides that "'Valuation Agent' means, for purposes of Paragraphs 3 and 5, the party making the demand under Paragraph 3, and, for purposes of Paragraphs 4(d)(ii) and 6(d), the Secured Party receiving or deemed to receive the Substitute Credit Support or the Distributions of the Interest Amount, as applicable, provided, however, that for purposes of calculating the Value of Eligible Credit Support or Posted Credit Support [CGML] shall be the Valuation Agent."

iv. Section 6(e)(ii)(2)(A) of the FRV-Citi Master Agreement provides:

> if Market Quotation applies, each party will determine a Settlement Amount in respect of the Terminated Transactions, and an amount will be payable equal to (I) the sum of (a) one-half of the difference between the Settlement Amount of the party with the higher Settlement Amount ("X") and the Settlement Amount of the party with the lower Settlement Amount ("Y") and (b) the Termination Currency Equivalent of the Unpaid Amounts owing to X less (II) the Termination Currency Equivalents of the Unpaid Amounts owing to Y . . . .

v. The definition of "Market Quotation" in the FRV-Citi Master Agreement provides that a Replacement Transaction "would have the effect of preserving for such party the economic equivalent of any payment or delivery . . . by the parties . . . in respect of such Terminated Transaction or group of Termination Transactions that would, but for the occurrence of the relevant Early Termination Date, have been required after that date." § 14.

vi. ***Good Faith and Commercially Reasonable Manner.*** Performance of all obligations under this Annex, including, but not limited to, all calculations, valuations and determinations made by either party, will be made in good faith and in a commercially reasonable manner. ¶ 11(d).

5. Citi further breached provisions of the FRV-Citi Master Agreement under which: "[CGML] agrees with [FRV] that, so long as either party has or may have any obligation under this Agreement or under any Credit Support Document to which it is a party . . . [it]

will comply in all material respects with all applicable laws . . . to which it may be subject if failure so to comply would materially impair its ability to perform its obligations under this Agreement." § 4(c).

6.     Under the FRV-Citi Master Agreement, Citi is liable for reasonable costs and attorney's fees incurred in this action: "A Defaulting Party will, on demand, indemnify and hold harmless the other party for and against all reasonable out-of-pocket expenses, including legal fees . . . incurred by such other party by reason of the enforcement and protection of its rights under this Agreement or any Credit Support Document to which the Defaulting Party is a party." § 11.

## Exhibit G
## Express Contractual Terms Between FVO and Defendant Citi

1.  On January 16, 2008, FVO entered into an ISDA Master Agreement (the "FVO-Citi Master Agreement") and Schedule (the "FVO-Citi Schedule") with Defendant CGML.

2.  The FVO-Citi Schedule provided: "This Agreement will be governed by and construed in accordance with the laws of the State of New York." Part 4(i).

3.  FVO entered into the swaps with CGML listed in Exhibit A, each of which was evidenced in a Confirmation (the "FVO-Citi Confirmations").

    a.  Each of the FVO-Citi Confirmations provided that CGML, as the "Calculation Agent" and the "Floating Rate Payer," would determine and pay the "Floating Amount" as each term is defined in the 2006 ISDA Definitions.

    b.  The FVO-Citi Schedule provided: "The Calculation Agent will be [CGML] unless otherwise specified in a Confirmation in relation to the relevant Transaction." Part 4(f).

    c.  The 2006 ISDA Definitions provide that the Calculation Agent is "responsible for: (a) calculating the applicable Floating Rate [and] (b) calculating any Floating Amount payable on each Payment Date. . . . Whenever the Calculation Agent is required to act, make a determination or to exercise judgment in any other way, it will do so in good faith and in a commercially reasonable manner." 2006 ISDA Definitions § 4.14.

    d.  Citi breached the FVO-Citi Schedule and each of the FVO-Citi Confirmations for the reasons set forth in the Complaint.

4.  On January 16, 2008, FVO also entered into a Credit Support Annex with CGML (the "FVO-Citi CSA").

    a.  Citi breached the following contractual provisions in the FVO-Citi CSA for the reasons set forth in the Complaint.

        i.   "[U]pon a demand made by the Secured Party . . . the Pledgor will Transfer to the Secured Party Eligible Credit Support having a Value as of the date of the Transfer at least equal to the applicable Delivery Amount . . . . [which] will equal the amount by which: (i) the Credit Support Amount exceeds (ii) the Value . . . of all Posted Credit Support held by the Secured Party." ¶ 3(a).

        ii.  "Credit Support Amount" includes, *inter alia*, the Secured Party's "Exposure," which as defined in the FVO-Citi CSA includes"

                the amount, if any, that would be payable to a party that is the Secured Party by the other party (expressed as a positive number)

or by a party that is the Secured Party to the other party (expressed as a negative number) pursuant to Section 6(e)(ii)(2)(A) of this Agreement as if all Transactions (or Swap Transactions) were being terminated as of the relevant Valuation Time; *provided* that Market Quotation will be determined by the Valuation Agent using its estimates at mid-market of the amounts that would be paid for Replacement Transactions (as that term is defined in the definition of "Market Quotation"). ¶ 12.

iii.    Paragraph 13(c)(i) of the FVO-Citi CSA provides that "'Valuation Agent' means, for purposes of Paragraphs 3 and 5, the party making the demand under Paragraph 3, and, for purposes of Paragraphs 4(d)(ii) and 6(d), the Secured Party receiving or deemed to receive the Substitute Credit Support or the Distributions of the Interest Amount, as applicable, provided, however, that for purposes of calculating the Value of Eligible Credit Support or Posted Credit Support [CGML] shall be the Valuation Agent."

iv.    Section 6(e)(ii)(2)(A) of the FVO-Citi Master Agreement provides:

if Market Quotation applies, each party will determine a Settlement Amount in respect of the Terminated Transactions, and an amount will be payable equal to (I) the sum of (a) one-half of the difference between the Settlement Amount of the party with the higher Settlement Amount ("X") and the Settlement Amount of the party with the lower Settlement Amount ("Y") and (b) the Termination Currency Equivalent of the Unpaid Amounts owing to X less (II) the Termination Currency Equivalents of the Unpaid Amounts owing to Y . . . .

v.    The definition of "Market Quotation" in the FVO-Citi Master Agreement provides that a Replacement Transaction "would have the effect of preserving for such party the economic equivalent of any payment or delivery . . . by the parties . . . in respect of such Terminated Transaction or group of Termination Transactions that would, but for the occurrence of the relevant Early Termination Date, have been required after that date." § 14.

vi.    ***Good Faith and Commercially Reasonable Manner.*** Performance of all obligations under this Annex, including, but not limited to, all calculations, valuations and determinations made by either party, will be made in good faith and in a commercially reasonable manner. ¶ 11(d).

5.    Citi further breached provisions of the FVO-Citi Master Agreement under which: "[CGML] agrees with [FRV] that, so long as either party has or may have any obligation under this Agreement or under any Credit Support Document to which it is a party . . . [it]

will comply in all material respects with all applicable laws . . . to which it may be subject if failure so to comply would materially impair its ability to perform its obligations under this Agreement." § 4(c).

6.      Under the FVO-Citi Master Agreement, Citi is liable for reasonable costs and attorney's fees incurred in this action: "A Defaulting Party will, on demand, indemnify and hold harmless the other party for and against all reasonable out-of-pocket expenses, including legal fees . . . incurred by such other party by reason of the enforcement and protection of its rights under this Agreement or any Credit Support Document to which the Defaulting Party is a party." § 11.

**Express Contractual Terms Between FRV and Defendant Credit Suisse**

1.  On June 18, 2003, FRV entered into an ISDA Master Agreement (the "Credit Suisse Master Agreement") and Schedule (the "Credit Suisse Schedule") with Defendant CSIN.

2.  The Credit Suisse Schedule provided: "This Agreement will be governed by and construed in accordance with the laws of the State of New York without reference to choice of law doctrine." Part 4(h).

3.  FRV entered into the swaps with CSIN listed in Exhibit A, each of which was evidenced in a Confirmation (the "Credit Suisse Confirmations").

    a.  Each of the Credit Suisse Confirmations provided that CSIN, as the "Calculation Agent" and the "Floating Rate Payer," would determine and pay the "Floating Amount" as each term is defined in the 2006 ISDA Definitions.

    b.  The Credit Suisse Schedule provided: "The Calculation Agent is [CSIN] unless otherwise agreed in a Confirmation in relation to the relevant Transaction." Part 4(e).

    c.  The 2006 ISDA Definitions provide that the Calculation Agent is "responsible for: (a) calculating the applicable Floating Rate [and] (b) calculating any Floating Amount payable on each Payment Date. . . . Whenever the Calculation Agent is required to act, make a determination or to exercise judgment in any other way, it will do so in good faith and in a commercially reasonable manner." 2006 ISDA Definitions § 4.14.

    d.  Credit Suisse breached the Credit Suisse Schedule and each of the Credit Suisse Confirmations for the reasons set forth in the Complaint.

4.  On June 18, 2003, FRV also entered into a Credit Support Annex with CSIN (the "Credit Suisse CSA").

    a.  Credit Suisse breached the following contractual provisions in the Credit Suisse CSA for the reasons set forth in the Complaint.

        i.   "[U]pon a demand made by the Secured Party . . . the Pledgor will Transfer to the Secured Party Eligible Credit Support having a Value as of the date of the Transfer at least equal to the applicable Delivery Amount . . . . [which] will equal the amount by which: (i) the Credit Support Amount exceeds (ii) the Value . . . of all Posted Credit Support held by the Secured Party." ¶ 3(a).

        ii.  "Credit Support Amount" includes, *inter alia*, the Secured Party's "Exposure," which as defined in the Credit Suisse CSA includes"

the amount, if any, that would be payable to a party that is the Secured Party by the other party (expressed as a positive number) or by a party that is the Secured Party to the other party (expressed as a negative number) pursuant to Section 6(e)(ii)(2)(A) of this Agreement as if all Transactions (or Swap Transactions) were being terminated as of the relevant Valuation Time; *provided* that Market Quotation will be determined by the Valuation Agent using its estimates at mid-market of the amounts that would be paid for Replacement Transactions (as that term is defined in the definition of "Market Quotation"). ¶ 12.

iii.   Paragraph 13(c)(i) of the Credit Suisse CSA provides that "'Valuation Agent' means [CSIN] for all purposes."

iv.   Section 6(e)(ii)(2)(A) of the Credit Suisse Master Agreement provides:

if Market Quotation applies, each party will determine a Settlement Amount in respect of the Terminated Transactions, and an amount will be payable equal to (I) the sum of (a) one-half of the difference between the Settlement Amount of the party with the higher Settlement Amount ("X") and the Settlement Amount of the party with the lower Settlement Amount ("Y") and (b) the Termination Currency Equivalent of the Unpaid Amounts owing to X less (II) the Termination Currency Equivalents of the Unpaid Amounts owing to Y . . . .

v.   The definition of "Market Quotation" in the Credit Suisse Master Agreement provides that a Replacement Transaction "would have the effect of preserving for such party the economic equivalent of any payment or delivery . . . by the parties . . . in respect of such Terminated Transaction or group of Termination Transactions that would, but for the occurrence of the relevant Early Termination Date, have been required after that date." § 14.

vi.   ***Good Faith and Commercially Reasonable Manner.*** Performance of all obligations under this Annex, including, but not limited to, all calculations, valuations and determinations made by either party, will be made in good faith and in a commercially reasonable manner. ¶ 11(d).

5.   Credit Suisse further breached provisions of the Credit Suisse Master Agreement under which: "[CSIN] agrees with [FRV] that, so long as either party has or may have any obligation under this Agreement or under any Credit Support Document to which it is a party . . . [it] will comply in all material respects with all applicable laws . . . to which it may be subject if failure so to comply would materially impair its ability to perform its obligations under this Agreement." § 4(c).

6. Under the Credit Suisse Master Agreement, Credit Suisse is liable for reasonable costs and attorney's fees incurred in this action: "A Defaulting Party will, on demand, indemnify and hold harmless the other party for and against all reasonable out-of-pocket expenses, including legal fees . . . incurred by such other party by reason of the enforcement and protection of its rights under this Agreement or any Credit Support Document to which the Defaulting Party is a party." § 11.

**Exhibit I**
**Express Contractual Terms Between FRV and Defendant Deutsche Bank**

1.      On January 11, 2002, FRV entered into an ISDA Master Agreement (the "FRV-Deutsche Bank Master Agreement") and Schedule (the "FRV-Deutsche Bank Schedule") with Defendant Deutsche Bank..

2.      The FRV-Deutsche Bank Schedule provided: "This Agreement shall be governed by, and construed and enforced in accordance with, the laws of the State of New York (without reference to its choice of law doctrine)." Part 4(h).

3.      FRV entered into the swaps with Deutsche Bank listed in Exhibit A, each of which was evidenced in a Confirmation (the "FRV-Deutsche Bank Confirmations").

      a.      Each of the FRV-Deutsche Bank Confirmations provided that Deutsche Bank, as the "Calculation Agent" and the "Floating Rate Payer," would determine and pay the "Floating Amount" as each term is defined in the 2006 ISDA Definitions.

      b.      The FRV-Deutsche Bank Schedule provided: "The Calculation Agent shall be [Deutsche Bank]." Part 4(e).

      c.      The 2006 ISDA Definitions provide that the Calculation Agent is "responsible for: (a) calculating the applicable Floating Rate [and] (b) calculating any Floating Amount payable on each Payment Date. . . . Whenever the Calculation Agent is required to act, make a determination or to exercise judgment in any other way, it will do so in good faith and in a commercially reasonable manner." 2006 ISDA Definitions § 4.14.

      d.      Deutsche Bank breached the FRV-Deutsche Bank Schedule and each of the FRV-Deutsche Bank Confirmations for the reasons set forth in the Complaint.

4.      On January 11, 2002, FRV also entered into a Credit Support Annex with Deutsche Bank (the "FRV-Deutsche Bank CSA").

      a.      Deutsche Bank breached the following contractual provisions in the FRV-Deutsche Bank CSA for the reasons set forth in the Complaint.

            i.      "[U]pon a demand made by the Secured Party . . . the Pledgor will Transfer to the Secured Party Eligible Credit Support having a Value as of the date of the Transfer at least equal to the applicable Delivery Amount . . . [which] will equal the amount by which: (i) the Credit Support Amount exceeds (ii) the Value . . . of all Posted Credit Support held by the Secured Party." ¶ 3(a).

            ii.      "Credit Support Amount" includes, *inter alia*, the Secured Party's "Exposure," which as defined in the FRV-Deutsche Bank CSA includes"

the amount, if any, that would be payable to a party that is the Secured Party by the other party (expressed as a positive number) or by a party that is the Secured Party to the other party (expressed as a negative number) pursuant to Section 6(e)(ii)(2)(A) of this Agreement as if all Transactions (or Swap Transactions) were being terminated as of the relevant Valuation Time; *provided* that Market Quotation will be determined by the Valuation Agent using its estimates at mid-market of the amounts that would be paid for Replacement Transactions (as that term is defined in the definition of "Market Quotation"). ¶ 12.

iii. Paragraph 13(c)(i) of the FRV-Deutsche Bank CSA provides that "'Valuation Agent' means: [Deutsche Bank]."

iv. Section 6(e)(ii)(2)(A) of the FRV-Deutsche Bank Master Agreement provides:

if Market Quotation applies, each party will determine a Settlement Amount in respect of the Terminated Transactions, and an amount will be payable equal to (I) the sum of (a) one-half of the difference between the Settlement Amount of the party with the higher Settlement Amount ("X") and the Settlement Amount of the party with the lower Settlement Amount ("Y") and (b) the Termination Currency Equivalent of the Unpaid Amounts owing to X less (II) the Termination Currency Equivalents of the Unpaid Amounts owing to Y . . . .

v. The definition of "Market Quotation" in the FRV-Deutsche Bank Master Agreement provides that a Replacement Transaction "would have the effect of preserving for such party the economic equivalent of any payment or delivery . . . by the parties . . . in respect of such Terminated Transaction or group of Termination Transactions that would, but for the occurrence of the relevant Early Termination Date, have been required after that date." § 14.

vi. ***Good Faith and Commercially Reasonable Manner.*** Performance of all obligations under this Annex, including, but not limited to, all calculations, valuations and determinations made by either party, will be made in good faith and in a commercially reasonable manner. ¶ 11(d).

5. Deutsche Bank further breached provisions of the FRV-Deutsche Bank Master Agreement under which: "[Deutsche Bank] agrees with [FRV] that, so long as either party has or may have any obligation under this Agreement or under any Credit Support Document to which it is a party . . . [it] will comply in all material respects with all applicable laws . . . to which it may be subject if failure so to comply would materially impair its ability to perform its obligations under this Agreement." § 4(c).

6. Under the FRV-Deutsche Bank Master Agreement, Deutsche Bank is liable for reasonable costs and attorney's fees incurred in this action: "A Defaulting Party will, on demand, indemnify and hold harmless the other party for and against all reasonable out-of-pocket expenses, including legal fees . . . incurred by such other party by reason of the enforcement and protection of its rights under this Agreement or any Credit Support Document to which the Defaulting Party is a party." § 11.

1.  On August 22, 2006, FVO entered into an ISDA Master Agreement (the "FVO-Deutsche Bank Master Agreement") and Schedule (the "FVO-Deutsche Bank Schedule") with Defendant Deutsche Bank.

2.  The FVO-Deutsche Bank Schedule provided: "This Agreement shall be governed by, and construed and enforced in accordance with, the laws of the State of New York (without reference to its choice of law doctrine)." Part 4(h).

3.  FVO entered into the swaps with Deutsche Bank listed in Exhibit A, each of which was evidenced in a Confirmation (the "FVO-Deutsche Bank Confirmations").

    a.  Each of the FVO-Deutsche Bank Confirmations provided that Deutsche Bank, as the "Calculation Agent" and the "Floating Rate Payer," would determine and pay the "Floating Amount" as each term is defined in the 2006 ISDA Definitions.

    b.  The FVO-Deutsche Bank Schedule provided: "The Calculation Agent shall be [Deutsche Bank]." Part 4(e).

    c.  The 2006 ISDA Definitions provide that the Calculation Agent is "responsible for: (a) calculating the applicable Floating Rate [and] (b) calculating any Floating Amount payable on each Payment Date. . . . Whenever the Calculation Agent is required to act, make a determination or to exercise judgment in any other way, it will do so in good faith and in a commercially reasonable manner." 2006 ISDA Definitions § 4.14.

    d.  Deutsche Bank breached the FVO-Deutsche Bank Schedule and each of the FVO-Deutsche Bank Confirmations for the reasons set forth in the Complaint.

4.  On August 10, 2006, FVO also entered into a Credit Support Annex with Deutsche Bank (the "FVO-Deutsche Bank CSA").

    a.  Deutsche Bank breached the following contractual provisions in the FVO-Deutsche Bank CSA for the reasons set forth in the Complaint.

        i.  "[U]pon a demand made by the Secured Party . . . the Pledgor will Transfer to the Secured Party Eligible Credit Support having a Value as of the date of the Transfer at least equal to the applicable Delivery Amount . . . . [which] will equal the amount by which: (i) the Credit Support Amount exceeds (ii) the Value . . . of all Posted Credit Support held by the Secured Party." ¶ 3(a).

        ii.  "Credit Support Amount" includes, *inter alia*, the Secured Party's "Exposure," which as defined in the FVO-Deutsche Bank CSA includes"

the amount, if any, that would be payable to a party that is the Secured Party by the other party (expressed as a positive number) or by a party that is the Secured Party to the other party (expressed as a negative number) pursuant to Section 6(e)(ii)(2)(A) of this Agreement as if all Transactions (or Swap Transactions) were being terminated as of the relevant Valuation Time; *provided* that Market Quotation will be determined by the Valuation Agent using its estimates at mid-market of the amounts that would be paid for Replacement Transactions (as that term is defined in the definition of "Market Quotation"). ¶ 12.

iii.    Paragraph 13(c)(i) of the FVO-Deutsche Bank CSA provides that "'Valuation Agent' means: [Deutsche Bank]."

iv.    Section 6(e)(ii)(2)(A) of the FVO-Deutsche Bank Master Agreement provides:

if there are two Affected Parties, each party will determine an amount equal to the Termination Currency Equivalent of the sum of the Close-out Amount or Close-out Amounts (whether positive or negative) for each Terminated Transaction or group of Terminated Transactions, as the case may be, and the Early Termination Amount will be an amount equal to (A) the sum of (I) one-half of the difference between the higher amount so determined (by party "X") and the lower amount so determined (by party "Y") and (II) the Termination Currency Equivalent of the Unpaid Amounts owing to X less (B) the Termination Currency Equivalent of the Unpaid Amounts owing to Y. If the Early Termination Amount is a positive number, Y will pay it to X; if it is a negative number, X will pay the absolute value of the Early Termination Amount to Y.

v.    ***Good Faith and Commercially Reasonable Manner.*** Performance of all obligations under this Annex, including, but not limited to, all calculations, valuations and determinations made by either party, will be made in good faith and in a commercially reasonable manner. ¶ 11(d).

5.    Deutsche Bank further breached provisions of the FVO-Deutsche Bank Master Agreement under which: "[Deutsche Bank] agrees with [FVO] that, so long as either party has or may have any obligation under this Agreement or under any Credit Support Document to which it is a party . . . [it] will comply in all material respects with all applicable laws . . . to which it may be subject if failure so to comply would materially impair its ability to perform its obligations under this Agreement." § 4(c).

6.    Under the FVO-Deutsche Bank Master Agreement, Deutsche Bank is liable for reasonable costs and attorney's fees incurred in this action: "A Defaulting Party will on

demand indemnify and hold harmless the other party for and against all reasonable out-of-pocket expenses, including legal fees . . . incurred by such other party by reason of the enforcement and protection of its rights under this Agreement or any Credit Support Document to which the Defaulting Party is a party." § 11.

1.  On January 10, 2002, FRV entered into a Derivatives Trading Arrangement (the "JPMorgan DTA") with Defendant JPMorgan Chase Bank, N.A.

2.  The JPMorgan DTA provided: "This Agreement shall be governed by English law." JPMorgan DTA at 1.

3.  The JPMorgan DTA provided: "This Agreement hereby incorporates by reference the printed form of 1992 ISDA Master Agreement (the *"Printed Form"*) published by the International Swaps and Derivatives Association, Inc. (*"ISDA"*) . . . . The parties hereto agree that this Agreement, together with the Events of Default, Termination Events and Credit Enhancement provisions set forth herein, constitutes a Master Agreement as referred to in the preamble to the Printed Form (the "Master Agreement"). This Agreement supplements, forms a part of, and incorporates by reference the ISDA Master Agreement, in the form published by ISDA, with the same legal effect as if the parties had executed the Printed Form with a Schedule containing the elections set forth herein on the date of this Agreement. . . . Terms used herein and not otherwise defined shall have the same meaning as contained in the ISDA Master Agreement or the ISDA Credit Support Annex referenced in Section 3 hereof." JPMorgan DTA at 1.

4.  FRV entered into the swaps with JPMorgan Chase Bank, N.A. listed in Exhibit A, each of which was evidenced in a Confirmation (the "FRV-JPMorgan Confirmations").

    a.  Each of the FRV-JPMorgan Confirmations provided that JPMorgan Chase Bank, N.A., as the "Calculation Agent" and the "Floating Rate Payer," would determine and pay the "Floating Amount" as each term is defined in the 2006 ISDA Definitions.

    b.  The JPMorgan DTA provided: *"JPMorgan Chase* shall serve as the Calculation Agent; provided, however, that if an Event of Default or Potential Event of Default has occurred and is continuing with respect to *JPMorgan Case*, then the *Counterparty* shall be the Calculation Agent. All determinations made by the Calculation Agent shall be made in a reasonable manner." JPMorgan DTA at 1.

    c.  The 2006 ISDA Definitions provide that the Calculation Agent is "responsible for: (a) calculating the applicable Floating Rate [and] (b) calculating any Floating Amount payable on each Payment Date. . . . Whenever the Calculation Agent is required to act, make a determination or to exercise judgment in any other way, it will do so in good faith and in a commercially reasonable manner." 2006 ISDA Definitions § 4.14.

    d.  JPMorgan breached the JPMorgan DTA and each of the FRV-JPMorgan Confirmations for the reasons set forth in the Complaint.

5.  The JPMorgan DTA provided: "This Agreement is supplemented by the standard form of ISDA Credit Support Annex (New York Law, Security Interest Form) which is hereby

incorporated by reference . . . ." JPMorgan DTA at 3. JPMorgan breached the following contractual provisions in the CSA for the reasons set forth in the Complaint.

i.      "[U]pon a demand made by the Secured Party . . . the Pledgor will Transfer to the Secured Party Eligible Credit Support having a Value as of the date of the Transfer at least equal to the applicable Delivery Amount . . . . [which] will equal the amount by which: (i) the Credit Support Amount exceeds (ii) the Value . . . of all Posted Credit Support held by the Secured Party." ¶ 3(a).

ii.     "Credit Support Amount" includes, *inter alia*, the Secured Party's "Exposure," which as defined in the CSA includes"

> the amount, if any, that would be payable to a party that is the Secured Party by the other party (expressed as a positive number) or by a party that is the Secured Party to the other party (expressed as a negative number) pursuant to Section 6(e)(ii)(2)(A) of this Agreement as if all Transactions (or Swap Transactions) were being terminated as of the relevant Valuation Time; *provided* that Market Quotation will be determined by the Valuation Agent using its estimates at mid-market of the amounts that would be paid for Replacement Transactions (as that term is defined in the definition of "Market Quotation"). ¶ 12.

iii.    Paragraph 13(c)(i) of the CSA provides that "'Valuation Agent' means for purposes of Paragraphs 3 and 5, the party making the demand under Paragraph 3, and, for purposes of Paragraph 6(d), the Secured Party receiving or deemed to have receive the Distributions or the Interest Amount, as applicable."

iv.    Section 6(e)(ii)(2)(A) of the ISDA Master Agreement provides:

> if Market Quotation applies, each party will determine a Settlement Amount in respect of the Terminated Transactions, and an amount will be payable equal to (I) the sum of (a) one-half of the difference between the Settlement Amount of the party with the higher Settlement Amount ("X") and the Settlement Amount of the party with the lower Settlement Amount ("Y") and (b) the Termination Currency Equivalent of the Unpaid Amounts owing to X less (II) the Termination Currency Equivalents of the Unpaid Amounts owing to Y . . . .

v.     The definition of "Market Quotation" in the ISDA Master Agreement provides that a Replacement Transaction "would have the effect of preserving for such party the economic equivalent of any payment or delivery . . . by the parties . . . in respect of such Terminated Transaction

or group of Termination Transactions that would, but for the occurrence of the relevant Early Termination Date, have been required after that date." § 14.

vi. ***Good Faith and Commercially Reasonable Manner.*** Performance of all obligations under this Annex, including, but not limited to, all calculations, valuations and determinations made by either party, will be made in good faith and in a commercially reasonable manner. ¶ 11(d).

6.  JPMorgan further breached provisions of the ISDA Master Agreement under which: "[JPMorgan Chase Bank, N.A.] agrees with [FRV] that, so long as either party has or may have any obligation under this Agreement or under any Credit Support Document to which it is a party . . . [it] will comply in all material respects with all applicable laws . . . to which it may be subject if failure so to comply would materially impair its ability to perform its obligations under this Agreement." § 4(c).

7.  Under the ISDA Master Agreement, JPMorgan is liable for reasonable costs and attorney's fees incurred in this action: "A Defaulting Party will, on demand, indemnify and hold harmless the other party for and against all reasonable out-of-pocket expenses, including legal fees . . . incurred by such other party by reason of the enforcement and protection of its rights under this Agreement or any Credit Support Document to which the Defaulting Party is a party." § 11.

Exhibit L
**Express Contractual Terms Between FVO and Defendant JPMorgan**

1.  On March 15, 2007, FVO entered into an ISDA Master Agreement (the "JPMorgan Master Agreement") and Schedule (the "JPMorgan Schedule") with Defendant JPMorgan Chase Bank, N.A..

2.  The JPMorgan Schedule provided: "This Agreement will be governed by and construed in accordance with the laws of the State of New York (without reference to choice of law doctrine)." Part 4(1).

3.  FVO entered into the swaps with JPMorgan Chase Bank, N.A. listed in Exhibit A, each of which was evidenced in a Confirmation (the "FVO-JPMorgan Confirmations").

    a.  Each of the FVO-JPMorgan Confirmations provided that JPMorgan Chase Bank, N.A., as the "Calculation Agent" and the "Floating Rate Payer," would determine and pay the "Floating Amount" as each term is defined in the 2006 ISDA Definitions.

    b.  The JPMorgan Schedule provided: "The Calculation Agent will be [JPMorgan Chase Bank, N.A.]." Part 5(5).

    c.  The 2006 ISDA Definitions provide that the Calculation Agent is "responsible for: (a) calculating the applicable Floating Rate [and] (b) calculating any Floating Amount payable on each Payment Date. . . . Whenever the Calculation Agent is required to act, make a determination or to exercise judgment in any other way, it will do so in good faith and in a commercially reasonable manner." 2006 ISDA Definitions § 4.14.

    d.  JPMorgan breached the JPMorgan Schedule and each of the FVO-JPMorgan Confirmations for the reasons set forth in the Complaint.

4.  On March 15, 2007, FVO also entered into a Credit Support Annex with JPMorgan Chase Bank, N.A. (the "JPMorgan CSA").

    a.  JPMorgan breached the following contractual provisions in the JPMorgan CSA for the reasons set forth in the Complaint.

        i.  "[U]pon a demand made by the Secured Party . . . the Pledgor will Transfer to the Secured Party Eligible Credit Support having a Value as of the date of the Transfer at least equal to the applicable Delivery Amount . . . . [which] will equal the amount by which: (i) the Credit Support Amount exceeds (ii) the Value . . . of all Posted Credit Support held by the Secured Party." ¶ 3(a).

        ii. "Credit Support Amount" includes, *inter alia*, the Secured Party's "Exposure," which as defined in the JPMorgan CSA includes"

the amount, if any, that would be payable to a party that is the Secured Party by the other party (expressed as a positive number) or by a party that is the Secured Party to the other party (expressed as a negative number) pursuant to Section 6(e)(ii)(2)(A) of this Agreement as if all Transactions (or Swap Transactions) were being terminated as of the relevant Valuation Time; *provided* that Market Quotation will be determined by the Valuation Agent using its estimates at mid-market of the amounts that would be paid for Replacement Transactions (as that term is defined in the definition of "Market Quotation"). ¶ 12.

iii.     Paragraph 13(c)(i) of the JPMorgan CSA provides that "'Valuation Agent' means the party making the demand under Paragraph 3, unless there has occurred and is continuing any Event of Default, Potential Event of Default or Additional Termination Event with respect to such party, in which case the other party shall be the Valuation Agent."

iv.     Section 6(e)(ii)(2)(A) of the JPMorgan Master Agreement provides:

> if Market Quotation applies, each party will determine a Settlement Amount in respect of the Terminated Transactions, and an amount will be payable equal to (I) the sum of (a) one-half of the difference between the Settlement Amount of the party with the higher Settlement Amount ("X") and the Settlement Amount of the party with the lower Settlement Amount ("Y") and (b) the Termination Currency Equivalent of the Unpaid Amounts owing to X less (II) the Termination Currency Equivalents of the Unpaid Amounts owing to Y . . . .

v.     The definition of "Market Quotation" in the JPMorgan Master Agreement provides that a Replacement Transaction "would have the effect of preserving for such party the economic equivalent of any payment or delivery . . . by the parties . . . in respect of such Terminated Transaction or group of Termination Transactions that would, but for the occurrence of the relevant Early Termination Date, have been required after that date." § 14.

vi.     ***Good Faith and Commercially Reasonable Manner.*** Performance of all obligations under this Annex, including, but not limited to, all calculations, valuations and determinations made by either party, will be made in good faith and in a commercially reasonable manner. ¶ 11(d).

5.     JPMorgan further breached provisions of the JPMorgan Master Agreement under which: "[JPMorgan Chase Bank, N.A.] agrees with [FVO] that, so long as either party has or may have any obligation under this Agreement or under any Credit Support Document to which it is a party . . . [it] will comply in all material respects with all applicable laws . . .

to which it may be subject if failure so to comply would materially impair its ability to perform its obligations under this Agreement." § 4(c).

6.    Under the JPMorgan Master Agreement, JPMorgan is liable for reasonable costs and attorney's fees incurred in this action: "A Defaulting Party will, on demand, indemnify and hold harmless the other party for and against all reasonable out-of-pocket expenses, including legal fees . . . incurred by such other party by reason of the enforcement and protection of its rights under this Agreement or any Credit Support Document to which the Defaulting Party is a party." § 11.