UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| SALIX CAPITAL US INC., | No. 13-cv-4018-NRB |
| Plaintiff, | **ORAL ARGUMENT REQUESTED** |
| -against- | |
| BANC OF AMERICA SECURITIES LLC, *et al*., | |
| Defendants. | |

**PLAINTIFF'S MEMORANDUM OF LAW
IN SUPPORT OF MOTION TO REMAND**

# <u>TABLE OF CONTENTS</u>

<u>Page</u>

PRELIMINARY STATEMENT ..................................................................................................1

BACKGROUND .....................................................................................................................2

ARGUMENT ..........................................................................................................................4

I.      THE EDGE ACT DOES NOT CONFER FEDERAL JURISDICTION OVER
        SALIX'S STATE-LAW CLAIMS .................................................................................4

        A.      Salix's Claims Against the National Bank Defendants Do Not Arise Out
                of "International or Foreign" Transactions .............................................................5

                1.      The Swap Agreements Between the Funds and the National Bank
                        Defendants Were Domestic Transactions ......................................................5

                2.      Salix's Claims "Arise Out Of" Its Domestic Transactions With the
                        National Bank Defendants .........................................................................9

        B.      Salix's Claims Do Not Involve "Banking" or "Other . . . Financial
                Operations" At All ...................................................................................................13

                1.      Salix's Claims Do Not Arise Out of "Banking" .......................................13

                2.      Salix's Claims Do Not Arise Out of "Other . . . Financial
                        Operations" ..............................................................................................15

II.     REMAND IS PROPER BECAUSE NO DEFENDANT IS A "FOREIGN
        STATE" AS DEFINED UNDER THE FSIA ..................................................................17

        A.      There Is No "Foreign State" in the Amended Complaint .....................................17

        B.      Because the Purported Foreign Sovereign Defendant Has Been Dismissed,
                Remand is Proper ...................................................................................................19

CONCLUSION ......................................................................................................................22

# TABLE OF AUTHORITIES

**Page**

## Cases

*Allstate Ins. Co. v. CitiMortgage, Inc.*,
No. 11 Civ. 1927, 2012 WL 967582 (S.D.N.Y. Mar. 13, 2012) .........................................4, 5

*Am. Int'l Grp., Inc. v. Bank of Am. Corp.*,
712 F.3d 775 (2d Cir. 2013).........................................................................................2, 6, 10

*Arango v. Guzman Travel Advisors Corp.*,
621 F.2d 1371 (5th Cir. 1980) ......................................................................................19

*Austin v. Port Auth. of N.Y. & N.J.*,
No. 91 Civ. 4185, 1993 WL 149033 (S.D.N.Y. May 5, 1993).......................................19, 20

*Bank of Am. Corp. v. Lemgruber*,
385 F. Supp. 2d 200 (S.D.N.Y. 2005).......................................................................10, 15, 16

*Bank of N.Y. v. Bank of Am.*,
861 F. Supp. 225 (S.D.N.Y. 1994) ............................................................................5, 6, 11

*Bin-Jiang Tao v. Citibank, N.A.*,
445 F. App'x 951 (9th Cir. 2011) ...............................................................................16

*Clarken v. Citicorp Diners Club, Inc.*,
No. 01 Civ. 5123, 2001 WL 1263366 (N.D. Ill. Oct. 22, 2001)....................................13, 14

*Consorcio de Fomento Industrial S.A. v. First Nat'l Bank of Chi.*,
No. 93 Civ. 0272, 1993 WL 291706 (N.D. Ill. Aug. 3, 1993)...............................14

*Corporación Venezolana de Fomento v. Vintero Sales Corp.*,
629 F.2d 786 (2d Cir. 1980)...................................................................................8

*In re Currency Conversion Fee Antitrust Litig.*,
No. 1409, 21-95, 2003 WL 22097502 (S.D.N.Y. Sept. 10, 2003) .........................13

*Dexia SA/NV v. Bear, Stearns & Co.*,
--- F. Supp. 2d ----, 2013 WL 2136508 (S.D.N.Y. May 17, 2013).........................6

*Diaz v. Pan Am. Fed. Sav. & Loan Ass'n*,
635 F.2d 30 (1st Cir. 1980)..................................................................................13

*Dole Food Co. v. Patrickson*,
538 U.S. 468 (2002)............................................................................................18

*Frolova v. Union of Soviet Socialist Republics*,
761 F.2d 370 (7th Cir. 1985) ..............................................................................21, 22

*Hall St. Assocs., LLC v. Mattel, Inc.*,
552 U.S. 576 (2008)............................................................................................15

*Hinkle's Jeep Sales, Inc. v. Villa Enter., Inc.*,
  90 F.R.D. 49 (S.D. Fla. 1981) ............................................................................................19

*Hyatt Corp. v. Stanton*,
  945 F. Supp. 675 (S.D.N.Y. 1996) ......................................................................................17

*JPMorgan Chase Bank, N.A. v. Wanke*,
  No. 12 Civ. 893, 2013 WL 308766 (S.D. Ohio Jan. 25, 2013)............................................10

*In re Kaiser Aluminum Corp.*,
  456 F.3d 328 (3d Cir. 2006)................................................................................................11

*Kolari v. N.Y.-Presbyterian Hosp.*,
  455 F.3d 118 (2d Cir. 2006)................................................................................................20

*In re LIBOR-Based Fin. Instruments Antitrust Litig.*,
  --- F. Supp. 2d ----, 2013 WL 1285338 (S.D.N.Y. Mar. 29, 2013) ......................1, 12, 14, 20

*Lazard Freres & Co. v. First Nat'l Bank of Md.*,
  No. 91 Civ. 0628, 1991 WL 221087 (S.D.N.Y. Oct. 15, 1991) ...............................5, 6, 10, 13

*In re Lloyd's Am. Trust Fund. Litig.*,
  928 F. Supp. 333 (S.D.N.Y. 1996) ......................................................................................10

*Maddaloni Jewelers, Inc. v. Rolex Watch U.S.A., Inc.*,
  354 F. Supp. 2d 293 (S.D.N.Y. 2004)..................................................................................20

*New Mexico ex rel. Foy v. Vanderbilt Capital Advisors, LLC*,
  No. 09 Civ. 0178, 2009 WL 3672921 (D.N.M. Apr. 13, 2009) .............................................5

*Nacional Financiera, S.N.C. v. Chase Manhattan Bank, N.A.*,
  No. 00 Civ. 1571, 2001 WL 327159 (S.D.N.Y. Apr. 4, 2001)..............................................13

*Noonan v. Possfund Investment, Ltd.*,
  No. 89 Civ. 2903, 1994 WL 515440 (S.D.N.Y. Sept. 3, 1993) .............................................19

*People ex rel. Cosentino v. Fed. Reserve Bank of Chi.*,
  579 F. Supp. 1261 (N.D. Ill. 1984) ......................................................................................6

*Racepoint Partners, LLC v. JPMorgan Chase Bank, N.A.*,
  No. 06 Civ. 2500, 2006 WL 3044416 (S.D.N.Y. Oct. 26, 2006) ......................................8, 12

*Schlumberger Indus., Inc. v. Nat'l Surety Corp.*,
  36 F.3d 1274 (4th Cir. 1994) ..............................................................................................21

*Sch. Dist. of Erie v. J.P. Morgan Chase Bank*,
  No. 08 Civ. 7688, 2009 WL 234128 (S.D.N.Y. Jan. 30, 2009)............................................16

*Scipar Inc. v. Chubb Corp.*,
  No. 09-cv-128, 2010 WL 3894982 (W.D.N.Y. Sept. 30, 2010)..............................................4

*Sealink Funding Ltd. v. Bear Stearns & Co. Inc.*,
  No. 12 Civ. 1397, 2012 WL 4794450 (S.D.N.Y. Oct. 9, 2012) ......................................10, 11

*Security Pac. Nat'l Bank v. Derderian*,
    872 F.2d 281 (9th Cir. 1989) ...................................................................21, 22

*Sollitt v. Keycorp*,
    463 F. App'x 471 (6th Cir. 2012) ...........................................................10

*St. Matthew's Baptist Church v. Wachovia Bank Nat'l Ass'n*,
    No. 04 Civ. 4540, 2005 WL 1199045 (D.N.J. May 18, 2005) ...............16

*Stamm v. Barclays Bank of N.Y.*,
    960 F. Supp. 724 (S.D.N.Y. 1997) .........................................................16

*Telecredit Serv. Ctr. v. First Nat'l Bank of the Fla. Keys.*,
    679 F. Supp. 1101 (S.D. Fla. 1988) ...............................................5, 10, 13

*Teledyne Inc. v. Kone Corp.*,
    892 F.2d 1404 (9th Cir. 1990) ................................................................19

*Trent Realty Assocs. v. First Fed. Sav. & Loan Ass'n of Phila.*,
    657 F.2d 29 (3d Cir. 1981)........................................................................8

*United Mine Workers v. Gibbs*,
    383 U.S. 715 (1966) ................................................................................20

*Verlinden B.V. v. Cent. Bank of Nigeria*,
    461 U.S. 480 (1983) ................................................................................22

*Warter v. Boston Sec., S.A.*,
    No. 03 Civ. 81026, 2004 WL 691787 (S.D. Fla. Mar. 22, 2004) ...........14

*Weiss v. Hager*,
    No. 11 Civ. 2740, 2011 WL 6425542 (S.D.N.Y. Dec. 19, 2011)................5, 10, 13

## <u>Statutes</u>

12 U.S.C. § 632 ........................................................................ *passim*

28 U.S.C. § 1330(a) ..........................................................................1

28 U.S.C. § 1441(d) ...............................................................1, 17, 21

28 U.S.C. § 1603(a) ...................................................................17, 18

28 U.S.C. § 1603(b) ..............................................................................18

## <u>Other Authorities</u>

Jonathon R. Nash,
    *Pendent Party Jurisdiction Under the Foreign Sovereign Immunities Act*,
    16 B.U. Int'l L.J. 71 (1998) .......................................................................20

By this motion to remand, Plaintiff Salix Capital US Inc. ("Salix") seeks to have this action—alleging purely state-law claims—returned to New York Supreme Court.

## PRELIMINARY STATEMENT

Defendants attempt to remove Salix's state-law claims to federal court notwithstanding this Court's recent admonition that "needless decisions of state law should be avoided both as a matter of comity and to promote justice between the parties, by procuring them a surer-footed reading of applicable law." *In re LIBOR-Based Fin. Instruments Antitrust Litig.*, ---F. Supp. 2d ----, 2013 WL 1285338, at *58 (S.D.N.Y. Mar. 29, 2013).  Applying this principle, the Court held that "considerations of judicial economy, convenience, fairness, and comity" counseled against exercising supplemental jurisdiction over state-law claims in the Libor multidistrict litigation, and that  "there is no reason why a [state] court should not decide plaintiffs' [state] common-law claims." *Id.* at *59.  Nonetheless, Defendants now seek to whisk Salix's state-law claims to federal court under two purported bases of jurisdiction:  the Edge Act, 12 U.S.C. § 632, and the Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. §§ 1330(a), 1441(d).

*As to the Edge Act*, which allows federal courts to address suits arising from foreign banking transactions or foreign financial operations of federally chartered banks, Defendants cannot overcome the strong presumption against removal and demonstrate that this narrowly drawn provision applies.  Defendants' argument fails for the simple reason that the FrontPoint Funds—the entities that entered into the transactions at issue and the assignors of Salix's claims—did not engage in any foreign banking or financial transactions with a federally chartered bank.  Rather, the only transactions that matter for Edge Act purposes—specifically, those where federally chartered banks were counterparties—involved *New York*-based Fund managers acting on behalf of *Connecticut*-based Funds who contracted with *U.S.*-based national

1

banks to swap fixed rate payments for floating rate payments tied to *U.S.* Dollar Libor.  These transactions were entirely domestic.  That there are "foreign dimensions" to this action, such as that "several foreign banks" are *co*-defendants, does not change the domestic nature of the nationally chartered banks' transactions with the Funds.  As the Second Circuit recently held, for Edge Act jurisdiction to apply, "the suit must have a federally chartered corporation as a party and the suit must arise out of an offshore banking or financial transaction **of that federally chartered corporation**."  *Am. Int'l Grp., Inc. v. Bank of Am. Corp.*, 712 F.3d 775, 784 (2d Cir. 2013) ("*AIG*") (emphasis added).  Because there is no such transaction here, Edge Act jurisdiction is absent.

 **As to the FSIA**, Defendants initially contended that federal jurisdiction exists because The Royal Bank of Scotland Group plc ("RBS Group") is majority-owned by the U.K. government and qualifies as a "foreign state" under the statute.  RBS Group, however, is no longer a Defendant in this case.  Because no party to this case is a "foreign state" under the FSIA, remand is warranted.  That a "foreign state" may have been a party for a few weeks is far too tenuous of a connection to justify placing this state-law case in federal court for its duration.

## BACKGROUND

 Salix filed its claims in New York Supreme Court.  Salix brings claims as assignee of the FrontPoint Funds, two investment funds based in Connecticut, and as assignee of the Funds' managers and sub-advisor.  First Amended Complaint ("FAC") ¶¶ 5, 15-17.  As this Court is well-aware, Defendants were members of the USD Libor panel of banks that engaged in a scheme to artificially suppress Libor by underreporting their borrowing costs.  *Id.* ¶ 3.

 Between December 2007 and February 2008, the Funds entered into a series of investments known as "basis packages."  *Id.* ¶¶ 6-7.  As part of the basis packages, the Funds entered into interest-rate swaps in which they contracted with a Defendant to receive floating-

rate payments linked to USD Libor in exchange for fixed-rate payments. *Id.* ¶ 6. At the same time, the Funds purchased fixed-rate corporate bonds and credit default swaps. *Id.* ¶ 7. The swaps were a crucial component of each basis package, and were designed to protect the Funds from interest-rate risk and bank-counterparty risk. *Id.*

All of the transactions at issue were executed by Fund managers located in New York. *Id.* ¶ 18. Defendants solicited the Funds' investments in New York. *Id.* ¶ 19. New York Fund managers reviewed Defendants' offers, negotiated swap contracts, and decided to enter the transactions in New York. *Id.* ¶ 20. Once the trades were executed, confirmations were received in New York. *Id.* After the investments were made, the securities and derivatives were held by the Funds' prime broker in New York. *Id.* The Funds' portfolios were managed by Fund managers in New York. *Id.* ¶ 21. In short, the investment activity at issue took place exclusively in New York. *Id.*

By falsifying their Libor submissions, Defendants artificially lowered the amounts they were contractually obligated to pay the Funds under the interest-rate swaps. *Id.* ¶ 10. As Libor suppression widened in late 2008, the Funds' obligations under the swaps became increasingly (and artificially) skewed relative to Defendants' obligations. *Id.* ¶ 11. Defendants proceeded to make bad-faith collateral demands that dried up much of the Funds' liquidity. *Id.* Due to losses on the swaps, the Funds were confronted with a wave of redemption requests from their investors. *Id.* ¶ 12. As a result, the Funds were forced to sell off the bonds and terminate the swaps during a period when Libor suppression was at its worst—thereby locking the Funds into substantial losses. *Id.* ¶¶ 13-14. The Funds suffered significant harm because of Defendants' breaches of contract and fraud and ultimately shut down in 2009. *Id.* ¶ 14.

Salix brings state-law claims for breach of contract, breach of the implied covenant of good faith and fair dealing, common-law fraud, and tortious interference. *See generally id.* ¶¶ 201-357.

Salix originally named RBS Group as a defendant because the BBA's website identified "The Royal Bank of Scotland Group" as a panel bank. Certain Defendants removed the action on the purported grounds that federal jurisdiction exists under the Edge Act and under FSIA. The FSIA removal was based on the argument that then-defendant RBS Group is purportedly a "foreign state. Upon further investigation, and because the entity that settled with the U.S. Department of Justice, the U.S. Commodity Futures Trading Commission, and the U.K. Financial Services Authority in connection with Libor manipulation was not in fact RBS Group,[1] Salix concluded that the proper defendant was in fact The Royal Bank of Scotland plc ("RBS PLC"). Accordingly, Salix filed an amended complaint that, among other things, dismissed RBS Group, and instead named its non-state-owned subsidiary, RBS PLC.[2]

## ARGUMENT

## I.     THE EDGE ACT DOES NOT CONFER FEDERAL JURISDICTION OVER SALIX'S STATE-LAW CLAIMS

Defendants' first basis for removal—the Edge Act, 12 U.S.C. § 632—has no legal or factual support. The Edge Act provides for federal jurisdiction where three requirements are

---

[1]   *See United States v. Royal Bank of Scotland plc,* Deferred Prosecution Agreement (Feb. 5, 2013); *In the Matter of The Royal Bank of Scotland plc and RBS Securities Japan Limited*, CFTC Docket No. 13-14, Order Instituting Proceedings Pursuant to Sections 6(c) and 6(d) of the Commodity Exchange Act, Making Findings and Imposing Remedial Sanctions (Feb. 6, 2013); Financial Services Authority, Final Notice to The Royal Bank of Scotland plc (Feb. 6, 2013).

[2]   The Court may consider the allegations in Salix's amended complaint in ruling on this Motion to Remand. *See Scipar Inc. v. Chubb Corp.*, No. 09-cv-128, 2010 WL 3894982, *2-3 (W.D.N.Y. Sept. 30, 2010) (considering post-removal amended complaint that added non-diverse defendant that plaintiff originally intended to sue).

met:  "(1) the case must be civil; (2) a corporation organized under the laws of the United States—for example a national bank—must be a party, and (3) the suit must arise out of transactions involving international banking or international financial operations."  *Allstate Ins. Co. v. CitiMortgage, Inc.*, No. 11 Civ. 1927, 2012 WL 967582, at *3 (S.D.N.Y. Mar. 13, 2012).

Defendants' burden of showing the Edge Act applies is difficult, as the Edge Act is "construed narrowly, with doubts resolved against removability."  *Bank of N.Y. v. Bank of Am.*, 861 F. Supp. 225, 232 n.15 (S.D.N.Y. 1994); *see also Weiss v. Hager*, No. 11 Civ. 2740, 2011 WL 6425542, at *2 (S.D.N.Y. Dec. 19, 2011); *Telecredit Serv. Ctr. v. First Nat'l Bank of the Fla. Keys.*, 679 F. Supp. 1101, 1103 (S.D. Fla. 1988).  "[B]ecause federal jurisdiction is presumed not to exist," a court should reject jurisdiction under the Edge Act when it possesses anything more than "'a scintilla of doubt' as to whether the transactions out of which [the] lawsuit arises are sufficiently international to meet the requirements of 12 U.S.C. § 632."  *New Mexico ex rel. Foy v. Vanderbilt Capital Advisors, LLC*, No. 09 Civ. 0178, 2009 WL 3672921, at *5 (D.N.M. Apr. 13, 2009).  As explained below, there is far more than a "scintilla of doubt" as to whether Edge Act jurisdiction is proper in this case.  In fact, there are two fatal flaws in Defendants' attempted Edge Act removal.

A.     **Salix's Claims Against the National Bank Defendants Do Not Arise Out of "International or Foreign" Transactions**

        1.     **The Swap Agreements Between the Funds and the National Bank Defendants Were Domestic Transactions**

The Edge Act cannot support jurisdiction because none of Salix's claims arises from an offshore banking transaction with a national bank.  While Defendants attempt to generate a great deal of smoke by emphasizing that the parties "accuse[d] of wrongdoing include several foreign banks," and "[t]he Funds' counterparties on many of the relevant Transactions were foreign bank entities," those facts are entirely irrelevant.  Removal Notice ¶¶ 19(c), (f).  "[A] district court

cannot find that it has § 632 jurisdiction merely because there was a federally chartered bank involved, there were banking-related activities, and there were foreign parties." *Lazard Freres & Co. First Nat'l Bank of Md.*, No. 91 Civ. 0628, 1991 WL 221087, at *2 (S.D.N.Y. Oct. 15, 1991); *see also Bank of N.Y.*, 861 F. Supp. at 232 (same).

The Edge Act provides only "a limited grant of federal jurisdiction necessitated by the unique role played by the federal reserve banks." *People ex rel. Cosentino v. Fed. Reserve Bank of Chi.*, 579 F. Supp. 1261, 1265 (N.D. Ill. 1984). For this reason, the Second Circuit has required that "the suit must have a federally chartered corporation as a party and the suit must arise out of an offshore banking or financial transaction *of that federally chartered corporation*." *AIG*, 712 F.3d at 784 (emphasis added). Because the only relevant considerations are the "corporation organized under the laws of the United States" and its "necessary offshore banking transaction[s]," *id.* at 780, Salix's claims against the fifteen defendants that are *not* nationally chartered banks are irrelevant for the purposes of assessing Edge Act jurisdiction. *Id.*; *see also Dexia SA/NV v. Bear, Stearns & Co.*, --- F. Supp. 2d ----, 2013 WL 2136508, at *3 (S.D.N.Y. May 17, 2013) (holding that the court "cannot exercise jurisdiction over this case under the Edge Act" where the national bank "did not itself engage in the foreign banking transactions").

Stripped of this irrelevant noise, Defendants cannot establish Edge Act jurisdiction. Only three national banks are defendants in this action: Bank of America, N.A., Citibank, N.A., and JPMorgan Chase Bank, N.A. (the "National Bank Defendants"). *See* Removal Notice ¶ 15; FAC, Exs. A & B. Of these National Bank Defendants, only Bank of America, N.A., and JPMorgan Chase Bank, N.A., were involved in the sale of the swap and bond transactions at

issue.  *See* FAC, Exs. A & B.[3]  While Citibank, N.A. served as a Libor panel bank, *see* FAC ¶ 26(e), it did not engage in any of the relevant sales to the Funds; instead, its non-federally chartered affiliates (CGML and CGMI) were the relevant counterparties.  *See* FAC, Exs. A & B.  Given Citibank, N.A.'s lack of participation, only the "offshore banking or financial transaction[s]" of Bank of America, N.A., and JPMorgan Chase Bank, N.A., are relevant for the purposes of Edge Act jurisdiction under *AIG*.

But their sale of basis package investments to the Funds was an entirely domestic affair. Bank of America, N.A., and JPMorgan Chase Bank, N.A., are U.S. entities headquartered in the United States.  *See* FAC ¶¶ 24(b), 29(b).  When these "Defendants solicited the Funds' investments in New York" in 2007 and 2008, they specifically directed "[t]he offers to buy the bonds and enter the swaps and CDS" to two New York-based Fund managers, Eric Grannan and Thomas Felgner.  *Id.* ¶ 19.  "New York-based traders reviewed Defendants' offers, negotiated the swap contracts, and decided to enter the transactions in New York."  *Id.* ¶ 20.  Those transactions involved the purchase of financial instruments whose rates of return were based on USD Libor.  *See id.* ¶¶ 2, 18, 36-37.  Grannan and Felgner then "initiated and executed" the trades "on the Funds' behalf in New York," following which "confirmations were received by e-mail and via Bloomberg terminals in New York."  *Id.* ¶¶ 18, 20.

The resulting investments were held on behalf of the Funds by their prime broker, which was located in New York, and were part of the Funds' portfolios that were managed by Grannan and Felgner in New York.  *Id.* ¶¶ 20-21.  All "decisions to retain, sell, terminate, or otherwise dispose of securities and derivatives held by the Funds, including the bonds, swaps, and CDS at

---

[3]   Bank of America, N.A., engaged in four interest rate swaps with FrontPoint Relative Value Opportunities Fund, L.P. ("FRV"), while JPMorgan Chase Bank, N.A., engaged in two interest rate swaps with FRV and six with FrontPoint Volatility Opportunity Fund, L.P. ("FVO").  *See* FAC, Ex. A.

issue here," occurred in New York.  *Id.* ¶ 21.  During the time that the basis packages were

within the Funds' portfolios, "[t]he offering memoranda for the Funds were . . . prepared in and

distributed out of New York, including to numerous New York investors."  *Id.* ¶ 22.  As a result,

"the investment activity at issue . . . took place exclusively in New York."  *Id.* ¶ 21.

Purchases of USD Libor-based financial instruments by U.S.-based investors, sold by

U.S.-based national banks, following communications in the United States, do not constitute

"international or foreign" transactions or financial operations within the meaning of the Edge

Act.  *See, e.g.*, *Corporación Venezolana de Fomento v. Vintero Sales Corp.*, 629 F.2d 786, 792

(2d Cir. 1980) (finding that a Swiss corporation's sale of notes to American and Canadian banks,

transacted in the United States, alone would not confer jurisdiction under the Edge Act);

*Racepoint Partners, LLC v. JPMorgan Chase Bank, N.A.*, No. 06 Civ. 2500, 2006 WL 3044416,

at *3 (S.D.N.Y. Oct. 26, 2006) (holding that a 2001 note "issued in United States dollars"

pursuant to an indenture agreement in which the seller, plaintiff investors, and defendant trustee

were U.S. entities did not have "any foreign or international involvement" as required by the

Edge Act).  As such, there is no Edge Act jurisdiction here.

Defendants try to distract the Court again by referring to the fact that certain transactions

involved one fund (FVO) that was a "limited partnership organized under the laws of the

Cayman Islands."  *See* Removal Notice ¶ 19(e).  But it is well-established that "a limited

partnership is an unincorporated association whose citizenship is deemed to be that of the

'persons composing such association.'"  *Trent Realty Assocs. v. First Fed. Sav. & Loan Ass'n of

Phila.,* 657 F.2d 29, 31-32 (3d Cir. 1981) (citation omitted).  FVO's "general partner [was]

FrontPoint Volatility Opportunities Fund GP, LLC, a limited liability company organized under

the laws of Delaware and, until March 1, 2011, an indirect wholly owned subsidiary of Morgan

Stanley." FAC ¶ 16(b).  Not only is FVO deemed to be a U.S. citizen for jurisdictional purposes, its principal place of business was located in Greenwich, Connecticut, *id.*, the purchases on its behalf for its portfolio were made in the United States, *id.* ¶¶ 18-21, and those purchases were made pursuant to an ISDA Master Agreement that was "governed by and construed in accordance with the laws of the State of New York." *Id.*, Ex. L ¶ 2; *see also id.*, Exs. A-B (listing FVO's purchases).  Thus, it remains the case that all of the transactions entered into with the National Bank Defendants—even those with FVO—were domestic.

### 2.   Salix's Claims "Arise Out Of" Its Domestic Transactions With the National Bank Defendants

Despite the fact that the transactions relevant to the determination of Edge Act jurisdiction were entirely domestic, Defendants contend that the sales were sufficiently connected to foreign misconduct as to warrant the application of the Edge Act.  Specifically, Defendants argue that:  (1) Salix's claims are based on the National Bank Defendants' misreporting of their estimated borrowing costs to the BBA, *see* Removal Notice ¶ 19(a); (2) this Court dismissed Libor-related RICO claims based on extraterritoriality concerns because the BBA was "plainly a foreign enterprise," *id.* ¶ 19(b); (3) the swaps were issued pursuant to standard form agreements published by the "*International* Swaps and Derivatives Association," *id.* ¶ 19(d); and (4) Libor is "a reference index used globally for various types of financial instruments," *id.* ¶ 21.  None of these purported considerations are sufficient to alter the domestic nature of the contractual relationships at issue between the Funds and the National Bank Defendants.

As an initial matter, it is not the case that a domestic transaction qualifies for Edge Act jurisdiction just because some of the bad conduct at issue has foreign ties.  Defendant Bank of

America, N.A. made this same argument before the Second Circuit.[4]  That the argument failed

there, as it must here, is not surprising.  Courts have long been "reluctant to subscribe to such an

inherently limitless view" of Edge Act jurisdiction.  *Sollitt v. Keycorp*, 463 F. App'x 471, 473

(6th Cir. 2012).  Instead, they have regularly "rejected the six degrees of separation theory of an

international transaction advanced by Defendants," *JPMorgan Chase Bank, N.A. v. Wanke*, No.

12 Civ. 893, 2013 WL 308766, at *2 (S.D. Ohio Jan. 25, 2013), and instead recognized that "an

indirect connection between the claim giving rise to the suit and international banking does not

suffice for jurisdiction under § 632."  *Lazard Freres*, 1991 WL 221087, at *2; *see also Telecredit*

*Serv. Ctr. v. First Nat'l Bank*, 679 F. Supp. 1101, 1104 (S.D. Fla. 1988) (finding no Edge Act

jurisdiction for claim for fraudulent credit charge-backs just because underlying sales involved

Bermuda travel services).  In short, there cannot be Edge Act jurisdiction where the foreign or

international component is "remote and tenuous," *JPMorgan Chase Bank*, 2013 WL 308766, at

*3, "incidental" or "fortuitous," *Weiss*, 2011 WL 6425542, at *3-4, or "downstream" and

"attenuated" from the national bank defendant's participation in the transaction(s) at issue,

*Sealink Funding Ltd. v. Bear Stearns & Co. Inc.*, No. 12 Civ. 1397, 2012 WL 4794450, at *5

(S.D.N.Y. Oct. 9, 2012).

---

[4]  *Compare* Removal Notice ¶ 17 (arguing that federal jurisdiction attaches "if any part of it arises out of transactions involving international or foreign banking" or "even if 'the international or foreign banking activity [is] not central to the case") *with* Br. for Defendants-Appellees, *Am. Int'l Grp., Inc. v. Bank of Am. Corp.*, No. 12-1640-cv, 2012 WL 3900575, at *21-23 (S.D.N.Y. Aug. 31, 2012) (arguing that "Section 632 is met if any part of the challenged transaction was connected to international banking" and relying on same decisions as these Defendants holding "that Section 632 confers jurisdiction over a suit where 'any part of it' arises out of transactions involving international or territorial banking, even if the international or territorial activity 'was not central to the case,' or represented only 'a small portion of the transactions at issue in the suit'") (citing *Bank of Am. Corp. v. Lemgruber*, 385 F. Supp. 2d 200, 214 (S.D.N.Y. 2005) and *In re Lloyd's Am. Trust Fund. Litig.*, 928 F. Supp. 333, 338, 340 (S.D.N.Y. 1996)).

Against this background, Defendants' proffered foreign aspects of this case cannot trump the domestic nature of the contracts entered into with the National Bank Defendants.  If the mere fact that Defendants' misconduct included "the setting of Libor," Removal Notice ¶ 21, federal jurisdiction would exist over *any* claim against a national bank relating in any way to Libor, which provides the interest-rate for hundreds of trillions of dollars in financial instruments.  FAC ¶ 1.  Such an expansive interpretation of the Edge Act would eviscerate the rule that the Edge Act must be read narrowly in light of the limited nature of federal jurisdiction.  *See Bank of N.Y.*, 861 F. Supp. at 233 (rejecting interpretation of Edge Act that would "confer[] jurisdiction on virtually any case where a bank is involved on account of the regular conduct of its business"); *see also In re Kaiser Aluminum Corp.*, 456 F.3d 328, 338 (3d Cir. 2006) ("A basic tenet of statutory construction is that courts should interpret a law to avoid absurd or bizarre results.").

Nor is it enough that, prior to the purchases at issue, the Funds and National Bank Defendants entered into agreements on forms provided by the "***International*** Swaps and Derivatives Association."  That the forms were provided by an organization with "international" in its title does not render every transaction using that piece of paper a matter of federal concern. Adjudicating Salix's claims against the National Bank Defendants will, despite the source of the forms, be a matter of domestic law, between domestic entities.  Given the ubiquity of the ISDA Master Agreements, to hold otherwise would again improperly sweep into federal court a large portion of the entire swap marketplace.

Finally, this Court's dismissal of RICO claims as impermissibly extraterritorial has no bearing on whether the Edge Act applies to Salix's claims in this case.  This Court's rationale in determining the location of the alleged RICO enterprise—that defendants "were each members of the BBA, an entity based in England, and participated in the affairs of the BBA by submitting

quotes each day to the BBA," *In re LIBOR-Based Fin. Instruments Antitrust Litig.*, 2013 WL 1285338, at *58—does not relate to the pertinent issue here, which is where the Funds' purchases of Libor-based financial instruments from the National Bank Defendants took place. This is but another attempt to improperly inject into the Court's analysis the foreign nature of the activity carried out by defendants other than the National Bank Defendants.  While looking at the larger picture could be proper in the RICO context, it is most assuredly improper as far as the Edge Act is concerned, under *AIG*.[5]

Ultimately, Salix's claims "arise out of" swaps entered between U.S.-based Funds and U.S.-based National Banks in the United States, for payment in U.S. dollars, calculated using USD Libor.  *See Racepoint Partners*, 2006 WL 3044416, at *3 (recognizing that foreign fraud occurred, but holding that plaintiffs' claims for breach of contract and breach implied covenant of good faith and fair dealing "arise out of the 1999 and 2001 Indenture Agreements").  While some aspects of Defendants' scheme to rob the Funds of the benefit of these domestic transactions were committed abroad, that foreign component does not render these domestic contracts a federal banking concern.[6]

---

[5]   Indeed, this Court also held that claims under the Commodity Exchange Act involving "futures contracts traded on domestic exchanges" were not impermissibly extraterritorial.  *In re LIBOR-Based Fin. Instruments Antitrust Litig.*, 2013 WL 1285338, at *21.  Thus, to the extent that this Court's previous extraterritoriality rulings are at all relevant as to whether the Edge Act applies, they favor Salix.

[6]   *See Weiss*, 2011 WL 6425542, at *3 (the fact that "defendants fraudulently convinced plaintiff to wire money to various European bank accounts" was insufficient for Edge Act jurisdiction where the international aspect was not "legally significant in the case"); *Lazard Freres*, 1991 WL 221087, at *2 ("foreign" requirement not met where the domestic agreement at issue had only an "indirect connection" to a sale-leaseback that was "international in character"); *Telecredit Serv. Ctr.*, 679 F. Supp. at 1104 ("One could hardly say that the nature of the transaction was a transaction involving international banking merely because the service being purchased was to be consumed in a foreign land.").

**B.   Salix's Claims Do Not Involve "Banking" or "Other . . . Financial Operations" At All**

Even if the National Bank Defendants could establish the requisite "foreign" element of the transactions at issue through their Libor submissions (which they cannot), Edge Act jurisdiction still would be inappropriate because Salix's claims do not arise out of "international or foreign *banking*" or "other international or foreign *financial operations*" as required by 12 U.S.C. § 632.

**1.   Salix's Claims Do Not Arise Out of "Banking"**

Courts, in taking "a commonsense approach to a statute principally concerned with financial transactions of an international character," have interpreted the term "banking" as set forth in the Edge Act in a narrow manner, construing it to include "only traditional banking activities." *Diaz v. Pan Am. Fed. Sav. & Loan Ass'n*, 635 F.2d 30, 31-32 (1st Cir. 1980).[7] "Traditional banking activities" include:

> the making and collection of loans, the issuance of documents evidencing loans (notes, guarantees), the opening and closing of checking accounts, the processing of checks, the filing of lawsuits for collection in event of default, the preparation of mortgage agreements, the foreclosure of mortgages, the issuance of letters of credit, the preparation of letters of guarantee, and participation in refinancing.

*Consorcio de Fomento Industrial S.A. v. First Nat'l Bank of Chi.*, No. 93 Civ. 0272, 1993 WL 291706, at *3 (N.D. Ill. Aug. 3, 1993) (collecting cases). Courts also have held that the "issuance of a credit card" and "currency conversion," *Clarken*, 2001 WL 1263366, at *1, as well as "wire transfers, maintaining deposits for customers, and providing investment advice,"

---

[7]   *See also In re Currency Conversion Fee Antitrust Litig.*, No. 1409, 21-95, 2003 WL 22097502, at *2 (S.D.N.Y. Sept. 10, 2003) (same); *Nacional Financiera, S.N.C. v. Chase Manhattan Bank, N.A.*, No. 00 Civ. 1571, 2001 WL 327159, at *3 (S.D.N.Y. Apr. 4, 2001) (same); *Clarken v. Citicorp Diners Club, Inc.*, No. 01 Civ. 5123, 2001 WL 1263366, at *1 (N.D. Ill. Oct. 22, 2001); *Telecredit Serv. Ctr.*, 679 F. Supp. at 1103 (same).

are "traditional banking activities" within the ambit of the Edge Act.  *See Warter v. Boston Sec., S.A.*, No. 03 Civ. 81026, 2004 WL 691787, at *5 (S.D. Fla. Mar. 22, 2004).

As discussed above, the swaps at issue (those with the National Bank Defendants) were domestic in nature.  Even if they were foreign, they still could not create jurisdiction because entering into a swap is not a "traditional banking" activity.  Defendants' notation that national banks can engage in swap activity is unavailing.  *See* Removal Notice ¶ 22.  The reality is that virtually *any* individual or financial entity can engage in swap activity.  Because entering into interest rate swap agreements is not a power unique to banks, it cannot be considered "traditional banking activity."

As also discussed above, the banks' Libor submissions are not the proper focus of whether this case involves a "foreign" transaction.  Even if the Libor submissions were relevant, they could still not create jurisdiction because submitting information to the BBA falls far outside of what has been carefully delineated as "traditional banking activities."  As Defendants have characterized their actions, "At most, Plaintiffs accuse Defendants of making false reports for their own purposes to a trade association regarding rates at which they believe they could borrow money in London."  Mem. in Supp. of Defs.' Mot. to Dismiss Pls.' Antitrust Claims, at 1, *In re LIBOR-Based Fin. Instruments Antitrust Litig.*, No. 11 MD 2262 (S.D.N.Y. June 29, 2012), ECF No. 166 ("*LIBOR* Mot.").  Reporting to the BBA—a "trade association"—does not involve any traditional banking activity.  It does not even involve any actual transactions.  The BBA itself admits that Libor is "is not necessarily based on actual transactions."[8]  In fact, Defendants have contended that the process is limited to answering a pure hypothetical:  "The

---

[8]   *See* http://www.bbalibor.com/explained/the-basics (last visited June 28, 2013).

14

banks are thus instructed to answer a hypothetical question regarding expected borrowing rates, not necessarily the rates they have actually paid in the past."  *LIBOR* Mot. at 7.[9]

Moreover, Libor was not developed until the 1980s, and its rates were not published until January 1986—decades after the Edge Act was enacted in 1919 and Section 632 was added in 1933.[10]  Only eighteen banks are members of the panel that submits rates to calculate USD Libor.[11]  The fact that a tiny subset of the entire banking industry have recently reported hypothetically to a trade association for Libor purposes can hardly be called "traditional" at all, much less "traditional banking activity."  No court has held otherwise.

### 2.    Salix's Claims Do Not Arise Out of "Other . . . Financial Operations"

Defendants are also incorrect in their assertion that this action arises out of "other . . . financial operations" as those terms are used in the Edge Act.  Removal Notice ¶ 23.  "[T]he Edge Act itself does not explicitly define 'other international or foreign financial operations.'" *Bank of Am. Corp. v. Lemgruber*, 385 F. Supp. 2d 200, 215 n.13 (S.D.N.Y. 2005).  As such, that provision is confined to subjects comparable to "transactions involving international or foreign banking, or banking in a dependency or insular possession of the United States."  12 U.S.C. § 632; *see Hall St. Assocs., LLC v. Mattel, Inc.*, 552 U.S. 576, 586 (2008) (noting that "when a statute sets out a series of specific items ending with a general term, that general term is confined to covering subjects comparable to the specifics it follows").  Indeed, courts have construed "other . . . financial operations" narrowly, limiting it to include the act of fund raising in some form.  *See, e.g.*, *Bin-Jiang Tao v. Citibank, N.A.*, 445 F. App'x 951, 954 (9th Cir. 2011) ("[O]ther

---

[9]    Specifically:  "At what rate could you borrow funds, were you to do so by asking for and then accepting inter-bank offers in a reasonable market size just prior to 11 am?"  *See* http://www.bbalibor.com/explained/the-basics (last visited June 28, 2013); FAC ¶ 35.

[10]    *See* http://www.bbalibor.com/explained/panels/usd (last visited June 28, 2013).

[11]    *See* http://www.bbalibor.com/explained/the-basics (last visited June 28, 2013).

international or foreign financial operations" are "defined to include operations by banks or corporations to raise capital, including through the sale of securities"); *Bank of Am. Corp.*, 385 F. Supp. 2d at 215 n.13 (the "common meaning" of "finance" is "to supply with funds through the issuance of stocks, bonds, notes or mortgages"); *Stamm v. Barclays Bank of N.Y.*, 960 F. Supp. 724, 728 (S.D.N.Y. 1997) ("'[F]inancial operations' are commonly understood as those operations that 'provide . . . capital or loan money as needed to carry on business'").

As for the (domestic, and thus irrelevant in any event) swaps, such are contracts making payments to each other.  One pays a fixed rate, while the other pays a variable rate based on Libor, computed on a notional principal amount that is not advanced by either party.  By their very nature, interest-rate swaps do not involve the furnishing of capital or money for fund raising purposes; nor do they involve the issuance of stocks, bonds, notes, or mortgages, or any of the elements of "financial operations" required in previous cases.  Indeed, an interest-rate swap is not even considered a "security" under federal statutes.[12]  Accordingly, under established precedent, a swap does not qualify as a "financial operation" for the purposes of the Edge Act, and cannot support removal even apart from the fact that the relevant swaps were all domestic.

The bonds purchased by the Funds as part of the basis packages were issued by third party corporate issuers—not by the National Banking Defendants.  Thus, those sales in no way related to the National Bank Defendants' raising of their own capital.  And, of course, the mere submission of information to the BBA can in no way be analogized to capital-raising by the National Bank Defendants.  Thus, there are no relevant "financial operations" in this case.

---

[12]    *See Sch. Dist. of Erie v. J.P. Morgan Chase Bank*, No. 08 Civ. 7688, 2009 WL 234128, at *1 (S.D.N.Y. Jan. 30, 2009) (finding that a swap agreement based on Libor was not security-based); *St. Matthew's Baptist Church v. Wachovia Bank Nat'l Ass'n*, No. 04 Civ. 4540, 2005 WL 1199045, at *12-13 (D.N.J. May 18, 2005) (same).

In sum, the relevant swap and bond transactions between the Funds and the National Banks cannot provide Edge Act jurisdiction, as those deals were purely domestic, and in any event are not "traditional banking activities" or "financial operations."  And the National Bank Defendants' Libor submissions cannot be the proper focus of the Edge Act analysis, rather than the domestic nature of the contracts at issue.  Otherwise, Edge Act jurisdiction would be virtually limitless.  Even if that were not the case, submitting information to the BBA cannot create jurisdiction because such is not a traditional banking activity nor a financial operation, as those terms are used in the Act.

## II. REMAND IS PROPER BECAUSE NO DEFENDANT IS A "FOREIGN STATE" AS DEFINED UNDER THE FSIA

No Defendant currently named in this action is a "foreign state" as defined by the statute. Given dismissal of the purported foreign sovereign and the narrow interpretation afforded the FSIA's removal provision, this case should be remanded to state court.  *See generally Hyatt Corp. v. Stanton*, 945 F. Supp. 675, 679 (S.D.N.Y. 1996) (in applying the FSIA, "[i]n light of the congressional intent to restrict federal court jurisdiction, as well as the importance of preserving the independence of state governments, federal courts construe the removal statute narrowly, resolving any doubts against removability").

### A. There Is No "Foreign State" in the Amended Complaint

The FSIA's removal provision, 28 U.S.C. § 1441(d), provides that "[a]ny civil action brought in a State court against a foreign state as defined in [28 U.S.C. § 1603(a)] may be removed by the foreign state to the district court of the United States for the district and division embracing the place where such action is pending."

Defendants contend that federal jurisdiction exists under the FSIA because RBS Group is majority-owned by the U.K. government.  Removal Notice ¶¶ 24, 30; *see* 28 U.S.C. 1603(a)

(defining "foreign state" to include "instrumentalities"); 28 U.S.C. § 1603(b) (defining "instrumentalities" to include an entity a majority of whose shares are "owned by a foreign state"). But RBS Group is no longer a defendant in this case. As discussed above, on June 27, 2013, after further investigating which entity appears to have been involved in the relevant wrongdoing, Salix filed an amended complaint dismissing RBS Group.

Under Supreme Court precedent, the now-defendant RBS PLC is not a "foreign state" for purposes of the FSIA. *See Dole Food Co. v. Patrickson*, 538 U.S. 468, 474 (2002). In *Dole Food*, defendants were indirect subsidiaries of the State of Israel, and removed on the purported grounds that they were instrumentalities of a foreign state as defined in § 1603(b). *Id.* at 472-74. The Supreme Court rejected that argument. Noting that under basic principles of American corporate law, a "parent does not own or have legal title to the subsidiaries of [its] subsidiary," *id.* at 475, the Supreme Court ruled that the defendants, as indirect subsidiaries, were not instrumentalities of a foreign state under the FSIA. *Id.* at 474. Rather, as the removing defendants acknowledged in their Notice of Removal (¶ 29), "***only direct ownership*** of a majority of shares by the foreign state satisfies the statutory requirement" of the FSIA. *Dole Food*, 538 U.S. at 474 (emphasis added).

Here, RBS PLC is a wholly owned subsidiary of RBS Group.[13] At best, RBS PLC is an indirect subsidiary of the U.K. government, just as the defendants in *Dole Food* were indirect subsidiaries of the State of Israel. Because "one or more corporate tiers," *id.* at 475, separates the U.K. government and defendant RBS PLC, it is not a "foreign instrumentality" (and hence, not a "foreign state") within the meaning of the FSIA. It is thus indisputable that there is no entity that would trigger FSIA jurisdiction currently in this case.

---

[13]   The Royal Bank of Scotland Group plc, Annual Report (Form 20-F) Ex. 8.1 (Mar. 27, 2013).

**B.**     **Because the Purported Foreign Sovereign Defendant Has Been Dismissed, Remand is Proper**

Because RBS Group has been dismissed from this action, this action should be remanded to state court.  Numerous courts have ruled that remand is proper when the issue of foreign sovereignty is removed from the case.  *See, e.g.*, *Arango v. Guzman Travel Advisors Corp.*, 621 F.2d 1371, 1376 n.6 (5th Cir. 1980) ("[I]n most instances" remand will occur when foreign sovereign is found not to be proper part of case); *see also Austin v. Port Auth. of N.Y. & N.J.*, No. 91 Civ. 4185, 1993 WL 149033, at *2-3 (S.D.N.Y. May 5, 1993); *Hinkle's Jeep Sales, Inc. v. Villa Enter., Inc.*, 90 F.R.D. 49, 52 (S.D. Fla. 1981).

Indeed, Defendants' authorities demonstrate that remand is the rule unless other bases for removal are present—which, as discussed above, is not the case here.  For example, in *Teledyne Inc. v. Kone Corp.*, 892 F.2d 1404, 1410 n.2 (9th Cir. 1990), the court only approved the exercise of pendent jurisdiction over the non-sovereign entities because the district court's ruling on the merits (1) made it unnecessary for the court to conduct a trial and (2) most important, was based on federal law, an application of the Federal Arbitration Act.  And in *Noonan v. Possfund Investment, Ltd.*, No. 89 Civ. 2903, 1994 WL 515440, at *1 (S.D.N.Y. Sept. 3, 1993), a magistrate judge recommended that a motion to remand be denied where the foreign sovereign was *still at that time* a third-party defendant in the case.  But earlier in that same case, the foreign sovereign had been dismissed as a direct defendant.  *Id.*  When the foreign sovereign was not a party at all, the same court found remand of the claims against all the other, non-sovereign parties (which, here, would be everyone remaining) appropriate.  *Id.*

This strong presumption in favor of remand upon dismissal of the foreign sovereign is consistent with other situations in which the jurisdiction-conferring federal claim is dismissed prior to trial.  As this Court recognized, "in the usual case in which all federal-law claims are

eliminated before trial, the balance of factors . . . will point toward declining to exercise jurisdiction over the remaining state-law claims."  *In re LIBOR-Based Fin. Instruments*, 2013 WL 1285338, at *58 (citing *Kolari v. N.Y.-Presbyterian Hosp.*, 455 F.3d 118, 122 (2d Cir. 2006)); *see also United Mine Workers v. Gibbs*, 383 U.S. 715, 726 (1966) ("[I]f the federal claims are dismissed before trial . . . the state claims should be dismissed as well.")

The considerations of judicial economy, convenience, fairness, and comity that led the Court to decline supplemental jurisdiction over state law claims in the Libor MDL, *In re LIBOR-Based Fin. Instruments*, 2013 WL 1285338, at *59, apply with even greater force here.  Here, the party purportedly creating federal jurisdiction (RBS Group) was not just dismissed before trial, but just weeks after the case began.  Salix's claims raise new issues of state law—including, among other things, whether Defendants breached ISDA Master Agreements with the Funds when they set their own floating rate payments and made collateral calls with knowledge that Libor was being suppressed.  Those ISDA Master Agreements are governed by New York law so the state court has "a strong interest in hearing the claims."  *Austin*, 1993 WL 149033, at *2.  That state court was Salix's chosen forum further tips the scales in favor of remand.  *See Maddaloni Jewelers, Inc. v. Rolex Watch U.S.A., Inc.*, 354 F. Supp. 2d 293, 311 (S.D.N.Y. 2004) (declining to exercise supplemental jurisdiction after dismissal of federal claims, one factor being that this "honor[ed] the plaintiff's original choice of forum").

That remand is proper here would be clear even if the normal considerations were at play.  But remand is in fact *required* here because the analysis under the FSIA "will weigh far more heavily in favor of dismissing or remanding to state court the remaining nonfederal claims than would the analogous analysis under the *Gibbs* norm."  Jonathon R. Nash, *Pendent Party Jurisdiction Under the Foreign Sovereign Immunities Act*, 16 B.U. Int'l L.J. 71, 119 (1998).

This makes sense, as issues of foreign sovereignty can by their nature only affect the purported sovereign.  Resolving the question of RBS Group's immunity was never going to have anything to do with the other defendants.  But now the question of RBS Group's immunity is guaranteed to not come up at *all*.  Accordingly, remand of this entire action is required.  *See Schlumberger Indus., Inc. v. Nat'l Surety Corp.*, 36 F.3d 1274, 1283-85 (4th Cir. 1994).

In *Schlumberger*, a foreign sovereign defendant removed under § 1441(d) of the FSIA. *Id.* at 1277.  The plaintiff voluntarily dismissed the relevant sovereign-defendant and moved to remand, but the district court denied the motion and later granted summary judgment for the defendants.  *Id.* at 1277-78.  The Fourth Circuit vacated and ordered the district court to remand to state court.  *Id.* at 1288.  Because the question of sovereign immunity could no longer be a part of the case, "no policy of section 1441(d) is furthered by retaining this case," and remand was mandatory.  *Id.* at 1283.  "In short, section 1441(d) is not intended to protect [the] interests of the domestic [defendants]."[14]  *Id.* at 1284.

In a similar context, courts have concluded that remand is required where, after removal, the foreign sovereign defendant is found to be immune.  *See, e.g.*, *Security Pac. Nat'l Bank v. Derderian*, 872 F.2d 281, 282 (9th Cir. 1989) (because foreign sovereign "was immune from suit under the FSIA, the district court lacked original jurisdiction over this matter.  Therefore, this action must be remanded to [state court].").  This is so because federal jurisdiction "does not attach until it is determined that the foreign sovereign lacks immunity" under the FSIA.  *Id.* at 283; *see also Schlumberger*, 36 F.3d at 1279 n.10; *Frolova v. Union of Soviet Socialist*

---

[14]  As recognized by the Fourth Circuit, remand was also required here due to federalism and comity concerns:  "[T]he fact that we are dealing with *removal* jurisdiction under the FSIA buttresses our conclusion that we should guard jurisdiction here with jealous restriction.  Because removal jurisdiction raises significant federalism concerns, we must strictly construe removal jurisdiction.  As a result, where federal [removal] jurisdiction is doubtful, a remand is necessary."  *Schlumberger*, 36 F.3d at 1284 (citations and internal quotation marks omitted).

*Republics,* 761 F.2d 370, 372-73 (7th Cir. 1985).  This rule applies where the foreign sovereign

defendant is, as here, voluntarily dismissed before an immunity determination is made, *see*

*Security Pac. Nat'l Bank*, 872 F.2d at 282-83, and "even if the foreign state does not enter an

appearance to assert an immunity defense," *see Verlinden B.V. v. Cent. Bank of Nigeria*, 461

U.S. 480, 493 n.20 (1983).

In sum, that a purported FSIA "foreign state" was a party for a brief few weeks at the

onset of the case—but no longer is—is far too attenuated of a reason to keep this state-law case

in federal court.  Remand is not just proper, but required.

## CONCLUSION

For the reasons set forth above, Salix respectfully requests that the Court remand this

action to the Supreme Court of the State of New York.

DATED:     New York, New York
           July 11, 2013


                              Respectfully submitted,

                              QUINN EMANUEL URQUHART &
                              SULLIVAN, LLP


                              By: /s/ Daniel L. Brockett
                              Daniel L. Brockett
                              Daniel P. Cunningham
                              Steig D. Olson
                              51 Madison Avenue, 22nd Floor
                              New York, New York  10010-1601
                              Telephone:  (212) 849-7000
                              Fax:  (212) 849-7100
                              danbrockett@quinnemanuel.com
                              danielcunningham@quinnemanuel.com
                              steigolson@quinnemanuel.com

*Of Counsel: (pro hac vice applications forthcoming where applicable)*

Jeremy D. Andersen
David Armillei
865 South Figueroa Street, 10th Floor
Los Angeles, California 90017
Telephone:  (213) 443-3000
Fax:  (213) 443-3100
jeremyandersen@quinnemanuel.com
davidarmillei@quinnemanuel.com

Matthew J. MacDonald
1299 Pennsylvania Avenue, NW
Suite 825
Washington, D.C. 20004
Telephone:  (202) 538-8000
Fax:  (202) 538-8100
mattmacdonald@quinnemanuel.com

*Attorneys for Plaintiff Salix Capital US*

**CERTIFICATE OF SERVICE**

I, Daniel L. Brockett, hereby certify that on July 11, 2013, I electronically filed a true and correct copy of the foregoing by using the Court's CM/ECF system.  I further certify that I caused the foregoing document to be electronically served on the following CM/ECF participants:

DAVIS POLK & WARDWELL
Arthur J. Burke
Paul S. Mishkin
Robert F. Wise, Jr.
450 Lexington Avenue
New York, NY 10017
Tel: (212) 450-4000
Fax: (212) 450-3352
arthur.burke@dpw.com
paul.mishkin@dpw.com
rwise@dpw.com

*Attorneys for Defendants Banc of America
Securities LLC, Bank of America Corporation,
and Bank of America, N.A.*

SULLIVAN & CROMWELL LLP
David H. Braff
Jeffrey T. Scott
Matthew S. Fitzwater
Matthew J. Porpora
Yvonne S. Quinn
125 Broad Street
New York, NY 10004
Tel: (212) 558-4705
Fax: (212) 558-3588
braffd@sullcrom.com
scottj@sullcrom.com
fitzwater@sullcrom.com
porporam@sullcrom.com
quinny@sullcrom.com

*Attorneys for Defendants Barclays Bank plc
and Barclays Capital, Inc.*

COVINGTON & BURLING LLP
Arthur A. Ruffino
620 Eighth Avenue
New York, NY 10018
Tel: (212) 841-1000
Fax: (212) 841-1010
aruffino@cov.com

*Attorneys for Defendants Citibank, N.A.,*
*Citigroup Global Markets, Ltd., and*
*Citigroup, Inc.*

PAUL WEISS RIFKIND WHARTON & GARRISON LLP
Andrew C. Finch
Moses Silverman
Ankush Khardori
1285 Avenue of the Americas
New York, NY 10019
Tel: (212) 373-3640
Fax: (212) 492-0460
afinch@paulweiss.com
msilverman@paulweiss.com
akhardori@paulweiss.com

*Attorneys for Defendants Deutsche Bank AG and*
*Deutsche Bank Securities, Inc.*

GIBSON, DUNN & CRUTCHER LLP
Peter Sullivan
Lawrence Jay Zweifach
Rachael Alden Lavery
200 Park Avenue
New York, NY 10166
Tel: (212) 351-4000
psullivan@gibsondunn.com
lzweifach@gibsondunn.com
rlavery@gibsondunn.com

*Attorneys for Defendant UBS AG*

I further certify that on July 11, 2013, I caused the foregoing document to be served on the following non-CM/ECF participants by first class mail:

CAHILL GORDON & REINDELL LLP
Herbert S. Washer
80 Pine Street
New York, NY 10005
hwasher@cahill.com

*Attorneys for Defendants Credit Suisse Group AG,*
*Credit Suisse International, and*
*Credit Suisse Securities (USA) LLC*

SIMPSON THACHER & BARTLETT LLP
Thomas C. Rice
425 Lexington Avenue
New York, NY 10017
Tel: (212) 455-2000
trice@stblaw.com

*Attorneys for Defendants JPMorgan Chase & Co.,*
*JPMorgan Chase Bank, N.A., and J.P. Morgan Securities LLC*

Royal Bank of Scotland plc
Attn: Litigation Department
600 Washington Blvd
Stamford, CT 06901

Citigroup Global Markets Inc.
Attn: Litigation Department
388 Greenwich Street
New York, NY 10013

/s/ Daniel L. Brockett