UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------X
SALIX CAPITAL US INC.,

                    Plaintiff,

          -against -                    **MEMORANDUM AND ORDER**

BANC OF AMERICA SECURITIES LLC,         13 Civ. 4018 (NRB)
ET AL.                                  13 Civ. 7005 (NRB)
                                        13 Civ. 2297 (NRB)
                    Defendants.
--------------------------------X

--------------------------------X
THE CHARLES SCHWAB CORP., ET AL.,

                    Plaintiff,

          -against -

BANK OF AMERICA CORP., ET AL.,

                    Defendants.
--------------------------------X

--------------------------------X
GEORGE MARAGOS,

                    Plaintiff,

          -against -

BANK OF AMERICA CORP., ET AL.,

                    Defendants.
--------------------------------X
**NAOMI REICE BUCHWALD**
**UNITED STATES DISTRICT JUDGE**

     This Memorandum and Order addresses three cases, two of

which were transferred to this Court by the Judicial Panel on

Multidistrict Litigation ("JPML") since they arose out of the

same factual issues as the <u>In re LIBOR-Based Financial Instruments Litigation</u> ("<u>In re LIBOR</u>"), 935 F. Supp. 2d 666 (S.D.N.Y. 2013), and the third of which was accepted by this Court as a related case following removal. In each of these cases, the respective plaintiffs seek to remand their action to state court, asserting that this Court lacks jurisdiction under either 12 U.S.C. § 632 ("the Edge Act") or 28 U.S.C. §§ 1330, 1441, and 1603 ("the Foreign Sovereign Immunities Act" or "the FSIA"). For the reasons provided below, we find that there is federal jurisdiction under the Edge Act. Furthermore, even assuming that the Edge Act did not confer federal jurisdiction over the plaintiffs' claims, this Court could still retain jurisdiction pursuant to the FSIA. The plaintiffs' motions for remand are therefore denied.

BACKGROUND

We will discuss the facts underlying each of the three cases in turn.

I. <u>**Salix Capital US Inc. v. Banc of America Securities LLC, et al.**</u>, 13 Civ. 4018

Salix is a Delaware corporation with its principal place of business in New York.[1] Salix Am. Compl. ¶ 15. Salix brought its

---

[1] Salix brought its complaint as an assignee of several hedge funds that shut down in 2009: FrontPoint Relative Value Opportunities Fund, L.P.; FrontPoint Volatility Opportunities Fund GP, L.P.; FrontPoint Volatility Opportunities

claims as the assignee of investment funds ("the Funds") that entered into interest rate swaps with several banks, each of whom are named as defendants, between December 2007 and February 2008. Id. ¶¶ 5-6. In these arrangements, the Funds would contract with one of the defendant banks to receive floating-rate (variable) payments linked to the London InterBank Offered Rate ("LIBOR"),[2] and the Funds would in turn pay the counterparty bank a sum based on a fixed interest rate. Id. ¶ 6-7. The swaps at issue were executed by the Funds' managers in New York, and the counterparties were also located in New York. Id. ¶¶ 18-22.

Salix filed its first summons and complaint against the defendants in New York State Supreme Court on May 20, 2013. In this complaint, the plaintiff filed claims for breach of contract, based on the individual swap contracts discussed above, as well as for unjust enrichment, fraud, tortious interference, and civil conspiracy. Salix Original Compl. ¶¶ 197-353. The core of the complaint was that the defendants, all of which were banks that submitted rates to the U.S. Dollar LIBOR panel and three of which -- Bank of America, Citibank, and

---

Fund, L.P.; and FrontPoint Partners, L.P. Salix was also an assignee of several individuals who acted as managers of these funds.
[2] In certain documents cited by the Court, the acronym "LIBOR" is occasionally written as "Libor," and when quoting those sources, we use whichever spelling appears in the original.

JPMorgan Chase ("the Edge Act banks") -- are federally chartered, intentionally suppressed LIBOR by submitting artificially low rates to the British Bankers' Association ("the BBA")[3]. Id. ¶¶ 269-70. In so doing, the defendants allegedly profited by ensuring that they would be able to pay Salix a reduced interest rate in swap transactions while receiving the higher fixed rate already promised by the plaintiff. See id. ¶ 3. Moreover, Salix asserts that the artificially low rates of return on investments that were keyed to LIBOR caused the Funds significant damages, and the Funds ultimately shut down in 2009. Id. ¶¶ 13-14.

On June 12, 2013, the defendants filed a notice of removal and removed the case to this Court. In the notice, the defendants asserted that there was federal jurisdiction over the matter pursuant to either the Edge Act or the FSIA. See Salix Notice of Removal ¶¶ 13-32. Salix then filed an amended complaint on June 27, 2013. The gravamen of the complaint remained the same as the original, but the plaintiff replaced The Royal Bank of Scotland Group plc ("RBS Group") as a defendant with The Royal Bank of Scotland plc ("RBS"). See

---

[3] Other opinions of this Court have discussed the setting of LIBOR in greater detail. See e.g., In re LIBOR-Based Fin. Instruments Litig., 935 F. Supp. 2d 666, 678-80 (S.D.N.Y. 2013) (describing the process by which certain banks submit interest rates to the BBA, and how the BBA in turn calculates LIBOR on a daily basis based on these submissions).

Salix Am. Compl. ¶ 34.   Salix next filed a motion for remand on July 11, 2013, asserting that there was no federal jurisdiction under either the Edge Act or the FSIA and requesting that the case be returned to New York state court.   See generally Pl.'s Mem. of Law in Supp. of Mot. to Remand ("Salix Mem.").

## II.   The Charles Schwab Corp., et al. v. Bank of America Corp., et al., 13 Civ. 7005

The Schwab plaintiffs, a collection of fourteen entities,[4] are no strangers to this Court.   Indeed, their original pleading was addressed in In re LIBOR, in which they were treated separately and apart from the other purported classes of plaintiffs. 935 F. Supp. 2d at 676.   This Court dismissed the Schwab plaintiffs' federal antitrust, RICO, and Cartwright Act claims, and declined to exercise jurisdiction over their remaining state-law claims.   Id. at 677.

Thereafter, on April 29, 2013, the Schwab plaintiffs filed a new complaint in California State Superior Court against the sixteen bank defendants composing the U.S. Dollar LIBOR panel, including the Edge Act banks.   The complaint asserted ten

---

[4] The fourteen Schwab plaintiffs are as follows: (1) The Charles Schwab Corporation; (2) Charles Schwab Bank, N.A.; (3) Charles Schwab & Co., Inc.; (4) Schwab Short-Term Bond Market Fund; (5) Schwab Total Bond Market Fund; (6) Schwab U.S. Dollar Liquid Assets Fund; (7) Schwab Money Market Fund; (8) Schwab Value Advantage Money Fund; (9) Schwab Retirement Advantage Money Fund; (10) Schwab Investor Money Fund; (11) Schwab Cash Reserves; (12) Schwab Advisor Cash Reserves; and (13) Schwab YieldPlus Fund, the contingent interests of which have passed to (14) Schwab YieldPlus Fund Liquidation Trust.

grounds for relief, including common-law contract claims, alleged violations of California statutory law, and alleged violations of Sections 11, 12, and 15 of the Securities Act of 1933.   Schwab Compl. ¶¶ 329-397.   Like Salix, the Schwab plaintiffs claim that the defendants' suppression of LIBOR caused them to experience financial losses; however, the damages alleged by the Schwab plaintiffs were not based on swap transactions, but rather on the plaintiffs' direct purchase of LIBOR-based financial instruments.   Id. ¶ 14-15, 289-319. According to the complaint, the suppressed LIBOR figure resulted in the plaintiffs receiving artificially low returns on their investments.   Id.

The defendants then filed a notice of removal in the U.S. District Court for the Northern District of California.   As was the case in Salix, the defendants claimed that removal was proper under both the Edge Act and the FSIA.   Schwab Notice of Removal ¶¶ 1-2.   On July 24, 2013, the Schwab plaintiffs responded by filing a motion to remand the case back to California state court, arguing that removal under either the Edge Act or the FSIA was improper.   See generally Pls.' Mem. P. & A. in Supp. of Mot. to Remand ("Schwab Mem.").   The California District Court deferred ruling on the Schwab plaintiffs' motion

until the JPML ruled on whether the case, along with the motion for remand, should be transferred to this Court.

On October 2, 2013, the JPML ordered that, pursuant to 28 U.S.C. § 1407, the Schwab plaintiffs' case should be transferred to this Court because it "shar[es] factual issues arising from allegations concerning defendants' participation in the British Bankers' Association (BBA) London Interbank Offered Rate (Libor) panel."   In re LIBOR-Based Fin. Instruments Antitrust Litig., MDL No. 2262, slip op. at 2 (J.P.M.L. Oct. 2, 2013).  On October 29, 2013, this Court granted the Schwab plaintiffs' application to reinstate their motion to remand their case to California Superior Court.   In deciding their motion for remand, we considered both the parties' original moving papers, as filed in the Northern District of California, as well as supplemental briefing materials submitted in accordance with this Court's direction.

III. **Maragos v. Bank of America Corp., et al.,** 13 Civ. 2297

George Maragos ("Maragos") is the Comptroller of the County of Nassau, New York, and in his official capacity, he filed this action in the Supreme Court of New York on November 27, 2012. The sixteen banks that submitted rates to the U.S. Dollar LIBOR panel, including the Edge Act banks, were named as defendants.

-7-

Similar to the complaint in <u>Salix</u>, the allegations at the core of <u>Maragos</u> are swap transactions in which the plaintiff claims damages on account of receiving payments at a lower interest rate than "true" LIBOR would have provided. <u>Id.</u> ¶¶ 8-9. The swap transactions at issue were between the Nassau County Interim Finance Authority ("NIFA"), on behalf of Nassau County, and bank counterparties. One of these bank counterparties is also a submitter to the U.S. Dollar LIBOR panel (UBS AG), but the other counterparties are not. Nevertheless, Maragos named as defendants all sixteen banks that allegedly suppressed LIBOR through their roles as members of U.S. Dollar LIBOR panel. <u>Id.</u> ¶ 58. Maragos asserted two causes of action against these defendants: common-law fraud and violation of New York General Business Law § 349. <u>Id.</u> ¶¶ 77-94.

On December 21, 2012, a subset of the defendants, including the Edge Act banks, filed a notice for removal in the U.S. District Court for the Eastern District of New York, claiming federal jurisdiction under the Edge Act and the FSIA. Maragos Notice of Removal ¶¶ 1-2. On January 18, 2013, the Honorable Arthur D. Spatt so ordered the plaintiff's voluntary dismissal of defendants RBS Group and WestLB AG ("Portigon"), pursuant to Fed. R. Civ. P. 41(a)(1)(A)(i). Maragos then moved in the Eastern District of New York to remand the case back to New York

state court, asserting that the action was not removable under either the Edge Act or the FSIA.  Before that court ruled on Maragos's remand motion, the JPML transferred the case to this Court, stating that there was "no question that the action has significant factual overlap with the actions already in the MDL."  In re LIBOR-Based Fin. Instruments Antitrust Litig., MDL No. 2262, slip op. at 2 (J.P.M.L. Apr. 1, 2013).  Thus, the plaintiff's motion for remand as it was originally briefed in the Eastern District of New York is now before us for decision.

*          *          *

As discussed above, the defendants in these cases are not identical: while the plaintiffs in Schwab and Maragos sued all or nearly all of the U.S. Dollar LIBOR panel banks, Salix named fewer defendants, most (but not all) of which were its direct counterparties in LIBOR-based swap transactions.[5]  However, because of the similarity of the complaints' allegations and the commonality of the defendants' removal arguments, the Court conducted a single oral argument for all three cases on December 4, 2013.

---

[5] The exceptions to Salix's decision to sue only those banks with which it contracted are RBS and UBS AG.  Although Salix did not have any agreements with these banks, the plaintiff's amended complaint quotes liberally from those banks' settlement agreements with governmental authorities regarding the fixing of LIBOR.  See Salix Am. Compl. ¶¶ 72-98, 136.

DISCUSSION

A defendant may remove a civil action from state to federal court "only if [the case] could have originally been commenced in federal court." Allstate Ins. Co. v. Ace Sec. Corp., No. 11 Civ. 1914(LBS), 2011 WL 3628852, at *3 (S.D.N.Y. Aug. 17, 2011); see 28 U.S.C. § 1441(a). "If a case is removed and a federal district court determines that it lacks jurisdiction over the matter, it must be remanded." Allstate Ins. Co. v. CitiMortgage, Inc., No. 11 Civ. 1927(RJS), 2012 WL 967582, at *2 (S.D.N.Y. Mar. 13, 2012).

"On a motion to remand, the party seeking to sustain the removal, not the party seeking remand, bears the burden of demonstrating that removal was proper." Hodges v. Demchuk, 866 F. Supp. 730, 732 (S.D.N.Y. 1994); see also United Food & Commercial Workers Union, Local 919, AFL-CIO v. CenterMark Props. Meriden Square, Inc., 30 F.3d 298, 301 (2d Cir. 1994). In light of this burden and the limited jurisdiction of federal courts, we must resolve all doubts against removability. See Purdue Pharma L.P. v. Kentucky, 704 F.3d 208, 213 (2d Cir. 2013); In re Methyl Tertiary Butyl Ether ("MTBE") Prods. Liab. Litig., 488 F.3d 112, 124 (2d Cir. 2007).

At oral argument, the parties agreed as a threshold matter that either the Edge Act or the FSIA may act as an independently

-10-

sufficient basis for removal of these cases.  Tr. of Oral Arg. at 5:10-6:6, Dec. 4, 2013.  Thus, we address the defendants' two arguments for federal jurisdiction in turn.

## I.   The Edge Act

The jurisdictional grant of the Edge Act states, in relevant part:

> "[A]ll suits of a civil nature at common law or in equity to which any corporation organized under the laws of the United States shall be a party, arising out of transactions involving international or foreign banking . . . or out of other international or foreign financial operations, either directly or through the agency, ownership, or control of branches or local institutions in dependencies or insular possessions of the United States or in foreign countries, shall be deemed to arise under the laws of the United States, and the district courts of the United States shall have original jurisdiction of all such suits; and any defendant in any such suit may, at any time before the trial thereof, remove such suits from a State court into the district court of the United States . . . .".

12 U.S.C. § 632.  Thus, to claim federal jurisdiction under the Edge Act, a party must establish that: (1) the suit is civil, (2) a corporation organized under the laws of the United States is a party to the suit, and (3) the suit arises out of <u>either</u> (a) transactions involving international or foreign banking <u>or</u> (b) other international or foreign financial operations.  <u>See</u> <u>Am. Int'l Grp. v. Bank of Am. Corp.</u>, 712 F.3d 775, 780 (2d Cir. 2013) ("<u>AIG</u>"); <u>Bayerische Landesbank v. HSBC Holdings PLC</u>, No.

-11-

13 Civ. 3906(AT), 2013 WL 6144762, at *2 (S.D.N.Y. Nov. 18, 2013).

The plaintiffs do not dispute that the defendants meet the first and second elements for Edge Act jurisdiction. Thus, we will focus squarely on the "arises out of" requirement. At oral argument, the parties agreed with the Court's analysis that, under this third element, the "transactions" prong and the "operations" prong are logically distinct and independently sufficient to support removal under the Edge Act. See Tr. of Oral Arg. at 6:7-11; see also Sealink Funding Ltd. v. Bear Stearns & Co., No. 12 Civ. 1397(LTS)(HBP), 2012 WL 4794450, at *4 (S.D.N.Y. Oct. 9, 2012) (emphasizing that the two prongs represent alternative avenues for federal jurisdiction). Therefore, we will first determine the conduct out of which these cases arise, and then we will decide whether such conduct constitutes either a transaction or an operation that confers federal jurisdiction under the Edge Act.

**A. These cases "arise out of" the setting of LIBOR.**

Two of the three sets of plaintiffs contend in their briefing papers that the relevant transactions or operations for determining Edge Act jurisdiction are the actual swaps with or purchases from individual bank defendants. See Salix's Mem. of Law in Supp. of Mot. to Remand at 12 ("Salix Mem.") ("Salix's

claims 'arise out of' swaps entered between U.S.-based Funds and U.S.-based National Banks in the United States . . . ."); Schwab's Nov. 4, 2013 Letter in Supp. of Mot. to Remand ("Schwab Letter") at 2 ("The focus must . . . be on the nature and location of Plaintiffs' investments in LIBOR-based financial instruments issued or sold by the National Bank Defendants.").[6] The defendants counter that the plaintiffs' claims arise out of the setting of LIBOR itself. <u>See</u> Mem. of Law in Opp'n to Salix's Mot. to Remand ("Salix Opp'n") at 10 ("The claims in this action arise from the alleged manipulation of LIBOR . . . ."); Defs.' Mem. of P. & A. in Opp'n to Schwab's Mot. to Remand ("Schwab Opp'n") at 15 ("The alleged manipulation of LIBOR in London by the national banks and their mostly foreign co-defendants is the very essence of this action."); Mem. of Law in Opp'n to Maragos's Mot. to Remand and in Supp. of Defs.' Cross-Mot. for a Stay ("Maragos Opp'n") at 11 (beginning their argument by noting that "the conduct complained of [is] the allegedly inaccurate fixing of LIBOR").

---

[6] Maragos does not take a position regarding whether his case arises out of the setting of LIBOR or the actual swap transactions between NIFA and bank counterparties. He argues that, regardless of the relevant conduct, neither the setting of LIBOR nor the swap transactions at issue are the sort of "transactions" or "operations" covered by the Edge Act. <u>See</u> Mem. of Law in Supp. of Maragos's Mot. to Remand ("Maragos Mem.") at 4–9. We address the assertion that the setting of LIBOR is not conduct falling under the ambit of the Edge Act in Part I.B, <u>infra</u>.

We agree with the defendants.  First, in each of the operative complaints, the plaintiffs either state explicitly or imply that their causes of actions arise out of the setting of LIBOR.  <u>See</u> Schwab Compl. ¶ 5 ("The case arises from the manipulation of LIBOR for the U.S. dollar . . . ."); Maragos Compl. ¶ 1 ("This cases arises from manipulation of the London Interbank Offered Rate ("LIBOR") by various prominent financial institutions."); Salix Am. Compl. ¶ 3 ("The [defendants] abused their control over Libor in order to reap massive profits at the expense of investors like the [plaintiff]."). Second, each of the plaintiffs sued LIBOR panel banks who were not direct counterparties to their financial transactions: the Schwab plaintiffs and Maragos broadly sued all or nearly all of the panel banks, and Salix sued RBS and UBS AG, two banks with which Salix had never transacted directly. Third, and perhaps most importantly, the plaintiffs agreed at oral argument that if there had been no manipulation of LIBOR, these cases would never have been brought. Tr. of Oral Arg. at 7:14−16.  This acknowledgement demonstrates that even if each of the plaintiffs had sued only those panel banks with which they had entered into contracts, those hypothetical cases would still "arise out of" the setting of LIBOR.

The plaintiffs suggest that this "interpretation of the Edge Act would eviscerate the rule that the Edge Act must be read narrowly." Salix Mem. at 11. However, no such rule exists. "Judicial attempts to construe the Edge Act have generated a variety of disparate results." Sealink, 2012 WL 4794450, at *5. While some courts here in the Southern District have employed the narrow view urged by the plaintiffs, others have endorsed the idea that the Edge Act should sweep broadly. Compare Weiss v. Hager, No. 11 CV 2740(VB), 2011 WL 6425542, at *3 (S.D.N.Y. Dec. 19, 2011) (calling for a narrow interpretation of § 632) and Bank of N.Y. v. Bank of Am., 861 F. Supp. 225, 232 (S.D.N.Y. 1994) (same) with Bank of Am. Corp. v. Lemgruber, 382 F. Supp. 2d 200, 215 (S.D.N.Y. 2005) (calling for a broad interpretation of the same statute) and In re Lloyd's Am. Trust Fund Litig., 928 F. Supp. 333, 340 (S.D.N.Y. 1996) (same). Regardless of whether we view the Edge Act through a restrictive or an expansive lens, these actions "arise out of" the setting of LIBOR in the purest sense of the phrase: without the alleged manipulation of the rate, the cases would not have been filed. Thus, even if there was a narrow construction rule, we would reach the same conclusion.

Further, the plaintiffs caution that our interpretation of the Edge Act would confer federal jurisdiction "over any claim

against a national bank relating in any way to Libor." Salix
Mem. at 11; see also Schwab Mem. at 12 (suggesting that finding
jurisdiction based on the setting of LIBOR would confer
jurisdiction over "any claim relating in any way to the setting
of LIBOR"). Such a concern is misplaced. As discussed above,
these are not cases that relate to LIBOR in some tangential or
incidental sense. The essence of the plaintiffs' claims is that
they were harmed because of the defendants' alleged manipulation
of LIBOR. A determination that these cases "arise out of" the
setting of LIBOR does not portend a great expansion of Edge Act
jurisdiction; rather, it is a common-sense assessment of where
these cases "originate" and "stem from." Black's Law Dictionary
122 (9th ed. 2009) (defining the verb "arise").

Finally, the plaintiffs' briefs cite the Second Circuit's
recent decision in AIG as a significant limitation on the scope
of the Edge Act's jurisdictional grant. See Salix Mem. at 6-7;
Schwab Letter at 1-2. We understand AIG as inserting a formal
nexus requirement into the Edge Act: section 632 only confers
federal jurisdiction if the suit "arise[s] out of an offshore
banking or financial transaction of that federally chartered
corporation." AIG, 712 F.3d at 784 (emphasis added); see also
Dexia SA/NV v. Bear, Stearns & Co., Inc., No. 12 Civ. 4761(JSR),
2013 WL 2136508, at *3 (May 17, 2013) (applying AIG to find that

-16-

the federal chartered bank defendant must "itself engage in the foreign banking transactions on the basis of which the defendants [seek] removal"); Racepoint Partners, LLC v. JPMorgan Chase Bank, Nos. 06 CIV. 2500 & 2501(MGC), 2006 WL 3044416, at *2-3 (S.D.N.Y. Oct. 26, 2006) (finding that an international transaction that was to be used as evidence, rather than as the central conduct out of which the case arises, is insufficient to confer federal jurisdiction under the Edge Act); Lazard Frères & Co. v. First Nat. Bank of Maryland, No. 91 Civ. 0628 (KMW), 1991 WL 221087, at *1 (S.D.N.Y. Oct. 15, 1991) ("[A] district court cannot find that it has § 632 jurisdiction merely because there was a federally chartered bank involved, there were banking activities, and there were foreign parties.").

But the holding of AIG proves unavailing for the plaintiffs here.  There is a clear nexus between the federally chartered bank defendants and the conduct out of which these actions arise; Bank of America, Citibank, and JPMorgan Chase are undisputedly (1) federally chartered corporations, (2) defendants in all three of the cases before the Court (as discussed above), and (3) submitters to the U.S. Dollar LIBOR panel.  See British Bankers' Ass'n, US Dollar Panel (May 2012), http://www.bbalibor.com/panels/usd.  Because we conclude that these cases arise out of submissions to the LIBOR panel --

including those by the Edge Act banks -- there is clearly a sufficient nexus between the relevant parties and the relevant conduct to confer Edge Act jurisdiction under AIG.

Thus, we find that the cases sub judice "arise out of" the defendants' allegedly misleading submissions to the LIBOR panel. These submissions are the core of the plaintiffs' complaints -- without this alleged misconduct, there would be no cases at all. Our interpretation of the Edge Act here is a common-sense application of the statutory language.  Furthermore, AIG is not an impediment to federal jurisdiction here, as there are federally chartered bank defendants who directly engaged in the setting of LIBOR, the conduct out of which these cases arise.

**B. The setting of LIBOR is an "international or foreign financial operation."**

The plaintiffs assert that, even if the Court were to decide that these cases arise out of the setting of LIBOR, this activity does not constitute an "international or foreign financial operation" under the Edge Act.[7]  See Salix's Reply Mem. of Law in Supp. of Mot. to Remand ("Salix Reply") at 8 ("Defendants' Libor submissions cannot meet the 'financial operations' prong of the Edge Act."); Reply in Further Supp. of

---

[7] The plaintiffs also contend that the setting of LIBOR would not qualify as a "transaction involving international or foreign banking."  However, because we find that there is jurisdiction under the operations prong of the Edge Act, we do not address those arguments.

-18-

Schwab's Mot. to Remand ("Schwab Reply") at 10 ("[T]he setting
of LIBOR is not a 'financial operation' within the Edge Act's
ambit."); Reply Mem. of Law in Further Supp. of Maragos's Mot.
to Remand and in Opp'n to Defs.' Cross-Mot. for a Stay ("Maragos
Reply") at 9 ("Defendants have cited no precedent suggesting
that anything involved with the setting of LIBOR satisfies the
jurisdiction requirements of the Edge Act."). In response, the
defendants claim that the fixing of LIBOR "is quintessentially a
banking operation" and that it must "be [a] financial
operation[] by any view of the common sense of that term." Tr.
of Oral Arg. at 13:2-3, 16:18-19.

Historically, cases have focused more on the "transactions"
prong of the Edge Act than on the "operations" one. See Steven
M. Davidoff, Section 632: An Expanded Basis of Federal
Jurisdiction for National Banks, 123 Banking L.J. 687, 695
(2006) (discussing "the absence of any judicial discussion or
recognition of the potential applicability of the second prong
of Section 632" and later describing this absence as a "judicial
attention deficit"). As a result, the "operations" prong has
remained largely undefined. See Sealink, 2012 WL 4794450, at *5
("[T]he case law offers little guidance as to the scope of the
'other international or foreign financial operations' prong,

-19-

other  than  to  observe  that  it  means  something  other  than banking.").

One  approach  has  been  to  treat  the  operations  prong  as  a broad,  catch-all  provision  intended  to  cover  conduct  beyond  mere banking  transactions.    See  Stamm  v.  Barclays  Bank  of  N.Y., No. 96  Civ.  5158(SAS),  1996  WL  614087,  at  *2  (S.D.N.Y.  Oct.  24, 1996)  (describing  "financial  operations"  as  a  "general  statutory category");  In  re  Lloyd's,  928  F.  Supp.  at  341  (finding  that "[e]ven  if  the  transactions  in  question  here  do  not  constitute banking  proper  .  .  .  they  surely  fall  within  the  ambit  of  the 'financial  operations'  contemplated  by  the  statute").    A  second approach,  favored  by  the  plaintiffs,  is  to  apply  the  Black's  Law Dictionary's  relatively  narrow  definition  of  the  verb  "finance" --  "to  raise  or  provide  funds"  --  to  the  Edge  Act  operations prong.    Black's  Law  Dictionary  706  (9th  ed.  2009).    This approach  also  has  some  support  in  the  case  law.    See,  e.g., Landesbank  Baden-Wurttemberg  v.  Capital  One  Fin.  Corp.,  Nos.  12 Civ.  5907,  5909,  5911(MGC),  2013  WL  3743161,  at  *2-3  (S.D.N.Y. Jul.  17,  2013);  Lemgruber,  382  F.  Supp.  2d  at  215  n.13;  Stamm  v. Barclays  Bank  of  N.Y.,  960  F.  Supp.  724,  728  (S.D.N.Y.  1997). Plaintiffs  claim  that  limiting  the  "financial  operations"  prong to  acts  of  fundraising  in  some  form  better  captures  the  usual meaning  of  the  term.    See  Salix  Reply  at  1;  Schwab's  Nov.  15,

2013 Letter in Further Supp. of Mot. to Remand ("Schwab Reply Letter") at 2.

However, we find the argument advanced by the plaintiffs to be untenable.  The starting point must be the plain meaning of the phrase "financial operations."  <u>See</u> <u>Racepoint</u>, 2006 WL 3044416, at *3 ("The phrase 'financial operations' in Section 632 is read according to its usual meaning."); <u>see also</u> <u>Perrin v. United States</u>, 444 U.S. 37, 42 (1979) ("[U]nless otherwise defined, words [in a statute] will be interpreted as taking their ordinary, contemporary, common meaning.").  In deriving that meaning, the Court respectfully disagrees with those cases which adopt the plaintiffs' proposed definition of "finance." We believe that it would be more logically sound to use the definition of the <u>noun</u> "finance," rather than the <u>verb</u> "finance," to understand the <u>adjective</u> "financial" as used to modify the word "operations" in the language of the Edge Act. The noun "finance" is defined as "[t]hat aspect of business concerned with the management of money, credit, banking, and investments."  Black's Law Dictionary 706 (9th ed. 2009).  This more expansive definition more accurately captures the way that the word "financial" is used in common parlance, and deriving

the adjective "financial" from the noun "finance," as opposed to the verb, better comports with linguistic conventions.[8]

Using this definition of the term "financial" makes clear that the fixing of LIBOR qualifies as an "international or foreign financial operation" under the Edge Act. As a threshold matter, this Court has already found that the conduct of the BBA, including the setting of LIBOR, "is plainly a foreign enterprise." In re LIBOR, 935 F. Supp. 2d at 733. Next, based on the definition above, the defendants' submissions of LIBOR figures are certainly "concerned with the management of money, credit, banking, and investments," as these submissions collectively set the benchmark that "determin[es] interest rates for trillions of dollars in financial instruments" worldwide. Schwab Compl. ¶ 5; see also Salix Am. Compl. ¶ 1; Maragos Compl. ¶ 2. It would be wholly illogical for this Court to conclude that the action of setting the London InterBank Offered Rate through submissions to British Bankers' Association, is not "concerned with . . . banking." And finally, each bank's

---

[8] The suffix "-al" or "-ial" is generally appended to a noun, not a verb, to convert the word into an adjective. For example, "autumn" becomes "autumnal," "recreation" becomes "recreational," and "manager" becomes "managerial." By contrast, adding the suffix "-al" or "-ial" to a verb typically transforms the word into a noun, not an adjective. For example, "arrive" becomes "arrival" and "rehearse" becomes "rehearsal." See also Merriam-Webster's Collegiate Dictionary 26, 573 (10th ed. 1998) (defining "-al" and "-ial" as adjective suffixes meaning "of, relating to, or characterized by," which implies that the root word must be a noun, not a verb).

regular submissions of their U.S. Dollar LIBOR fix to the panel, done every day at the same time, is plainly an "operation" under a common-sense understanding of that word.

In sum, the conduct out of which these cases arise -- the submission of rates to the U.S. Dollar LIBOR panel -- is an "international or foreign financial operation" under the Edge Act.  Thus, this Court has jurisdiction, and we therefore deny the plaintiffs' motions for remand.[9]

## II.  The Foreign Sovereign Immunities Act

Because we find that jurisdiction in these cases can be premised on the Edge Act, we need not address the parties' arguments regarding the FSIA.  That said, the Court notes that the FSIA could potentially provide an independent avenue for federal jurisdiction in each of these cases.

### A. Salix and Maragos

First, in both <u>Salix</u> and <u>Maragos</u>, the defendants removed the cases to federal court under the FSIA on the grounds that there was a party to the case that was majority owned by a foreign sovereign.  <u>See</u> Salix Notice of Removal ¶¶ 24-30 (basing federal jurisdiction on the inclusion of RBS Group, which is

---

[9] As discussed above, the Edge Act confers federal jurisdiction if the case at bar arises out of <u>either</u> "international or foreign financial operations" <u>or</u> "transactions involving international or foreign banking."  Therefore, we do not address in this Memorandum and Order whether the fixing of LIBOR would also constitute a "transaction" under the Edge Act.

approximately 80% owned by the United Kingdom, as a defendant); Maragos Notice of Removal ¶¶ 23-27 (basing federal jurisdiction on the inclusion of Portigon, which is approximately 69% owned by the German state of North Rhine-Westphalia, as a defendant).

The plaintiffs do not dispute the foreign ownership of RBS Group and Portigon. However, both Salix and Maragos eliminated the majority foreign-owned entities from their respective complaints: Salix filed an amended complaint removing RBS Group as a defendant, and Maragos voluntarily discontinued the action against Portigon pursuant to Fed. R. Civ. P. 41(a)(1)(A)(i).[10] Both plaintiffs claim that dismissing these defendants also eliminates the grounds for removal under the FSIA. Salix Mem. at 19-20; Maragos Mem. at 10-11.

However, the general rule is that a defendant's right to remove a case to federal court is fixed at the time of removal. See Rockwell Int'l Corp. v. United States, 549 U.S. 457, 474 n.6 (2007) (noting that "an amendment eliminating the original basis for federal jurisdiction generally does not defeat jurisdiction"); Pullman Co. v. Jenkins, 305 U.S. 534, 537 (1939) ("The second amended complaint should not have been considered

---

[10] Although Salix eliminated RBS via an amended complaint and Maragos employed a dismissal pursuant to Rule 41(a) to remove Portigon, we believe that this is a distinction without a difference. See Chambers v. Time Warner, Inc., No. 00 Civ. 2839(JSR), 2003 WL 1107790, at *2 (S.D.N.Y. Mar. 12, 2003) ("[A] Rule 15(a) amendment eliminating a claim is the same as a Rule 41(a) dismissal of the claim.").

in determining the right to remove, which . . . was to be determined according to the plaintiffs' pleading at the time of the petition for removal."); Vera v. Saks & Co., 335 F.3d 109, 116 n.2 (2d Cir. 2003) ("[W]e generally evaluate a defendant's right to remove a case to federal court at the time the removal notice is filed."). Therefore, the defendants have a cogent argument that they were entitled to remove these cases under the FSIA because majority foreign-owned defendants existed in the operative complaints at the time of removal.

Practically, however, removal based on the FSIA in these cases would have minimal impact on the course of the respective litigations. As defendants conceded during oral argument, there is nothing to prevent Salix and Maragos from voluntarily dismissing their federal cases without prejudice and then simply re-filing them in state court without suing any of the majority foreign-owned defendants. Tr. of Oral Arg. at 19:16-20:4; see Fed. R. Civ. P. 41(a). Because we have found jurisdiction under the Edge Act, we decline to grapple with the tensions between the technical rules of removal and the practical implications of adhering to those rules when they are likely to unnecessarily expend judicial resources. We only note that precedent indicates that the defendants' arguments in Salix and Maragos for federal jurisdiction under the FSIA have merit.

**B. Schwab**

As in <u>Salix</u> and <u>Maragos</u>, the defendants in <u>Schwab</u> sought removal on the grounds that majority foreign-owned defendants were named as defendants in the complaint.  Schwab Notice of Removal ¶¶ 21-29 (based on the inclusion of both RBS Group and Portigon).  Unlike the <u>Salix</u> and <u>Maragos</u> plaintiffs, the Schwab plaintiffs did not eliminate RBS Group and Portigon from their pleadings.  Rather, they argued that the FSIA does not apply because their case arises under the Securities Act of 1933 ("the Securities Act" or "the Act").  Schwab Ltr. at 1-2.  The Act provides, in relevant part, that "no case arising under [the Act] and brought in any State court of competent jurisdiction shall be removed to any court of the United States."  15 U.S.C. § 77v(a).

We believe that this argument is fatally flawed on two grounds.  First, the plaintiffs' argument requires the Court to conclude that the Securities Act must trump the FSIA for jurisdictional purposes.  We reject that proposition.  "[The FSIA] expresses an intention to give sovereign foreign defendants an <u>absolute right</u> to a federal forum . . . ."  <u>Noonan v. Possfund Invs., Ltd.</u>, No. 89 Civ. 2903 (WK), 1994 WL 515440, at *2 (S.D.N.Y. Sept. 3, 1993) (emphasis added) (quoting <u>Teledyne, Inc. v. Kone Corp.</u>, 892 F.2d 1404, 1409 (9th Cir.

-26-

1989)).  Given "Congress's intent to give foreign states a clear right of removal," we believe that such a right under the FSIA "is paramount" and would likely trump the contradictory language of the Securities Act.  19A Charles Alan Wright et al., Federal Practice and Procedure App. G, Revision Pt. III, Rptr. Note F (2013).

Second, the Schwab plaintiffs' Securities Act claims are plainly untimely pursuant to the Act's three-year statute of repose.  15 U.S.C. § 77m.  The plaintiffs make no allegation that their claims are based on a public securities offering made after April 29, 2010.[11]  In the Second Circuit, the Act's statute of repose is not subject to tolling under American Pipe & Construction Co. v. Utah, 414 U.S. 538 (1974).  See Police & Fire Ret. Sys. of Detroit v. IndyMAC MBS, Inc., 721 F.3d 95, 109 (2d Cir. 2013); Caldwell v. Berlind, No. 13-156-cv, 2013 WL 5779021, at *2 (S.D.N.Y. Oct. 28, 2013).[12]  Thus, the Schwab plaintiffs' Securities Act claims are time-barred and cannot serve as the basis to defeat federal jurisdiction.

Therefore, the Schwab action was properly removed to this Court under both the Edge Act and the FSIA.

---

[11] Schwab filed their operative complaint on April 29, 2013.
[12] The Schwab plaintiffs concede that the Act's statute of repose renders their claim untimely unless the Second Circuit's decision in IndyMAC is reversed by the Supreme Court.  Schwab Reply Letter at 2; Tr. of Oral Arg. at 22:10-13.

## CONCLUSION

For the foregoing reasons, the plaintiffs' motions to remand are denied.

**SO ORDERED.**

Dated:    New York, New York
          December 27, 2013

                                    NAOMI REICE BUCHWALD
                                    UNITED STATES DISTRICT JUDGE